THE HONORABLE _____

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SEATTLE CITY EMPLOYEES' RETIREMENT SYSTEM, an agency of the City of Seattle,<br><br>           Plaintiff,<br><br>    v.<br><br>EPSILON GLOBAL ACTIVE VALUE FUND II, LTD., a British Virgin Islands corporation, EPSILON GLOBAL MASTER FUND II, L.P., a limited partnership formed under the laws of the Cayman Islands, EPSILON INVESTMENT MANAGEMENT, LLC, a Delaware limited liability company, EPSILON GLOBAL ASSET MANAGEMENT LTD., a corporation formed under the laws of the Cayman Islands, and STEVEN G. STEVANOVICH, a resident of Florida,<br><br>           Defendants. | No. _____<br><br>NOTICE OF REMOVAL |

TO:    The Clerk, United States District Court
         for the Western District of Washington at Seattle

**1.    Removal of State Court Action**

Defendants Epsilon Global Active Value Fund II, Ltd. ("Epsilon II"), Epsilon Global

Master Fund II, L.P. ("Epsilon Master Fund II"), Epsilon Investment Management, LLC

("Epsilon Investment Management"), Epsilon Global Asset Management Ltd. ("Epsilon Asset

Management"), and Steven G. Stevanovich (collectively "Defendants") are parties in the above-

NOTICE OF REMOVAL (NO. _____) – 1

**Perkins Coie** LLP
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

entitled civil action commenced on March 15 2010, and still pending in the Superior Court of the

State of Washington for King County, as Cause No. 10-2-10235-3 SEA. Through this Notice,

Defendants pray that this action be removed to this Court from the Superior Court of the State of

Washington for King County.

## 2.    Basis for Jurisdiction in Federal Court

a.    Plaintiff Seattle City Employees' Retirement System is, and has been since

the commencement of this action, an agency of the City of Seattle and therefore a citizen of the

State of Washington for diversity purposes. Compl. ¶ 1; *Moor v. County of Alameda*, 411 U.S.

693, 718 (1973) (for purposes of diversity jurisdictions, political subdivisions are citizens of their

respective states).

b.    Citizenship of Defendants

i.    Defendant Epsilon II is, and has been since this action was

commenced, a corporation incorporated in the British Virgin Islands, with its principal place of

business in the British Virgin Islands. Decl. of Edmund P. Bergan, Jr. ("Bergan Decl.") ¶ 2 and

Ex. 1.

ii.    Defendant Epsilon Master Fund II is, and has been since the

commencement of this action, a limited partnership. Bergan Decl. ¶ 2 and Ex. 1. For diversity

purposes, Epsilon Master Fund II is *not* a citizen of Washington, and has not been since the

commencement of this action. Bergan Decl. ¶ 2 and Ex. 1 (identifying citizenship of partners).

*See Johnson v. Columbia Props. Anchorage, L.P.*, 437 F.3d 894 (9th Cir. 2006) (for diversity

purposes, citizenship of partnership/LLC is every state in which partners/members are citizens;

the citizenship of a trust is the citizenship of its trustee(s)).

iii.    Defendant Epsilon Investment Management is, and has been since

the commencement of this action, a Delaware limited liability company. Bergan Decl. ¶ 2 and

Ex. 1. For diversity purposes, Epsilon Investment Management is *not* a citizen of Washington,

NOTICE OF REMOVAL (NO. _____ ) – 2

**Perkins Coie** LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone: 206.359.8000
Fax:  206.359.9000

73288-0001/LEGAL17938004.2

and has not been since the commencement of this action. Bergan Decl. ¶ 2 and Ex. 1 (identifying citizenship of members).

iv.    Defendant Epsilon Asset Management is, and has been since the commencement of this action, a corporation incorporated in the Cayman Islands, with its principal place of business in the Cayman Islands. Bergan Decl. ¶ 2 and Ex. 1.

v.    Defendant Stevanovich is an individual who is, and has been since this action was commenced, a resident and citizen of the State of Florida. Bergan Decl. ¶ 2 and Ex. 1.

vi.    None of the Defendants is a citizen of Washington for diversity purposes, and therefore complete diversity exists and has existed since the commencement of this action.

c.    Amount in Controversy

i.    Plaintiff's Complaint includes a claim for injunctive relief to "prevent[] Epsilon II from paying any management fee to Epsilon [Investment] Management, or any other entity, while redemptions are not being permitted from Epsilon II." Compl. ¶ 48. The jurisdictional minimum for diversity jurisdiction is satisfied because the value of the injunctive relief sought exceeds $75,000.

ii.    Under the terms of agreements at issue in this action (Epsilon II Offering Memoranda and Articles of Association), on the last day of each quarter, Epsilon Asset Management is entitled to receive a management fee from Epsilon II equal to 0.5% of the total net asset value of Epsilon II (as of the last day of the quarter—that is, as of March 31, 2010, for the first quarter of 2010). Bergan Decl. ¶ 4.

iii.    On February 4, 2010, Epsilon II temporarily suspended the redemption of shares, Compl. Ex. C, and the suspension has remained in effect to date and will remain in effect beyond March 31, 2010, Bergan Decl. ¶ 3. Thus, the injunctive relief sought by Plaintiff would prevent Epsilon II from paying Epsilon Asset Management the management fee

NOTICE OF REMOVAL (NO. _____ ) – 3

**Perkins Coie** LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

73288-0001/LEGAL17938004.2

for the first quarter of 2010 (and future management fees, depending on how long redemptions are suspended).

        iv.    The total net asset value of Epsilon II funds on March, 31, 2010, is no less than $26 million. Bergan Decl. ¶ 5. Thus, the management fee owed to Epsilon Asset Management for the first quarter of 2010 is no less than $130,000 (i.e., 0.5% of $26 million). Bergan Decl. ¶ 6. Because this amount exceeds $75,000, the amount-in-controversy requirement for diversity jurisdiction is satisfied. The same is true for the prorated amount covering the period from February 4 through March 31, 2010 (56 of 90 days), which is no less than $80,889 (i.e., 56/90 of $130,000). Bergan Decl. ¶ 7.

        d.    Thus, this Court has original jurisdiction over the subject matter of this action under 28 U.S.C. § 1332 because plaintiff and defendants are citizens of different states and the amount in controversy is in excess of $75,000, exclusive of costs and interest.

### 3.    Propriety of Removal

This action is removable to this Court under 28 U.S.C. § 1441 because this Court would have had original jurisdiction over plaintiff's claims had plaintiff elected to file the action initially in federal court. This Court is the United States District Court for the district and division embracing the place where the state court action is pending, and is therefore the appropriate court for removal pursuant to 28 U.S.C. § 1441(a).

### 4.    Receipt of Initial Pleading and Timeliness of Removal

Defendants received initial notice of Plaintiff's Summons and Complaint by email on March 15, 2010, the date the Complaint was filed. This Notice of Removal is filed within thirty (30) days of service, as required by 28 U.S.C. § 1446(b).

### 5.    The State-Court Complaint and other Pleadings

Attached to this Notice is a true copy of the Complaint that plaintiff filed in the action pending in state court. All other process, pleadings, or orders filed in the state court in this action will be filed, together with the verification of defendants' counsel, as promptly as possible.

NOTICE OF REMOVAL (NO. _____) – 4

**Perkins Coie** LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

73288-0001/LEGAL17938004.2

DATED this 31st day of March, 2010.

PERKINS COIE LLP

By: *s/ Harry H. Schneider Jr.*
    Harry H. Schneider, Jr., WSBA No. 09404
    Joseph M. McMillan, WSBA No. 26527
    Jeffrey M. Hanson, WSBA No. 34871

Attorneys for Defendants

NOTICE OF REMOVAL (NO. _____) – 5

73288-0001/LEGAL17938004.2

1
2
3
4
5
6

7

SUPERIOR COURT OF WASHINGTON IN AND FOR KING COUNTY

8
9

SEATTLE CITY EMPLOYEES'
RETIREMENT SYSTEM, an agency of the
City of Seattle,

Cause No.  10-2-10235-3 SEA

10

                             Plaintiff,

11

    v.

COMPLAINT FOR INJUNCTIVE
RELIEF

12
13
14
15
16
17

EPSILON GLOBAL ACTIVE VALUE FUND
II, LTD., a British Virgin Islands corporation,
EPSILON GLOBAL MASTER FUND II, L.P.,
a limited partnership formed under the laws of
the Cayman Islands, EPSILON INVESTMENT
MANAGEMENT, LLC, a Delaware limited
liability company, EPSILON GLOBAL ASSET
MANAGEMENT LTD., a corporation formed
under the laws of the Cayman Islands, and
STEVEN G. STEVANOVICH, a resident of
Florida,

18

                           Defendants.

19
20
21

     For its complaint against Epsilon Global Active Value Fund II, Ltd., Epsilon Global Master Fund II, L.P., Epsilon Global Asset Management Ltd., Epsilon Investment Management, LLC and Steven G. Stevanovich, Plaintiff alleges as follows:

22

## I.  PARTIES

23
24
25
26

     1.     Plaintiff, Seattle City Employees' Retirement System ("SCERS"), is an agency of the City of Seattle.  SCERS provides retirement, disability and survivors' benefits to the City of Seattle's employees.  SCERS currently manages pension investments for over 15,000 current, former, and retired City of Seattle employees and surviving beneficiaries.  SCERS is

COMPLAINT FOR INJUNCTIVE RELIEF - 1

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

1  administered in Seattle, King County, Washington.

2     2.     Upon information and belief, Defendant Epsilon Global Active Value Fund II, Ltd.

3  ("Epsilon II") is a British Virgin Islands private investment corporation. Epsilon II conducts

4  business in King County, Washington. Further, Epsilon II's legal counsel, Monahan & Biagi,

5  PLLC, is located in Seattle, King County, Washington. Defendant Steven G. Stevanovich is an

6  active director of Epsilon II. As director, Stevanovich is responsible for Epsilon II's operations

7  and activities.

8     3.     Upon information and belief, Defendant Epsilon Global Master Fund II, L.P.

9  ("Epsilon Master Fund") is a limited partnership formed under the laws of the Cayman Islands.

10  All assets of Epsilon II and the proceeds from the sale of additional shares of common stock of

11  Epsilon II are invested through Epsilon Master Fund. As a result, Epsilon II's current financial

12  position is directly tied to Epsilon Master Fund. As with Epsilon II, Stevanovich is an active

13  director of Epsilon Master Fund. As director, Stevanovich is responsible for Epsilon Master

14  Fund's operations and activities.

15     4.     Upon information and belief, Defendant Epsilon Global Asset Management Ltd.

16  ("Epsilon Global") is a corporation formed under the laws of the Cayman Islands.

17  Epsilon Global is the General Partner and Investment Manager of Epsilon Master Fund.

18  Epsilon Global was the former Investment Manager of the Epsilon II, and as such, was solely

19  responsible for the trading and investment decisions of Epsilon II. Stevanovich is the manager of

20  Epsilon Global and, therefore, was responsible for the investment decisions of Epsilon II when

21  Epsilon Global was the Investment Manager of Epsilon II and is responsible for the investment

22  decisions of Epsilon Master Fund as the current Investment Manager of Epsilon Master Fund.

23     5.     Upon information and belief, Defendant Epsilon Investment Management, LLC

24  ("Epsilon Management") is a Delaware limited liability company. Epsilon Management is the

25  current investment manager for Epsilon II. Epsilon Management provides services for the

26  Epsilon II's operation including analysis and recommendations related to Epsilon II's trading and

COMPLAINT FOR INJUNCTIVE RELIEF - 2

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

1  investments transactions. Stevanovich is the manager of Epsilon Management. In particular,

2  Stevanovich is the President and Founder of Epsilon Management, acts as Epsilon

3  Management's Chief Financial Officer, is responsible for risk management, has responsibility

4  over all trading activities, has ultimate and final authority to approve trades, is involved in every

5  trading decision, has sole authority with respect to cash movements, and all staff of Epsilon

6  Management ultimately report to Stevanovich. Epsilon Management solicited investments in

7  Epsilon II through correspondence and in-person visits to Seattle. Epsilon Management, as the

8  investment manager of Epsilon II, also regularly communicates with SCERS with respect to

9  SCERS's investment in Epsilon II.

10      6.    Upon information and belief, Defendant Steven G. Stevanovich ("Stevanovich")

11  resides in DelRay Beach, Florida. Stevanovich is an active director of Epsilon II and Epsilon

12  Master Fund and as such, is responsible for Epsilon II and Epsilon Master Fund's operations and

13  activities. Stevanovich is also the manager of Epsilon Global and as such, is responsible for the

14  investment decisions of Epsilon Master Fund (which SCERS invests in, through Epsilon II).

15  Stevanovich is also the manager of Epsilon Management, and as such, is responsible for the

16  investment decisions of Epsilon II.

17      7.    Upon information and belief, Stevanovich (or if not him, through his employees)

18  solicited investment in Epsilon II (and through Epsilon II, investment in the Epsilon Master

19  Fund) in-person in Seattle, King County, Washington.

## II. JURISDICTION AND VENUE

21      8.    **Personal Jurisdiction**.  This Court has personal jurisdiction over Defendants

22  because they conduct business in King County, Washington. Further, Defendants solicited

23  SCERS to invest in Epsilon II through correspondence and through a presentation in Seattle

24  touting the benefits of Epsilon II, the Epsilon Master Fund, and the Epsilon family of companies.

25      9.    **Subject Matter Jurisdiction**. This Court has subject matter jurisdiction over this

26  matter because the subject of this action is a contractual relationship entered into in King County,

COMPLAINT FOR INJUNCTIVE RELIEF - 3

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

1    Washington.

2        10.    **Venue.**  Venue for this action lies in this Court pursuant to RCW 4.12.020(3) and

3    RCW 4.12.025(1) and (3) because (a) Defendants transact business in King County, Washington;

4    (b) Defendants transacted business in King County, Washington at the time this cause of action

5    arose; and (c) the contractual relationship serving as the basis of the lawsuit was entered into

6    King County, Washington.  Venue also lies in this Court because the parties agreed that actions

7    in connection with the investment could be brought in "any court of competent jurisdiction."

8    King County is the "competent jurisdiction" of Plaintiff's choosing.

9                                    **III. FACTS**

10   **A.    SCERS's Investment in Epsilon II.**

11       11.    In or about May 2003, Epsilon Management solicited SCERS to invest in

12   Epsilon II. Solicitation of SCERS for investment in Epsilon II (and through it, investment in the

13   Epsilon Master Fund) occurred both through correspondence and in-person in Seattle,

14   King County, Washington.

15       12.    Between May 2003 and December 2003, Epsilon Management provided a

16   Confidential Offering Memorandum, dated January 2003, to SCERS for investment in

17   Epsilon II. The January 2003 Confidential Offering Memorandum is attached as Exhibit A.

18       13.    In or about December 2003, SCERS accepted the terms offered in the Confidential

19   Offering Memorandum and executed a Subscription Agreement and Standing Proxy, by which it

20   purchased shares in Epsilon II. SCERS purchased additional shares in Epsilon II in or about

21   January 2005. In total, SCERS has invested approximately $20,000,000 in Epsilon II. The

22   Subscription Agreements and Standing Proxies executed by SCERS are attached as Exhibit B.

23   **B.    Epsilon II Is Required To Provide Annual Reports, Annual Audited Financial
         Statements, And Quarterly Investment Reports to SCERS.**

24
25       14.    Under the January 2003 Confidential Offering Memorandum, Epsilon II is

26   obligated to provide an annual report and an annual audited financial statement to SCERS within

COMPLAINT FOR INJUNCTIVE RELIEF - 4

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

1   120 days following the conclusion of each fiscal year.

2        15.    Under the January 2003 Confidential Offering Memorandum, Epsilon II is also

3   obligated to provide a quarterly investment report, describing Epsilon II's activities.

4        16.    Historically, Epsilon Management has provided these reports and statements to

5   SCERS.

6   **C.    Defendants Failed To Provide A 2008 Annual Report And Audited Financial**
        **Statement.**
7
         17.    Epsilon II was required to provide the 2008 annual report and the 2008 audited
8
    financial statement by May 1, 2009.  Defendants did not meet this deadline.
9
         18.    Following Defendants' failure to provide the 2008 annual report and audited
10
    financial statements within the contractually mandated time frame, SCERS inquired as to its
11
    whereabouts.  SCERS was informed by Epsilon Management that they had yet to complete their
12
    audited financials for 2008, but that the annual report and audited financials would be
13
    forthcoming.
14
         19.    To date, Defendants Epsilon II and Epsilon Management have yet to provide the
15
    2008 annual report and 2008 audited financial statement.
16
    **D.    Following A Redemption Request From SCERS, Stevanovich Suspended**
17      **Redemption Of Shares In Epsilon II And Other Funds That He Manages.**

18       20.    On or about January 28, 2010, SCERS notified Epsilon Management that it would

19  like to redeem its investment in Epsilon II.  In response, on or about February 4, 2010,

20  Stevanovich, writing on Epsilon Management letterhead, stated that redemptions in Epsilon II

21  had been suspended because: (1) an unrelated fund, Westford I, also managed by Stevanovich,

22  was under investigation by the Securities and Exchange Commission ("SEC"); (2) there were

23  liquidity problems with Westford I; and (3) in light of the SEC investigation of Westford I,

24  PricewaterhouseCoopers ("PwC") had not released audited financial statements.  Stevanovich

25  did not provide any justification for the withholding of audited financial statements for Epsilon II

26  or for his suspension of redemption of shares for Epsilon II.  Stevanovich's February 4, 2010

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

COMPLAINT FOR INJUNCTIVE RELIEF - 5

memorandum is attached hereto as Exhibit C.

21. In response to Stevanovich's memorandum, on February 12, 2010, SCERS requested that Epsilon II consider redeeming 85% of SCERS's position within the subscription documents' timeline and holding back 15% pending completion of the 2008 audit, or other event-driven circumstance, at which point it could provide a full release of held back monies. SCERS's requested a response by February 23, 2010. SCERS's February 12, 2010 email is attached as Exhibit D.

22. Epsilon Management did not respond to SCERS's February 12 request, other than to provide an "Investor Statement" on February 19, 2010, stating that SCERS's closing position as of December 31, 2009 was $24,865,756.33. No supporting data was supplied with the statement and the statement did not appear to be audited. The Investor Statement is attached as Exhibit E.

23. On March 8, 2010, SCERS sent additional correspondence to Epsilon Management requesting a response to its February 12, 2010 request for partial redemption. SCERS also requested additional information regarding its position in Epsilon II, explaining that none of the reasons supplied in Stevanovich's February 4 memorandum justified withholding from SCERS the audited financial statements of Epsilon II or associated records if the audited financial statements were not available. SCERS also noted that Stevanovich's February 4 memorandum did not justify refusing to redeem SCERS's shares in Epsilon II. SCERS's March 8, 2010 email to Epsilon Management is attached as Exhibit F.

24. SCERS's March 8, 2010 correspondence also requested a meeting between Epsilon Management and SCERS on March 15, 2010 at which meeting it requested: (1) the 2008 audited financial statement, if it existed; (2) all underlying documents provided to Epsilon

COMPLAINT FOR INJUNCTIVE RELIEF - 6

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

II's auditor, PwC, for the purposes of preparing the 2008 audited financial statements; and (3) an accounting of SCERS's December 31, 2009 holdings as a percentage of Epsilon II (which had also been requested in the February 12, 2010 correspondence).

25.    On Friday, March 12, 2010 Epsilon Management, contacted SCERS and stated that Epsilon Management would not meet with SCERS staff and that Epsilon II would not provide the requested documents by March 15, 2010.

**E.    Defendants' Unjustifiable Lack Of Transparency Threatens SCERS's Investment In Epsilon II.**

26.    As a result of Defendants' refusal and failure to provide the 2008 annual report and 2008 audited financial statement, or at the very least, underlying documents provided to Epsilon II's auditor, PwC, for purposes of preparing the 2008 audited financial statements, SCERS is unable to determine the progress and status of its investment. This inhibits SCERS's ability to manage its $20,000,000 investment in Epsilon II.

27.    Indeed, although the February 19, 2010 Investor Statement from Epsilon Management stated that SCERS's closing position as of December 31, 2009 was $24,865,756.33, no supporting data was supplied and the statement did not appear to be audited. This is further troubling because, according to the 2007 Directors' Report and Financial Statement, the net asset value to holders of redeemable shares in Epsilon II was $24,222,406. SCERS suspects that it may be the only shareholder remaining in Epsilon II. The 2007 Director's Report and Financial Statement is attached as Exhibit G.

28.    Moreover, Epsilon II has suffered very significant losses in the past in very short periods of time and there is a possibility that SCERS's investment could quickly erode.

COMPLAINT FOR INJUNCTIVE RELIEF - 7

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

F.    **Defendants Epsilon Management, Stevanovich, Epsilon Global, And Epsilon Master Fund Are the *Alter Ego* Of Epsilon II.**

29.    Defendants Epsilon Management, Stevanovich, Epsilon Global, and Epsilon Master Fund are all controlled by Stevanovich and, therefore, are the *alter ego* of Epsilon II.

30.    Stevanovich is an active director of Epsilon II and Epsilon Master Fund and is responsible for Epsilon II and Epsilon Master Fund's operations and activities. He is also the manager of Epsilon Global and as such, is responsible for the investment decisions of Epsilon Master Fund (which SCERS invests in, through Epsilon II). Stevanovich is also the manager of Epsilon Management, and as such, is responsible for the investment decisions of Epsilon II.

31.    Stevanovich ignores the corporate form to serve whatever end he deems to be in his best interest. For example, his letter asserting that Epsilon II was suspending redemptions was written on Epsilon Investment Management letterhead. Further, all justifications he provided for not having audited financial statements for Epsilon II related to the SEC's investigation of Westford I, another fund managed by Stevanovich that is not related to Epsilon II.

32.    Stevanovich controls all of the Epsilon entities and is in position to produce the financial statements owed by Epsilon II to SCERS.

## V.    CAUSES OF ACTION

### First Claim For Relief

### Breach of Contract

33.    Plaintiff incorporates the foregoing allegations as though fully set forth herein.

34.    Defendant Epsilon II breached its contract with Plaintiff to provide the 2008 annual report (together with an annual audited financial statement) describing Epislon II's trading activities for the fiscal year to SCERS within 120 days following the conclusion of the 2008 fiscal year.

35.    Plaintiff is entitled to specific performance of the contract terms.

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

## Second Claim For Relief

### Violation of British Virgin Islands Business Companies Act of 2004

36.    Plaintiff incorporates the foregoing allegations as though fully set forth herein.

37.    Section 184G of the British Virgin Islands Business Companies Act of 2004 permits members of a company to bring an action against the company for breach of a duty owed by the company to him as a member.

38.    Epsilon II owed a duty under the offering memorandum to provide the 2008 annual report and the 2008 annual audited financial statement within 120 days following the conclusion of the 2008 fiscal year.

39.    Epsilon II failed to provide the 2008 annual report and audited financial statements by May 1, 2009, and therefore, breached its duty under the parties' agreement.  Plaintiff is entitled to specific performance of Epsilon II's duty under the parties' agreement.

### Third Claim For Relief

### Injunctive Relief Requiring Production Of Financial Documents

40.    Plaintiff incorporates the foregoing allegations as though fully set forth herein.

41.    Plaintiff is entitled to temporary and permanent injunctive relief requiring Epsilon II to produce the 2008 annual report and audited financial statements.

42.    To the extent the 2008 annual report and audited financial statement do not exist, Plaintiff is further entitled to temporary and permanent injunctive relief requiring Epsilon II to produce all underlying documents provided to Epsilon II's auditor, PwC, for purposes of preparing the 2008 audited financial statements for Epsilon II.

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

43. Plaintiff is also entitled to temporary and permanent injunctive relief requiring Epsilon II to produce the annual report and audited financial statements for the 2009 fiscal year when they come due on May 1, 2010.

44. To the extent Epsilon II is unable to produce the 2008 annual report and audited financial statement, or all underlying documents provided to Epsilon II's auditor, PwC, for purposes of preparing the 2008 audited financial statements for Epsilon II, Plaintiff is entitled to temporary and permanent injunctive relief requiring Defendants Epsilon Management, Stevanovich, Epsilon Global, and Epsilon Master Fund to produce all such documents.

### Fourth Claim For Relief

### Injunctive Relief Preventing Epsilon II From Taking Action Harmful To SCERS As An Investor Or Its Investment

45. Plaintiff incorporates the foregoing allegations as though fully set forth herein.

46. Plaintiff is entitled to temporary and permanent injunctive relief to prevent Epsilon II from taking any action harmful to Plaintiff's position as an investor in Epsilon II and/or its investment in Epsilon II.

### Fifth Claim For Relief

### Injunctive Relief Preventing Epsilon II From Paying Any Management Fee During the Gating Of SCERS's Investment

47. Plaintiff incorporates the foregoing allegations as though fully set forth herein.

48. Plaintiff is entitled to temporary and permanent injunctive relief preventing Epsilon II from paying any management fee to Epsilon Management, or any other entity, while redemptions are not being permitted from Epsilon II.

### V. PRAYER FOR RELIEF

Plaintiff requests the following relief:

1. Temporary and permanent injunctive relief requiring Epsilon II to produce to

COMPLAINT FOR INJUNCTIVE RELIEF - 10

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

1    SCERS an annual report and audited financial statement for the 2008 fiscal year and to provide

2    the annual report and audited financial statement for the 2009 fiscal year when they come due on

3    May 1, 2010;

4          2.    To the extent the 2008 annual report and 2008 audited financial statement do not

5    exist, temporary and permanent injunctive relief requiring Epsilon II to produce all underlying

6    documents provided to Epsilon II's auditor, PwC, for the purposes of preparing 2008 audited

7    financial statements for Epsilon II to SCERS;

8          3.    Immediate issuance of subpoenas to PwC, Epsilon II's current auditor; Equinoxe

9    Alternative Investment Services Ltd., Epsilon II's current fund administrator/broker; Goldman

10   Sachs & Co., Epsilon II's former broker; and JPMorgan Chase, Epsilon II's former broker,

11   requiring production of all financial information related to Epsilon II from 2003 to present;

12         4.    To the extent Epsilon II is unable to produce the 2008 annual report and audited

13   financial statements, or all underlying documents provided to Epsilon II's auditor, PwC, for the

14   purposes of preparing the 2008 audited financial statements for Epsilon II, and    because

15   Defendants Epsilon Management, Stevanovich, Epsilon Global and Epsilon Master Fund have

16   such documents, (i) piercing of Defendants Epsilon Management, Stevanovich, Epsilon Global

17   and Epsilon Master Fund's corporate veil because they are the *alter ego* of Epsilon II and

18   intentionally are acting as vehicles for Epsilon II to evade its duty to provide financial documents

19   to SCERS, thus depriving SCERS of its financial records as a result of their intentional acts, and

20   (ii) temporary and permanent injunctive relief requiring Defendants Epsilon Management,

21   Stevanovich, Epsilon Global and Epsilon Master Fund to produce the above-mentioned

22   documents to SCERS;

23         5.    Temporary and permanent injunctive relief to prevent Epsilon II from taking any

24   action harmful to Plaintiff's position as an investor in Epsilon II and/or its investment in

25   Epsilon II;

26

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

1       6.    Temporary and permanent injunctive relief preventing Epsilon II from paying any

2  management fee to Epsilon Management, or any other entity, while redemptions are not being

3  permitted from Epsilon II;

4       7.    For an award of the Plaintiff's attorney fees and costs, as permitted by statute,

5  contract or rule of equity or law;

6       8.    For leave to amend this Complaint pursuant to CR 15; and

7       9.    For such other and further relief as the court deems just and equitable.

8

9       DATED this 15th day of March, 2010.

10

11                    FOSTER PEPPER PLLC

12

13                    Bradley P. Thoreson, WSBA No. 18190
                    Samuel T. Bull, WSBA No. 34387

14                    Miriam H. Cho, WSBA No. 40238
                    Attorneys for Plaintiff Seattle City Retirement

15                    Systems

16

17

18

19

20

21

22

23

24

25

26

COMPLAINT FOR INJUNCTIVE RELIEF - 12

# EPSILON GLOBAL ACTIVE VALUE FUND II LTD.

Maximum Capitalization:  10,000,000 shares
Minimum Investment:  US $2,000,000

---

### CONFIDENTIAL OFFERING MEMORANDUM

---

THE DIRECT OR INDIRECT OFFER AND/OR SALE OF SHARES
OF EPSILON GLOBAL ACTIVE VALUE FUND II LTD. TO CITIZENS
NATIONAL OR RESIDENTS OF, OR INSTITUTIONS OR OTHER
ENTITIES ORGANIZED, CHARTERED OR RESIDENT IN, THE
UNITED STATES OF AMERICA, WITH THE EXCEPTION OF
CERTAIN QUALIFIED TAX EXEMPT ENTITIES IS EXPRESSLY
PROHIBITED

The date of this offering memorandum is 1 January 2003


EXHIBIT A

<u>**TABLE OF CONTENTS**</u>

                                                                                    **Page**

INVESTOR NOTICES.................................................................................................... iii

MUTUAL FUNDS DISCLOSURE ................................................................................ v

ANTI-MONEY LAUNDERING.................................................................................... vi

DIRECTORY ................................................................................................................. vii

SUMMARY OF THE CONFIDENTIAL OFFERING MEMORANDUM ....................1
        The Fund ......................................................................................................1
        Terms of Investment....................................................................................2

THE FUND ....................................................................................................................5

INVESTMENT OBJECTIVES ......................................................................................5

INVESTMENT PRINCIPLES .......................................................................................5

MANAGEMENT OF THE FUND, THE INVESTMENT MANAGER
AND OTHER RELATIONSHIPS ..................................................................................6

CERTAIN RISK FACTORS ..........................................................................................8

ADMINISTRATION......................................................................................................12

THE FUND'S SHARE CAPITAL.................................................................................12

SUBSCRIPTION PROCEDURE ..................................................................................12

REDEMPTION PROCEDURE......................................................................................15

DETERMINATION OF NET ASSET VALUE.............................................................16

FEES, COMPENSATION AND EXPENSES ...............................................................17

DIVIDEND POLICY .....................................................................................................18

TAXATION ....................................................................................................................18

MISCELLANEOUS.......................................................................................................20

Appendix A:     Subscription Documents - Subscription Agreement and Standing Proxy....................21
                for Non-U.S. Investors

### INVESTOR NOTICES

THIS MEMORANDUM CONSTITUTES AN OFFER ONLY TO THE PERSON WHOSE NAME APPEARS IN THE SPACE PROVIDED ON THE COVER PAGE. DELIVERY OF THIS MEMORANDUM TO ANYONE OTHER THAN THE PERSON NAMED OR HIS DESIGNATED REPRESENTATIVE IS UNAUTHORIZED, AND ANY REPRODUCTION OF THIS MEMORANDUM, IN WHOLE OR IN PART, WITHOUT THE PRIOR WRITTEN CONSENT OF THE ADMINISTRATOR OF THE FUND, IS PROHIBITED.

\* \* \* \* \* \* \* \* \*

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL, OR A SOLICITATION OF AN OFFER TO BUY, SHARES IN THE FUND IN ANY JURISDICTION WHERE SUCH OFFER, SOLICITATION, PURCHASE OR SALE WOULD BE PROHIBITED BY LAW, OR TO ANY FIRM OR INDIVIDUAL TO WHOM IT WOULD BE UNLAWFUL TO MAKE SUCH AN OFFER, SOLICITATION, PURCHASE OR SALE.

\* \* \* \* \* \* \* \* \*

THIS MEMORANDUM CONTAINS A SUMMARY OF THE MATERIAL PROVISIONS OF THE DOCUMENTS REFERRED TO HEREIN. STATEMENTS MADE WITH RESPECT TO THE PROVISIONS OF THOSE DOCUMENTS ARE NOT NECESSARILY COMPLETE, AND REFERENCE IS MADE TO THE ACTUAL DOCUMENT FOR COMPLETE INFORMATION AS TO THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO.

\* \* \* \* \* \* \* \* \*

SHARES ARE AVAILABLE ONLY TO PERSONS WILLING AND ABLE TO BEAR THE ECONOMIC RISKS OF THIS INVESTMENT. THE SHARES ARE SPECULATIVE AND INVOLVE A HIGH DEGREE OF RISK. INVESTMENT IN THE FUND IS DESIGNED ONLY FOR SOPHISTICATED PERSONS WHO ARE ABLE TO BEAR THE LOSS OF THEIR INVESTMENT.

\* \* \* \* \* \* \* \* \*

NO OFFERING LITERATURE SHALL BE EMPLOYED IN THE OFFERING OF THE SHARES EXCEPT AS PROVIDED BY THE FUND, TOGETHER WITH THIS MEMORANDUM. NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY REPRESENTATIONS OR PROVIDE ANY INFORMATION WITH RESPECT TO THE SHARES EXCEPT SUCH INFORMATION AS IS CONTAINED IN THIS MEMORANDUM. NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALES MADE HEREUNDER SHALL UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE MATTERS DISCUSSED HEREIN SINCE THE DATE HEREOF.

\* \* \* \* \* \* \* \* \* \*

EACH INVESTOR AND HIS OR HER ADVISORS MAY INQUIRE ABOUT ANY ASPECT OF THE OFFERING. NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY REPRESENTATION WITH RESPECT TO THE FUND, ITS INVESTMENT MANAGER, OR THIS OFFERING OTHER THAN THAT WHICH IS CONTAINED IN THIS MEMORANDUM. ANY REPRESENTATION NOT CONTAINED HEREIN MUST NOT BE RELIED UPON. NO REPRESENTATION IS BEING MADE HEREBY WITH RESPECT TO THE POTENTIAL RETURN TO BE DERIVED BY AN INVESTOR. ANY INFORMATION CONTAINED IN THE FUND'S PROMOTIONAL MATERIALS SHALL BE SUPERSEDED BY THE MEMORANDUM TO THE EXTENT SUCH MATERIALS ARE INCONSISTENT THEREWITH.

\* \* \* \* \* \* \* \* \*

EACH INVESTOR IN THE SHARES OFFERED HEREBY MUST ACQUIRE SUCH SHARES SOLELY FOR SUCH INVESTOR'S OWN ACCOUNT AND NOT WITH AN INTENTION OF DISTRIBUTION, TRANSFER, OR RESALE, EITHER IN WHOLE OR IN PART.  IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THIS OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED.  THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY U.S. FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY.  THERE IS NO ESTABLISHED MARKET FOR THESE SECURITIES AND NONE WILL DEVELOP.

* * * * * * * * *

THE FUND IS SUBJECT TO CONFLICTS OF INTEREST.

iv

## MUTUAL FUNDS DISCLOSURE

The British Virgin Islands Mutual Funds Act (the "Act") came into force on January 2nd 1998 with the aim of regulating open-ended Mutual Funds, and the Managers and Administrators of open-ended mutual funds.

Three types of funds, namely Private, Professional and Public Funds (each as defined in the Act) are regulated by the Act.   It is intended that Epsilon Global (Euro) Ltd. (the "Fund"), be recognized under the Act as a Professional Fund.

A Professional Fund is defined as a mutual fund:

a.      the shares of which are made available only to professional investors and the initial investment in which, in respect of the majority of each such investors, is not less than one hundred thousand dollars in US currency or its equivalent in any other currency; or

b.      is designated as a professional fund by regulations.

A "Professional Investor" is defined as a person whose ordinary business involves, whether for his own account or the account of others, the acquisition or disposal of property of the same kind as the property, or a substantial part of the property, of the fund or a person who has signed a declaration that he, whether individually or jointly with his spouse, has a net worth in excess of $1 million in United States currency or its equivalent in any other currency and that he consents to being treated as a professional investor.

The Act provides for a Professional Fund to be able to manage or administer its affairs in or from within the Territory for up to fourteen days before being recognized.

A recognized Professional Fund is required by the Act to pay an annual fee of US$350.

Recognition under the Act should not be taken to imply that the Fund has been approved by any regulatory authority in any country such as the United States, the United Kingdom or any other jurisdiction other than the BVI and it is intended that any potential shareholders of the Fund, participate on the basis that they can afford to lose all or a substantial portion of their investment.

v

## ANTI-MONEY LAUNDERING

In order to comply with regulations aimed at the prevention of money laundering, the Fund will require verification of identity from all prospective investors (unless in any case the Fund is satisfied that an exemption under the Money Laundering Regulations 2000 of the Cayman Islands (the "Regulations") applies). Depending on the circumstances of each subscription, it may not be necessary to obtain full documentary evidence of identity where:

    (a)    the prospective investor makes the payment for his investment from an account held in the prospective investor's name at a recognised financial institution;

    (b)    the prospective investor is regulated by a recognised regulatory authority and is based or incorporated in, or formed under the law of, a recognised jurisdiction; or

    (c)    the subscription is made by an intermediary acting on behalf of the prospective investor and such intermediary is regulated by a recognised regulatory authority and is based or incorporated in, or formed under the law of, a recognised jurisdiction.

For the purposes of these exceptions, recognition of a financial institution, regulatory authority or jurisdiction will be determined in accordance with the Regulations by reference to those jurisdictions recognised by the Cayman Islands as having sufficient anti-money laundering regulations.

The Fund reserves the right to request such information as is necessary to verify the identity of a prospective investor. The Fund also reserves the right to request such identification evidence in respect of a transferee of Shares. In the event of delay or failure by the prospective investor or transferee to produce any information required for verification purposes, the Fund may refuse to accept the application or (as the case may be) to register the relevant transfer and (in the case of a subscription of Shares) any funds received will be returned without interest to the account from which the monies were originally debited.

The Fund also reserves the right to refuse to make any redemption payment to a Shareholder if any of the Directors of the Fund or the Administrator suspects or is advised that the payment of any redemption moneys to such Shareholder might result in a breach or violation of any applicable anti-money laundering or other laws or regulations by any person in any relevant jurisdiction, or such refusal is considered necessary or appropriate to ensure the compliance by the Fund, its Directors or the Administrator with any such laws or regulations in any relevant jurisdiction.

If, as a result of any information or other matter which comes to his attention, any person resident in the Cayman Islands (including the Fund, its Directors and the Administrator) knows or suspects that another person is engaged in money laundering, such person is required to report such information or other matter pursuant to the Proceeds of Criminal Conduct Law (2001 Revision) of the Cayman Islands and such report shall not be treated as a breach of any restriction upon the disclosure of information imposed by law or otherwise.

## DIRECTORY

### FUND REGISTERED OFFICE

Epsilon Global Active Value Fund II Ltd.
Craigmuir Chambers
P.O. Box 71
Road Town, Tortola, British Virgin Islands

### INVESTMENT MANAGER

Epsilon Global Asset Management Ltd.
Ugland House, South Church Street
P.O. Box 309
George Town, Grand Cayman
Cayman Islands
British West Indies

**All notices to the Investment Manager
must be sent as follows:**

Epsilon Global Asset Management Ltd.
c/o Epsilon Investment Management L.L.C.
7280 W. Palmetto Park Road, Suite 310
Boca Raton, Florida 33433 U.S.A.
Phone:  561-237-0330
Fax:  561-237-0329

### ADMINISTRATOR

UBS Fund Services (Cayman) Ltd.
UBS House
227, Elgin Avenue, P.O. Box 852
George Town, Grand Cayman
Cayman Islands

### PRIME BROKER AND CUSTODIAN

Goldman Sachs & Co.
One New York Plaza
New York, New York 10004
U.S.A.

### ACCOUNTANTS AND AUDITORS

PricewaterhouseCoopers
Hofplein 19
3032 AC Rotterdam
The Netherlands

### COUNSEL

Monahan & Biagi, P.L.L.C.
701 Fifth Avenue, Suite 2800
Seattle, Washington  98104
U.S.A.

## SUMMARY OF THE CONFIDENTIAL OFFERING MEMORANDUM

THE FOLLOWING IS A SUMMARY OF THIS CONFIDENTIAL OFFERING MEMORANDUM (THE "MEMORANDUM"). THIS SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE MORE DETAILED INFORMATION APPEARING ELSEWHERE HEREIN, AND THE DESCRIPTION OF ANY DOCUMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO SUCH DOCUMENT. AN INVESTMENT IN THE FUND IS SPECULATIVE AND INVOLVES SUBSTANTIAL RISKS. EACH SHAREHOLDER MAY LOSE HIS ENTIRE INVESTMENT (INCLUDING ANY PROFITS, WHETHER OR NOT DISTRIBUTED). SEE "RISK FACTORS."

### The Fund

Epsilon Global Active Value Fund II Ltd. (the "Fund") is a corporation formed under the laws of the British Virgin Islands. All assets of the Fund are, and the proceeds from the sale of additional shares of Common Stock in the Fund will be, invested through a "master-feeder" fund structure in Epsilon Global Master Fund II, L.P., a limited partnership formed under the laws of the Cayman Islands ("Master Fund"). The General Partner of the Master Fund is Epsilon Global Asset Management Ltd., a corporation formed under the laws of the Cayman Islands and is responsible for all investment decisions relating to the Master Fund. Epsilon Global Active Value Fund II, L.P., a U.S. partnership organized for U.S. investors, also invests all of its assets in the Master Fund and other investment vehicles may be formed in the future to invest in the Master Fund. Each such investment vehicle will invest in the Master Fund on substantially the same terms and conditions as the Fund and therefore will generally be allocated a proportionate share of the Master Fund's gains, losses and expenses based on their interest in the Master Fund, adjusted for any differences in fees. It is also noted that the Fund is authorized to invest outside of the Master Fund, although it does not currently anticipate that it will do so.

**Investment Objective**

The Fund's investment objective is capital appreciation with risk control. (References to the "Fund" in this Memorandum include both the Fund and the Master Fund.) The Fund seeks to achieve a superior absolute return by employing various investment strategies.

**Investment Manager**

The Investment Manager of the Fund is Epsilon Global Asset Management Ltd. (the "Investment Manager" or "Epsilon"), a Cayman Islands corporation. Epsilon is solely responsible for the trading and investment decisions of the Fund.

**Directors**

The Directors of the Fund are Mr. Steve G. Stevanovich and Mr. Alberto Clodoaldo D'ABREU DE PAULO.

**Administrator**

UBS Fund Services (Cayman) Ltd. ("UBS") serves as the Fund's Administrator, and will communicate with the Fund's shareholders.

**Auditors**

The Fund's books of account will be audited each year by the Fund's independent auditors, PricewaterhouseCoopers.

**Prime Broker & Custodian**

The Fund's principal prime broker and custodian is Goldman Sachs & Co., New York.

**Indemnification**

Neither the Administrator, the Investment Manager, nor any of their respective officers, directors, employees or agents ("Indemnified Parties"), shall be liable, in damages or otherwise, to the Fund or the Shareholders for any act or omission performed or omitted by any of them unless such act or omission results from willful misconduct, fraud or bad faith. The Fund will indemnify and hold harmless all Indemnified Parties from and against any and all claims or liabilities of any nature whatsoever, including attorneys' fees, arising out of or in connection with any action taken or

1

omitted by any Indemnified Party, unless such act or omission results from willful misconduct, fraud or bad faith.

### Fees and Expenses Payable by the Fund

The Fund pays or causes to be paid its own fees and expenses, including all legal and accounting expenses, and all normal trading, operating, communication and administrative expenses. To the extent that fees and expenses are paid by the Master Fund with regard to investments made into the Master Fund, such fees and expenses will not be charged to investors at the Investor Fund level.

### Management Fee

The Investment Manager will receive, in consideration for their services to the Fund, a quarterly management fee in an amount equal to one half of one percent (2% per annum) of the Fund's net assets, determined as of the close of each calendar quarter (the "Management Fee"). In the discretion of the Investment Manager, certain shareholders may be assessed a Management Fee in a different amount. To the extent that such Management Fee is paid by the Master Fund for investments made by the Fund into the Master Fund, such Management Fee amounts will not charged to investors at the Investor Fund level.

### Performance Fee

The Investment Manager will receive a contingent performance fee for each fiscal year or otherwise determined upon the redemption of any Common Stock, with respect to such redeemed Common Stock, respectively, (each a "Performance Period") equal to 20% of the amount, if any, of the net appreciation of the Fund's net assets during that Performance Period. The Investment Manager may elect to defer all or part of this 20% amount for two years, 10 years, or any period in between. If the Investment Manager elects to defer all or part of the 20% amount, that deferred amount is treated as if it were invested in newly issued common stock of the Fund as of the last day of the Performance Period. The deferred amount then rises and falls with the value of the Fund's common shares during the intervening period of between two and ten years. To the extent that the Performance Fee is paid by the Master Fund with regard to investments made into the Master Fund by the Fund, such Performance Fee amounts will not be charged to investors at the Fund level.

If the Fund incurs a net loss during a fiscal year, the Investment Manager may not receive any contingent fees from the Fund in a subsequent fiscal year unless and until the amount of such net loss applicable to each and every Share which experienced such net loss (and which remains outstanding at the time the subsequent profit occurs) has been recouped in full.

### Reports

Within 120 days following the conclusion of each fiscal year, each Shareholder will receive an annual report (together with an annual audited financial statement) describing the results of the Fund's trading activities for that fiscal year. The annual report will be audited by the Fund's independent public accountants. Each Shareholder will also receive a quarterly investment report, describing the Fund's activities in such detail, as the Investment Manager, in its sole discretion, shall determine. The Fund reports its results in U.S. dollars.

### Fiscal Year

The fiscal year of the Fund shall end on December 31 of each year, and the fiscal quarters of the Fund shall end on March 31, June 30, September 30 and December 31 of each year; provided, however, that the Fund's initial fiscal year shall begin on the date the Fund commences operations and shall end on the following December 31.

### Terms of Investment

### Shares

The Fund will issue shares of common stock ("Shares"). Each of the Shares is entitled to participate ratably, on a share for share basis, with all outstanding Shares, in the Fund's earnings and assets. Purchasers of Shares are referred to herein as Shareholders. With the exception of certain pension and profit sharing trusts, charities and other entities which are generally tax-exempt under U.S. Federal income tax laws ("U.S. tax-exempt entities"), ownership of Shares will

2

be restricted to persons other than "United States persons." "United States persons" are defined to include (i) a citizen or resident of the United States; (ii) a corporation, partnership, trust, or other entity organized or created under the laws of the United States; or (iii) any organization or entity controlled, directly or indirectly, by a person or persons described in (i) or (ii), or in which such persons are known to be the owners, directly or indirectly, of a majority of the beneficial interests therein.

### Minimum Subscription

The minimum subscription for Shares is US$2,000,000, subject to the Investment Manager's discretion to accept lesser amounts.

### Subscription Procedure

The Fund offers its shares on a continuous basis at a price per Share equal to the Net Asset Value (the "NAV") per Share as of date of issuance, plus any applicable subscription charges. A deposit to a Performance Fee Reserve may be required in certain circumstances, and further adjustments to the number of Shares may be required in accordance with an Equalization Credit (See "Equalization Adjustments" for a more detailed description of Equalization Accounting). Subscriptions received during any monthly period will ordinarily be accepted as of the first day of the following monthly period, i.e., subscriptions received between March 1 and March 31 will be accepted as of April 1. The Fund may, in its discretion, accept subscriptions on a day other than the first day of a month. The Fund will issue number of shares by dividing subscription amount by per share price rounded to 2 decimal places.

All persons desiring to subscribe for and purchase Shares should complete, execute and deliver a Subscription Agreement to the Fund. Subscription Instructions are attached to this Memorandum as Exhibit A-1. The Subscription Agreement is attached to this Memorandum as Exhibit A-2.

Shares will generally be issued on the first day of the month following the acceptance of a subscription (the "Closing Date"). The subscriber's payment for his or her Shares must be made at least one Business Day prior to the Closing Date.

Payments should be made by wire transfer of immediately available funds to the Fund's account as follows:

| | |
|---|---|
| To: | UBS AG, Stamford Branch |
| ABA Fedwire: | 0260-0799-3 |
| SWIFT: | UBSWUS33XXX |
| For account of: | UBS Fund Services (Cayman) Ltd. |
| Account#: | 101-WA-359025-000 |
| | |
| For further credit to: | Epsilon Global Active Value Fund II Ltd. |
| | |
| Account#: | 72162 |

All subscriptions for Shares are irrevocable by the subscriber upon acceptance by the Fund. The Fund or Investment Manager may reject any subscription for any reason.

Potential investors, by accepting delivery of this Memorandum, agree to return this Memorandum, including Exhibits hereto, if (i) such potential investor does not subscribe for Shares, (ii) such potential investor's subscription is not accepted, or (iii) the offering is terminated before the sale to such potential investor is consummated.

There are no underwriting arrangements with respect to the shares. All solicitations by subscriptions will be made directly by the Fund or through the issuance of unaffiliated placement

agents or money managers. Such unaffiliated placement agents may charge their clients a fee or share in the fees paid to the Managers.

### Solicitation of Subscriptions

There are no underwriting arrangements with respect to the offering of Shares. All solicitations of subscriptions will be made directly by the Company or through the assistance of unaffiliated placement agents and money managers. Such unaffiliated placement agents and money managers may charge their clients a placement fee of up to 5% of the total amount of the subscription for Shares sold with their assistance, and/or share in the fees earned by Epsilon Global Asset Management Ltd., as Investment Manager. The unaffiliated placement agents and money managers may rebate all or a portion of such fees to their clients.

### Limited Transferability

Each potential investor must represent that they will acquire the Shares only for investment purposes and not with a view to resale or distribution. No Shareholder may transfer Shares without the prior written consent of the Investment Manager and on terms acceptable to Administrator.

### Redemption Procedure

Upon 45 days' prior written notice to the Fund, each Shareholder may request that the Fund redeem all or part of such Shareholder's Shares as of the close of business on the last day of the calendar quarter.

With respect to any partial redemption, a Shareholder may not make a partial redemption of less than US$100,000 and may not reduce such Shareholder's unredeemed Shares to an amount less than the minimum investment then required of new Shareholders. Also, in order to be considered a partial redemption, the redemption cannot exceed 90% of a Shareholder's total capital account. In any case, the redemption price shall be the NAV of the redeemed Shares, as calculated at the end of the applicable measurement period.

The Investment Manager also has the right to force the complete redemption of any Shareholder at any time at the Investment Manager's sole discretion.

## THE FUND

Epsilon Global Active Value Fund II Ltd. (The "Fund") incorporated in the territory of the British Virgin Islands (the "BVI") as an international business company. The registered office of the Fund is located in Tortola, British Virgin Islands.

Shareholders have the right to purchase additional shares on a monthly basis (see "Offering of the Shares") and to redeem shares as of the last day of end of fiscal quarter on at least 45-days notice (see "Redemption Procedure").

## INVESTMENT OBJECTIVES

The Fund's investment objective is capital appreciation with risk control. The Investment Manager seeks superior absolute returns while reducing the risk of permanent impairment to capital. To accomplish this objective, the Investment Manager employs global opportunistic, distressed and event-driven value investing across a variety of security types and asset classes.

## INVESTMENT PRINCIPLES

. The Investment Manager seeks investment opportunities and deploys capital on a global basis. The Fund's opportunistic investment style may lead to investments in capital structure restructuring, the equity or high yield debt of distressed or mismanaged companies which may be in default or in bankruptcy, private corporate debt such as bank debt or trade claims, sovereign debt, convertible securities and special situations including turnarounds, mergers, spinoffs, restructurings, recapitalizations and exchange offers. The Fund may also invest in privately negotiated and structured securities of public and private companies.

**Analytical Methodology.** The Investment Manager believes that the market price of the various components of a capital structure are ultimately determined by enterprise value. Therefore, when evaluating the securities of distressed or mismanaged companies, the Investment Manager attempts to determine the enterprise or "going concern" value of the company and then compares that value to the current market value of the company's securities. This analysis and comparison enables the Investment Manager to determine which securities are incorrectly priced, and subsequently, offer the best risk/return. Factors considered by the Investment Manager in assessing enterprise value are, among other things: (i) historical and discounted future levels of operating and free cash flow, (ii) current and likely future financing needs and alternatives, (iii) balance sheet structure including off balance sheet items, (iv) revenue and expense recognition policies, (v) industry standing, (vi) diversity of operations and (vii) background, operational experience and track record of management.

The application of the above analytical methodology not only enables the Investment Manager to identify which securities it believes are undervalued, but also which securities are overpriced. Once identified, these overpriced securities may be sold short in anticipation of a future price decline.

**Global Investments.** In non-U.S. markets, the Investment Manager may purchase U.S. dollar and non-U.S. currency denominated equity and debt securities of non-U.S. corporations, as well as the sovereign debt of various governments and the debt of their respective agencies or departments, which may be trading at distressed levels. The Investment Manager may also purchase newly or recently privatized equity or debt securities of former state owned entities in private or open market transactions. When purchasing non-U.S. currency denominated securities, the Investment Manager may hedge currency fluctuation risk, thereby minimizing the impact of negative currency movements.

**Special Situations.** The Investment Manager focuses on corporate dislocations and discrete events such as a restructuring or a reorganization, the spinoff of a division or subsidiary, a recapitalization, an acquisition or merger, a tender offer, an asset sale or a regulatory shift. For example, in a restructuring, a company may sell, spinoff or close unprofitable or non-strategic portions of its business, thereby leaving a more focused core business. Additionally, the company may restructure its balance sheet by exchanging high interest rate debt for lower rated debt or equity or some combination thereof. The Investment Manager seeks restructuring situations in an effort to identify companies whose core business or whose remaining or newly created securities are incorrectly priced by the market.

**Risk Control.** The Investment Manager may attempt to reduce risk or to hedge positions, including the risk of non-U.S. currency fluctuations, with offsetting transactions, such as short sales and buying or selling options on the same or similar securities. The Investment Manager analyzes the historical and probable price movements of certain securities against that of an underlying security, in an effort to determine not only which securities offer the best hedge, but also which hedge ratio offers the best downside protection as well as upside potential. The Investment Manager may also purchase and sell market or index options for hedging or speculative purposes.

## MANAGEMENT OF THE FUND, THE INVESTMENT MANAGER AND OTHER RELATIONSHIPS

**The Fund.** The Fund's Board of Directors has overall management responsibility for the Fund, including establishing investment, dividend and distribution policy (although it will not make or approve investment decisions since all of these have been delegated to the Investment Manager), and having the authority to select and replace the Fund's Administrator, any officers of the Company and other persons or entities with management or administrative responsibilities to the Fund. The Fund's Memorandum and Articles of Association provide that a Director shall not be liable to the Fund for any acts or omissions in the performance of his duties if such person acted honestly and in good faith with a view to the best interests of the Fund and, in the case of criminal proceedings, such a person had no cause to believe that his conduct was unlawful. Such Memorandum and Articles of Association contain certain provisions for the indemnification of Directors by the Fund, to the extent permitted by law, against liabilities to third parties arising in connection with the performance of their services. The Directors of the Fund are Mr. Steve G. Stevanovich and Mr. Alberto Clodoaldo d'ABREU DE PAULO, whose backgrounds are set forth below.

Mr. Steve G. Stevanovich is the Founder and President of Epsilon Investment Management L.L.C. Mr. Stevanovich has over 18 years of experience in international investment management. During these 18 years, Mr. Stevanovich has developed an ability to assess and exploit capital structure mispricings on a global basis while utilizing various hedging techniques in an attempt to maximize capital preservation. Prior to founding Epsilon, Mr. Stevanovich was the Executive Vice President of Everest Capital Limited, a US$1.4 billion global hedge fund. During the five and one-half years that Mr. Stevanovich spent at Everest, the fund had a compounded return of over 25% per annum. Prior to joining Everest Capital, Mr. Stevanovich had over seven years of experience in corporate finance and investment banking, most recently at Ingoldsby, O'Connor, Altwell & Company, a leveraged buyout firm in Boston where he was involved in analyzing and valuing companies in various industries and negotiating the capital structure and pricing of various transactions. Mr. Stevanovich has a BA in Economics from the University of Chicago and an MBA from the University of Chicago Graduate School of Business.

Alberto Clodoaldo d'ABREU DE PAULO is a Managing Director of Dutch Antilles Management N.V. He was born in Curacao on September 7th, 1938, residing at Plantage Klein Kwartier z/n, Curacao, Netherlands Antilles, with the personal title of "PRESIDENT".

**Epsilon Global Asset Management Ltd.** The Investment Manager of the Fund is Epsilon Global Asset Management Ltd. ( the "Investment Manager" or "Epsilon"). In its capacity as Investment Manager to the Fund, Epsilon provides all advisory services required for the Fund's operation and has full discretion in the management of the fund's trading and investments transactions. Specifically, Epsilon manages the investment and reinvestment of the Fund's assets, including the selection of securities brokers and banks. Steve G. Stevanovich, whose background is set forth above, is responsible for the investment decisions of the Fund and is assisted by a team of investment professionals.

**Investment Management Agreement.** Under an Investment Management Agreement (the "Management Agreement") between the Investment Manager and the Fund, the Investment Manager will invest and reinvest the assets of the Fund in accordance with the investment objective and policies of the Fund set forth above. It is noted that the Investment Manager will maintain the Fund's financial records and compute the net asset value.

Under the terms of the Management Agreement, the Fund will pay to Epsilon Global Asset Management Ltd. for its services as Investment Manager a "Fixed Fee" and an "Incentive Fee" as described below. The Fixed Fee for any fiscal quarter is an amount payable in arrears equal to 0.5% of the net assets of the Fund before any Incentive Fee allocation on the last day of such quarter. The Fund will pay the Fixed Fee in U.S. dollars promptly after the end of such quarter, unless the Investment Manager elects to defer receipt of the Fixed Fee as further described below. The Fixed Fee will be deducted in computing the net profit or net loss of the Fund. In the event that the Investment Manager is not acting as Investment Manager for an entire fiscal quarter, the Fixed Fee payable by the Fund for such fiscal quarter will be prorated to reflect the portion of such fiscal quarter in which the Investment

Manager is acting as such under the Management Agreement. Notwithstanding the foregoing, certain shareholders may, in effect, be charged the Fixed Fee at a rate less than 0.5% of the net assets of the Fund before any Incentive Fee allocation on the last day of each quarter.

The Incentive Fee is an amount, allocated annually or such shorter period upon redemption of Common Stock, equal to twenty percent (20%) of the net profits (including net unrealized gains), if any, during such Performance Period allocable to each share of Common Stock. If a share of Common Stock has a loss chargeable to it during any fiscal year and during a subsequent year there is a profit allocable to such share, there will be no Incentive Fee payable with respect to such share until the amount of the loss previously allocated to such share has been recouped. In certain circumstances (e.g., due to prior net losses or a loss carryforward at the Fund level), all or a portion of the Incentive Fee attributable to a share of Common Stock may be paid by redemption of a portion of a shareholder's shares of Common Stock. Notwithstanding the foregoing, certain shareholders may, in effect, be charged the Incentive Fee at a rate less than 20% of the net profits of the Fund during any Performance Period. The Management Agreement provides that the Investment Manager will be paid the Incentive Fee within 30 days after the end of the Performance Period, unless the Investment Manager elects to defer receipt of the Incentive Fee as further described below.

The Investment Manager may elect to defer payment of its Fixed Fee or Incentive Fee to the first day of any Performance Period following the quarter or year such fee was earned. If the Investment Manager elects to defer payment of all or part of the Fixed Fee or Incentive Fee, any such deferred amounts payable to the Investment Manager shall be treated, and the amounts eventually payable at the end of such deferred periods shall be determined, as if such deferred amounts had been invested in shares of Common Stock on the first day of the fiscal quarter or year following the year the deferred fee was earned and redeemed as of the last day of the deferred period. The deferred fees and amounts of net profits, if any, allocated to such deferred fees shall be paid promptly after the end of the deferred period. If any cash dividends are paid with respect to the Common Stock during any of such deferred periods, there shall be paid to the Investment Manager, at the time of payment of such dividends, an amount equal to the dividends that would have been paid to the Investment Manager if the deferred amounts had been invested in shares of Common Stock.

As noted above, the Fund invests all of its assets through a "master-feeder" fund structure in the Master Fund, a Cayman Islands limited partnership of which the Investment Manager serves as the General Partner of the Partnership and the Investment Manager. The Limited Partnership Agreement of the Master Fund provides that the General Partner shall be paid a fixed fee for each quarter in an amount equal to 0.5% of the net assets of the Master Fund before any Incentive Fee Allocation and an incentive allocation equal to 20% of the net profits of each limited partner in the Master Fund. However, to the extent that the Master Fund pays Fixed Fees and Incentive Fees with regard to investments made into the Master Fund, such Fixed Fee and Incentive Fee amounts will not be charged at the Investor Fund level.

The Management Agreement provides that it shall continue until the close of business on December 31, 2030, except that either the Fund or the Investment Manager may terminate the Management Agreement effective at the close of business on the last day of any fiscal year by giving the other party not less than 60 days written notice.

The Management Agreement recognizes that the Investment Manager has investments of its own and is acting as investment manager for others. The Management Agreement further recognizes that the Investment Manager may become associated with other investment entities and engage in investment management for others. Except to the extent necessary to perform its obligations under the Management Agreement, the Investment Manager or its affiliates are not limited or restricted from engaging in or devoting time and attention to the management of any other business, whether of a similar or dissimilar nature, or to render services of any kind to any other corporation, firm, individual or association. As a result, the Investment Manager and its affiliates and other clients may hold substantial positions in securities that are owned by the Fund. If the Investment Manager and its affiliates and other clients hold a substantial position in an issuer, liquidity and concentration considerations may limit the ability of the Investment Manager to add to the position on behalf of the Fund or other clients or to readily dispose of the position. The Investment Manager may on occasion give advice or take action with respect to those accounts that differs from the advice given with respect to the Fund. See discussion on page 11 under "Conflicts of Interest."

Pursuant to the Investment Management Agreement between the Fund and the Investment Manager the Investment Manager shall not be liable to the Fund for any acts or omissions in the performance of their respective services in the absence of willful misconduct, gross negligence or as otherwise required by law, and each agreement contains provisions for the indemnification of each of the Managers by the Fund against liabilities to third parties arising in connection with the performance of their services, to the extent permitted by law.

**Prime Broker and Brokerage Commissions.** Although the Investment Manager will regularly review the brokerage commission rates charged to the Fund, it has complete discretion to determine which brokerage firms will be engaged by the Fund, regardless of their commission rates. The fund will use Goldman Sachs & Co. as its principal prime broker and custodian, but may engage other brokers to provide similar services.

Portfolio transactions for the Fund will be allocated by the Investment Manager to broker-dealers on the basis of best execution, price, and brokerage services (e.g., special execution capabilities, clearance, settlement and custodial services) which benefit the Fund. The Investment Manager may also generally consider the amount and nature of research, execution and other services provided by brokers, as well as the extent to which such services are relied upon, and may attempt to allocate a portion of the brokerage business of the Fund on the basis of that consideration. The investment information received from brokers may be used by the Investment Manager in servicing any other entities to which the Investment Manager provides investment advice and not all such information may be used by the Investment Manager in connection with the Fund. A broker will not be excluded from receiving brokerage business because it does not provide research services. Among the services the Investment Manager may consider in allocating portfolio transactions to broker-dealers is whether a broker-dealer has referred investors to the Fund. If, and when, such an allocation of portfolio transactions is made, the commission rates charged for such transactions shall not exceed commercially reasonable rates.

<u>CERTAIN RISK FACTORS</u>

AN INVESTMENT IN THE FUND IS SPECULATIVE AND IS SUITABLE ONLY FOR PERSONS WHO ARE ABLE TO ASSUME THE RISK OF LOSING THEIR ENTIRE INVESTMENT. PROSPECTIVE PURCHASERS SHOULD CAREFULLY CONSIDER THE FOLLOWING RISKS BEFORE SUBSCRIBING FOR SHARES.

**Limited Operating History.** The Fund commenced operation only in July, 2001 and has only a limited operating history upon which an evaluation of the Fund's performance can be made. The success of the Fund will be largely dependent on the judgment and ability of the Investment Manager.

**Securities to be Purchased.** The Fund may purchase low rated or unrated debt securities. Such securities may offer higher yields than do higher rated securities, but generally involve greater volatility of price and risk of principal and income, including the possibility of default by, or bankruptcy of, the issuers of the securities. In addition, the markets for such securities may be limited. The Fund may enter into contracts with dealers as principal to purchase certain securities and synthetic instruments. Such transactions are not subject to exchange rules and may result in losses to the Fund in the event of a default or bankruptcy of a counterparty. The Fund may also purchase securities issued by companies from many countries and by the countries themselves. Such investments will cause the Fund to be affected by changes in the currency exchange rates and revaluation of currencies. Less information may be available about non-U.S. issuers than about their U.S. counterparts. Further, securities markets of certain other countries may not be as liquid as U.S. markets. Investment in these securities may result in higher costs to the Fund than investment in U.S. securities due to the cost of converting a foreign currency to dollars, the payment of fixed brokerage commissions on some non-U.S. exchanges and the imposition of transfer taxes or transaction charges by those exchanges. Investment in securities of certain countries may also be subject to political or economic risks. The Fund may invest in securities of United States or non-U.S. closed-ended investment companies. There may be no liquid secondary market for these securities and some of the companies may limit the intervals at which shares may be redeemed.

**Leverage and Short Sales.** The Fund may maximize its investment position by purchasing securities on margin. As a result, the possibilities of profit and loss will be increased. Borrowing money to purchase securities will provide the Fund with advantages of leverage, but exposes it to capital risk and higher current expenses. Any gain in the value of securities purchased with borrowed money or income earned from these securities that exceeds interest paid on the amount borrowed would cause the Fund's investment profit or loss to increase faster than would otherwise be the case. Conversely, any decline in the value of the securities purchased would cause the Fund's

investment profit or loss to decrease faster than would otherwise be the case. In addition to purchasing securities on margin, the Fund may engage in short selling of securities. A short sale will result in a gain if the price of the securities sold declines sufficiently between the time of the short sale and the time at which securities are purchased to replace those borrowed. A short sale will result in a loss if the price of securities sold short increases or does not decline sufficiently to cover transactions. Any gain would be decreased and any loss would be increased by the amount of any premium or interest that the Fund may be required to pay with respect to the borrowed securities.

**Assets May Not Be Diversified.** The Fund may at times have an unusually high concentration in certain types of securities positions. Accordingly, the Fund's assets may be subject to greater risk of loss than if they were more widely diversified, since the failure of one or more limited number of investments could have a material adverse effect on the Fund.

**Foreign Exchanges.** The Fund may invest in non-United States securities and may trade securities on exchanges located outside the United States, where protection afforded to investors by the Securities and Exchange Commission and federal securities laws do not apply. Accordingly, the Fund is subject to various risks inherent in trading non-U.S. securities and/or trading on foreign exchanges, including fluctuations in currency exchange rates, exchange controls, expropriation, burdensome or confiscatory taxation, moratoria, or political or economic events, all of which could have an adverse effect on the Fund's ability to generate profits on investments. As the Fund determines its investment profit or loss in United States dollars, it will be subject to the risk of fluctuation in the exchange rate between the local currency and dollars and to foreign exchange controls. Although the Fund may hedge against fluctuations in currency exchange rates, there can be no assurance that the Fund would not incur losses as a result of adverse changes in currency exchange rates and foreign exchange controls. The Fund is unable to predict the nature of future exchange controls. Imposition or significant increases in the level of exchange controls or other restrictions could have an adverse effect on the Fund.

**Limited Liquidity of Investment.** The Fund does not intend to list its Shares on any securities exchange. It is not expected that there will be any established over-the-counter market for sale of the Shares, and it is not anticipated that there will be any secondary market for trading in the Shares. However, a Shareholder may request that the Fund redeem some or all of his or her Shares. Under certain circumstances, including market conditions which would prohibit the liquidation of positions, the Fund may delay redemption beyond the end of the applicable year.

**Active Investments.** The Investment Manager may seek to effect the control or management of a company in which the Fund has an investment position. The Investment Manager may take positions in excess of 5% of a company's outstanding voting shares, possibly giving the Investment Manager the ability to influence the actions of management. Additionally, the Investment Manager may structure, negotiate and execute private transactions directly with publicly traded companies or their agents. Often, the resulting security is convertible debt with underlying publicly traded common stock. The Fund may also invest in the securities of privately held companies.

**The Failure of Brokerage Firms.** The Fund may be subject to a risk of loss of the assets held by a broker-dealer in the event of a broker-dealer's bankruptcy. In the event of a failure of a broker-dealer used by the Fund, the United States Securities Investor Protection Corporation provides a maximum of US$500,000 of account insurance, only US$100,000 of which may be taken in cash. To the extent the Fund leaves assets in the possession of its broker in excess of these amounts, the Fund may receive only a pro rata share of the remaining assets deposited with the failed broker-dealer. Moreover, because the Fund may trade on non-United States exchanges with non-United States brokers and/or dealers, the failure of a non-United States broker or dealer could result in the complete loss of Fund amounts on deposit with such broker or dealer, depending on the regulatory rules governing such broker.

**Government Regulation.** The Fund is not registered as an investment company under the Investment Company Act of 1940, and the Investment Manager is not registered as an investment adviser under the U.S. Investment Advisers Act of 1940 (or any similar law). Shareholders, therefore, are not afforded the protective measures provided by such laws.

**Substantial Fees and Expenses.** The expenses to which the Fund will be subject could be substantial.

**Arbitrage Trading May Involve Risks.** The Fund's investments may involve arbitrage between the prices of two securities, between the equity and equity options of the same or similar securities, between the price of a security and its announced buy-out or exchange price and/or any combination thereof. Given the volatile nature of certain arbitrage situations, the short-term performance of the Fund's arbitrage investments may fluctuate significantly in

value. The Fund may purchase or sell securities (on a current basis) and take offsetting positions in the options of the same or similar securities. These offsetting positions entail a substantial risk that the price differential could change unfavorably, causing a loss to the Fund.

**Unidentified Investments.** The Fund has not identified any particular investments to make from the proceeds of this offering, other than to make investments on the basis of opportunities as they may arise. Therefore, prospective investors must rely on the ability of the Investment Manager in making investments consistent with the Fund's objectives. Shareholders will not have the opportunity to evaluate the relevant economic, financial and other information which will be utilized by the Fund in deciding whether or not to make a particular investment. The Memorandum and Articles of Association of the Fund do not restrict the type of investments the Fund may make.

**Options.** The Fund may engage in the trading of options, including index and equity options. Such trading involves risks substantially similar to those involved in trading margined securities, in that options are speculative and highly leveraged. Specific market movements of the securities underlying an option cannot accurately be predicted. The purchaser of an option is subject to the risk of losing the entire purchase price of the option. The writer of an option is subject to the risk of loss resulting from the difference between the premium received for the option and the price of the security underlying the option which the writer must purchase or deliver upon exercise of the option.

**Futures Contracts.** Futures contracts are contracts usually made on a futures exchange which call for the future delivery of a specified "commodity" at a specified time and place. These contractual obligations, depending on whether one is a buyer or a seller, may be satisfied either by taking or making physical delivery of the "commodity" or by making an offsetting sale or purchase of an equivalent futures contract on the same exchange prior to the end of trading in the contract month. Commodity futures prices are highly volatile. Price movements of commodity futures contracts are influenced by, among other things, changing supply and demand relationships, governmental, agricultural and trade programs and policies and national and international political and economic events. Financial instrument and foreign currency futures and forward prices are influenced by, among other things, interest rates, changes in balances of payments and trade, domestic and international rates of inflation, international trade restrictions and currency revaluations. Because low margin deposits are normally required, an extremely high degree of leverage is obtainable in commodity futures trading. A relatively small price movement in a commodity futures contract, consequently, may result in large losses. Thus, like other highly leveraged investments, any purchase or sale of a commodity futures contract may result in losses that exceed the amount invested.

**Synthetics.** The Investment Manager may use derivatives or other synthetic securities, both listed and over-the-counter, instead of purchasing or selling securities outright. These synthetic securities allow the Investment Manager to gain exposure to certain markets or securities which the Investment Manager might otherwise not be able to execute. If the Investment Manager believes that a situation merits investment, but the costs and risks associated with such an investment are prohibitive or unacceptable, then the Investment Manager may enter into an over-the-counter option contract, custom securities basket or swap transaction in order to gain exposure to the situation. Such instruments involve risks not associated with more traditional types of investments, including counterparty default risk.

**Nature of Investments.** A portion of the portfolio of the Fund may consist of securities issued by privately-held companies. There is generally little or no publicly available information about such companies and the Fund must rely on the due diligence of the Investment Manager to obtain the information necessary for the decision to invest in them. Typically, such companies depend for their success on the management, talents and efforts of one person or a small group of persons, so that the death, disability or resignation of such person or persons could have a materially adverse impact on them. Moreover, small companies frequently have smaller product lines and smaller market shares than larger companies and therefore may be more vulnerable to economic downturns. Because these companies will generally have highly leveraged capital structures at least initially, reduced cash flow resulting from an economic downturn may adversely affect the return on, or the recovery of, the Company's investment in them. Investment in such companies therefore involves a high degree of business and financial risk, which can result in substantial losses, and, accordingly, should be considered speculative.

**Illiquidity.** A portion of the Fund's investments may consist of securities acquired directly from their issuers in private transactions. These securities will be restricted securities under the Securities Act of 1933 and may not be resold unless there is an effective registration statement on file with the Securities and Exchange Commission with

respect to such securities, or an exemption from registration exists. Such securities will therefore be illiquid. In addition, there may be no established trading market for such securities into which they could be sold, even after an exemption from registration becomes workable.

**Lack of Liquidity in Markets.** Despite heavy volume of trading in securities, the markets for some securities have limited liquidity and depth. This lack of depth could disadvantage the Fund, both in the realization of the prices which are quoted and in the execution of orders at desired prices.

**Master-Feeder Fund Structure.** As noted above, the Fund generally invests all of its investable assets through a "master-feeder" fund structure in the Master Fund. The "master-feeder" fund structure - in particular the existence of multiple investment vehicles investing in the same portfolio - presents certain unique risks to investors. Smaller investment vehicles investing in the Master Fund may be materially affected by the actions of larger investment vehicles investing in the Master Fund. For example, if a larger investment vehicle withdraws from the Master Fund, the remaining funds may experience higher pro rata operating expenses, thereby producing lower returns. Similarly, the Master Fund may become less diverse due to a withdrawal by a larger investment vehicle, resulting in increased portfolio risk.

**Conflicts of Interest.** There exist a number of potential conflicts of interest between the Investment Manager and the Fund. In addition to serving as investment manager to the Fund, the Investment Manager serves as the general partner of Epsilon Global Master Fund, L.P., a Cayman Islands partnership and Epsilon Global Master Fund II, L.P., a Cayman Islands partnership, and may have additional investment management clients in the future (collectively, the "Other Clients"). The Other Clients may invest in the same or similar securities as the Fund. Purchase and sale orders may be combined for the Fund and the Other Clients with each entity paying its pro rata share of the total commission and paying or receiving its pro rata share of the total cost or sales proceeds. From the standpoint of the Fund, simultaneous identical portfolio transactions for the Fund and the Other Clients may tend to decrease the prices received, and increase the prices required to be paid, by the Fund for its portfolio sales and purchases. Where less than the maximum desired number of shares of a particular security to be purchased is available at a favorable price the shares purchased will be allocated among the Fund and the Other Clients in a manner as determined by the Investment Manager. In addition, purchase and sale transactions (including swaps) may be effected between the Fund and the Other Clients.

The Investment Manager may have conflicts of interest in allocating its time and activity between the Fund and the Other Clients, in allocating investments between the Fund and the Other Clients and in effecting transactions between the Fund and the Other Clients, including ones in which the Investment Manager may have a greater financial interest. In addition, the Investment Manager and its officers and employees may have investments of their own. Further, the Investment Manager may engage in a wide variety of investment banking activities. The Investment Manager may, in some instances, perform investment banking services for companies in which the Fund owns securities. The Investment Manager may choose not to make an otherwise appropriate investment for the Fund if the Investment Manager or its clients have a business relationship with either the potential investee company or with a third party that has indicated its interest in acquiring the potential investee company. Any fees earned by the Investment Manager with respect to its investment banking activities will be paid solely to the Investment Manager and not the Fund.

In addition, the Investment Manager may become aware of investment opportunities and, to the extent the Investment Manager in its sole discretion determines such investment would not be suitable for the Fund, may refer such investment opportunities to others. Any fees or commissions with respect to the referral of such investments will be paid solely to the Investment Manager (see discussion concerning additional potential conflicts of interest under Fees, Compensation and Expenses).

The Investment Manager's obligations to the Fund are not exclusive and the Investment Manager is not required to devote any specific amount of time to the Fund.

THE DESCRIPTION CONTAINED HEREIN OF SPECIFIC ACTIVITIES THAT MAY BE ENGAGED IN BY THE FUND SHOULD NOT BE CONSTRUED AS IN ANY WAY LIMITING THE FUND'S INVESTMENT ACTIVITIES. THE FUND MAY ENGAGE IN INVESTMENT ACTIVITIES NOT DESCRIBED HEREIN WHICH THE INVESTMENT MANAGER CONSIDERS APPROPRIATE.

## ADMINISTRATION

**The Administrator.** UBS Fund Services (Cayman) Ltd. serves as the Administrator of the Fund pursuant to an administration agreement to be entered into between the Fund and the Administrator (the "Administration Agreement"). The Administrator's principal place of business is located at UBS house, 227 Elgin Avenue, P.O. Box 852, George Town, Grand Cayman, Cayman Islands. The Administrator is licensed as a mutual fund administrator under the Mutual Funds Law (2001 Revision) of the Cayman Islands.

Pursuant to the Administration Agreement, the Administrator will perform or supervise the performance of services necessary for the operation and administration of the Fund (other than making investment decisions), including administrative, accounting, administration and shareholder services. For the purpose of calculating the Net Asset Value of the Fund, the Administrator will rely solely on the valuation of the Master Fund as provided by the Investment Manager.

The Administration Agreement also provides for indemnification of the Administrator and its directors, officers and employees from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgements suites, costs, expenses or disbursements of any kind or nature whatsoever (other than those resulting from fraud, gross negligence or willful default on its part or on the part of its directors, officers, servants or agents) which may be imposed on, incurred by or asserted against the Administrator in performing its obligations or duties thereunder.

The Directors and the Investment Manager, and not the Administrator, are responsible for determining that the Shares are marketed and sold in compliance with all applicable securities and other laws.

The Administration Agreement is governed by the laws of the Cayman Islands and is for an indefinite period, but it may be terminated by either party on ninety days' written notice to the other party.

### THE FUND'S SHARE CAPITAL

**Capitalization of the Fund.** The Fund has an authorized capital of US$100,000, consisting of 10,000,000 shares of common stock (par value US$ 0.01 per share) (the "Shares").

**Share Participation in Earnings and Assets.** Each Share is entitled to participate ratably, on a share for share basis, with each other outstanding Share, in the earnings and assets of the Fund.

### SUBSCRIPTION PROCEDURE

The minimum subscription for Shares is US$2,000,000, subject to the Fund's discretion to accept lesser amounts. The Fund will offer its Shares on a continuous basis at a price per Share equal to the Net Asset Value (the "NAV") per Share as of the last Business Day of the date of issuance, plus any applicable subscription charges. A deposit to a Performance Fee Reserve may be required in certain circumstances, and further adjustments to the number of Shares may be required in accordance with an Equalization Credit (See "Equalization Adjustments" below for a more detailed description of Equalization Accounting).

All persons desiring to subscribe for and purchase Shares should complete, execute and deliver a Subscription Agreement to the Fund's Administrator. The subscription agreement may be sent by fax if original is received by the Administrator within 10 business days. The wire payment instructions have to include the name of the subscriber which has to match the name on the subscription agreement. Subscription Instructions are attached to this Memorandum as Exhibit A-1. The Subscription Agreement is attached to this Memorandum as Exhibit A-2.

Shares will generally be issued on the first day of the month following the month in which each subscriber's subscription and payment for Shares is received. Subscriptions received during any monthly period will ordinarily be accepted as of the first day of the following month, i.e., subscriptions received between March 1 and March 31, will be accepted as of April 1. The Fund may, in its discretion, accept subscriptions on a day other than the first day of the month. Payments should be made by wire transfer of immediately available funds to the Fund's account as follows:

| To: | UBS AG, Stamford Branch |
| ABA Fedwire: | 0260-0799-3 |
| SWIFT: | UBSWUS33XXX |
| For account of: | UBS Fund Services (Cayman) Ltd. |
| Account#: | 101-WA-359025-000 |
| For further credit to: | Epsilon Global Active Value Fund II Ltd. |
| Account#: | 72162 |

All subscriptions for Shares are irrevocable by the Subscriber. The Fund may reject a subscription for any reason.

Potential investors, by accepting delivery of this Memorandum, agree to return this Memorandum, including the Exhibit hereto, if (i) such potential investor does not subscribe for Shares, (ii) such potential investor's subscription is not accepted, or (iii) the offering is terminated before the sale to such potential investor is consummated.

**Equalization Adjustments.**    When interim subscriptions are made, certain adjustments may be required to the price paid for Shares or to the number of Shares purchased. These adjustments are necessary to ensure: (a) the Performance Fee paid to the Investment Manager is charged only to those Shares which have appreciated in value since their acquisition, (b) all Shareholders have the same amount per Share at risk and (c) all Shares have the same NAV.

With respect to a Deficit Interim Subscription, the subscription price per Share is the NAV per Share on the acquisition date plus 20% of the excess, if any, by which the Peak NAV per Share, for a preceding calendar year-end exceeds the NAV per Share on the date of subscription. Such amount (the "Performance Fee Reserve") shall be added to the purchase price per Share and shall be invested and distributed as set forth herein. The Performance Fee Reserve shall be separately invested in U.S. Treasury Bills, Certificates of Deposit or other equivalently rated short-term instruments. The Performance Fee Reserve shall become payable to the Investment Manager if the deficit between the NAV per Share on the subscription date and the Peak NAV is recouped by favorable performance of the Fund. The Performance Fee Reserve may, in certain circumstances, be returned to a Shareholder upon redemption of Shares if, and to the extent, such Performance Fee Reserve applicable to the Shares being redeemed has not been earned by the Investment Manager. Promptly after the end of each fiscal year in which a Performance Fee Reserve is held, the interest or dividends earned thereon shall either be paid to the Shareholder who provided such Performance Fee Reserve or reinvested into the Fund in the form of additional Shares, at the Investment Manager's discretion.

With respect to a Premium Interim Subscription, where the NAV per Share on the date of subscription (computed before accrued Performance Fees) is greater than the Peak NAV per Share, for a preceding calendar year-end, 20% of the excess shall constitute an "Equalization Credit." This Equalization Credit accounts for the fact that the NAV per Share at the time of subscription includes a potential Performance Fee to be borne by existing Shareholders which experienced such appreciation. The Equalization Credit serves as a credit against Performance Fees that might otherwise be payable to the Investment Manager by Shareholders of the Fund, but which should not, in equity, be charged against such subscriber's Shares because, as to its Shares, no favorable performance has yet occurred. Upon redemption by a Shareholder of its Shares, the Equalization Credit, or a portion thereof, will be paid to such Shareholder, without interest, or if a Performance Fee becomes payable prior to such redemption, then the Equalization Credit payable shall be applied to the purchase of additional Shares, subject to appropriate adjustments for favorable performance. Examples of a Deficit Interim Subscription and a Premium Interim Subscription are set forth on the next page.

13

**TABLE 1 — Deficit Interim Subscription [Based on a 20% Performance Share Allocation]:**

| | |
|---|---|
| Peak NAV = | 1,000 |
| Gross Subscription NAV = | 900 |
| NAV at Date of Purchase = | 900 |
| Performance Fee Reserve (1,000 – 900) * 20% = | 20 |

| Gross NAV at Valuation Date | Performance Fee Due to Investment Manager | Performance Fee Reserve Due to Investment Manager | NAV (Net of All Fees) | Performance Fee Reserve on Account |
|---|---|---|---|---|
| 1,050 | 10.0 | 20.0 | 1,040 | 0.0 |
| 1,000 | 0.0 | 20.0 | 1,000 | 0.0 |
| 950 | 0.0 | 10.0 | 950 | 10.0 |
| 900 | 0.0 | 0.0 | 900 | 20.0 |
| 850 | 0.0 | 0.0 | 850 | 20.0 |

NOTE: Gross NAV is equal to the NAV before accrual for Performance Fees. The total value of a Shareholder's position is equal to the sum of the NAV (Net of All Fees) and the Performance Fee Reserve on Account. In the above example, the Performance Fee Reserve on Account does not include any accrued interest.

**TABLE 2 — Premium Interim Subscription [Based on a 20% Performance Share Allocation]:**

| | |
|---|---|
| Peak NAV = | 1,000 |
| Gross Subscription NAV = | 1,400 |
| NAV at Date of Purchase = | 1,320 |
| Performance Fee Reserve (1,400 – 1,000) * 20% = | 80 |

| Gross NAV at Valuation Date | Performance Fee Due to Investment Manager | Equalization Credit Due to Shareholder | NAV (Net of All Fees) | Equalization Credit Against Future Performance Fees | |
|---|---|---|---|---|---|
| | | | | At Performance Fee Payment | At Redemption |
| 1,500 | 20.0 | 80.0 | 1,400 | 0.0 | 0.0 |
| 1,400 | 0.0 | 80.0 | 1,320 | 0.0 | 0.0 |
| 1,200 | 0.0 | 40.0 | 1,160 | 40.0 | 0.0 |
| 1,000 | 0.0 | 0.0 | 1,000 | 80.0 | 0.0 |
| 900 | 0.0 | 0.0 | 900 | 80.0 | 0.0 |

NOTE: Gross NAV is equal to the NAV before accrual for Performance Fees. The Equalization Credit remaining against future performance fees does not accrue interest; rather, these funds are at risk with other monies in the Fund and will appreciate or depreciate accordingly.

14

## REDEMPTION PROCEDURE

Shareholders may redeem their Shares as of the last day of each calendar quarter (the "Redemption Date), upon 45 days written notice.  The amount payable in redemption of the Shares is equal to the "net asset value" of such Shares as of the Redemption Date (the "Redemption Price").  A Shareholder wishing to redeem his Shares is required to deliver to the Fund's Investment Manager, at least 45 days prior to the Redemption Date, a written redemption request indicating the number of Shares to be redeemed.  The redemption request must be accompanied by:  (i) the share certificate(s) if issued, representing the Shares to be redeemed, if issued, and (ii) a certification (in a form furnished by or satisfactory to the Fund) identifying all Shares which are directly or indirectly owned by such shareholder.

With respect to any partial redemption of Shares, a Shareholder may not make a partial redemption of less than US$100,000, and, in the case of a partial redemption, may not reduce such Shareholder's unredeemed Shares to an amount less than the minimum investment then required of new Shareholders.  Also, in order to be considered a partial redemption, the redemption cannot exceed 90% of a Shareholder's total capital account.

Payment in U.S. dollars of the Redemption Price will be made as soon as practicable but, except in cases where share certificates and share transfers are not delivered, the shareholder will receive at least 90% of the Redemption Price no later than thirty (30) days following the date of redemption, with the balance paid within fifteen days after the receipt by the Fund of its audited annual financial statements for the fiscal year.  The Investment Manager has the right to make payment on such redemption in securities owned by the Fund.  The Investment Manager may, in its discretion, deduct from any redemption proceeds an amount determined by the Investment Manager to represent the transaction costs and related expenses incurred by the Fund in connection with the processing of redemptions.

The Investment Manager also has the right to force the complete redemption of any Shareholder at any time at the Investment Manager's sole discretion.

The Fund has the power to suspend the redemption of Shares in the following circumstances:

(a)    During any period with the New York Stock Exchange, or any other securities exchange or board of trade or other contract market on which a significant portion of the Fund's assets is ordinarily traded, is closed (other than for holidays) or trading thereon has been restricted or suspended;

(b)    When, for any reason, the value of the Fund's assets cannot be accurately ascertained;

(c)    During any state of affairs which, in the judgment of the Investment Manager, would render disposition of the Fund's assets impracticable or be seriously prejudicial to the Fund's Shareholders; or

(d)    When, in the opinion of counsel to the Fund, such redemption could result in adverse tax consequences to the Fund or its Shareholders.

The Fund will promptly notify Shareholders of the suspension of redemptions for any reason.

**Sales and Transfers of Shares.**  The Fund has the authority to issue additional Shares following the initial offering, either through the resale of Shares tendered for redemption or through the issuance of authorized but previously unissued Shares.  The subscription price payable for any Shares which may be issued in the future will be the net asset value of such Shares determined at the time of issuance.

15

1.  <u>Total·Net Assets</u>.  The value of the "total net assets" of the Fund as of a particular date will be computed by subtracting from the total value of all securities and other assets of the Fund an amount equal to all accrued debts, liabilities and obligations of the Fund (including any contingencies for which it is determined that any accrual should be made).

2.  <u>Net Asset Value</u>.  The total net assets are allocated pro rata, on a share for share basis, to each outstanding Share. The net asset value of each Share is equal to the amount of such total net assets divided by the number of Shares outstanding on the date as of which the valuation is being made (with due account being given to any Shares "deemed issued" to the Managers under their respective agreements with the Fund).  Net asset value determinations for the Fund will be made in accordance with United States generally accepted accounting principles in which the following principles are observed.

In general, portfolio securities will be valued at the last sales price reported on securities exchanges, or quoted in the NASDAQ National Market System, or at the last reported bid price in the case of other over-the-counter securities (or listed securities for which there have been no sales on the determination date) held long, or the last reported asked price in the case of other over-the-counter securities (or listed securities for which there have been no sales on the determination date) sold short.

Forward contracts will be valued based upon the closing quotations reported for the same on the principal board of trade or other contract market in which dealings are made or by quotations from the counterparty bank. Swap positions will be valued at the average secondary trading market price, as obtained from dealers in such market.

Commodities and commodity futures, if utilized by the Fund, will be valued based upon the closing quotations reported for the same on the principal board of trade or contract market in which dealings are made.  If a futures contract cannot be liquidated, due to the operation of daily limits or otherwise, on a day when net assets are determined, a value determined to be fair and reasonable by the Investment Manager shall be used.

Listed securities options traded on an exchange will be valued at their last sales prices on the date of determination on the principal exchange on which such options shall have traded on such date (or, in the event that the date of determination is not a date upon which exchange on which such options are traded was open for trading, on the last prior date on which such exchange was so open), or if no sales occurred on either of the foregoing dates, at the mean between the "bid" and "asked" prices on the principal securities exchange on which such options are traded, on the date of determination (or, in the event that the date of determination is not a date upon which such securities exchanges was open for trading, on the last prior date on which such securities exchange was so open). Premiums received for the writing of listed securities options written by the Fund will be included in the assets of the Fund, and the market value of such options will be included as a liability of the Fund.

Over-the-counter options will be valued at fair value, as determined by the Investment Manager, based upon representative brokers' bids or valuations.  If such bids or valuations are not available, or, in the opinion of the Investment Manager, do not represent fair value, over-the-counter options will be valued as the Investment Manager deems fair and reasonable.

In the absence of quoted values, or for assets which are not readily marketable, valuations will be at fair market value as determined by the Investment Manager.

<u><b>FEES, COMPENSATION AND EXPENSES</b></u>

<u>Expenses</u>.  The Fund will bear all of the continuing offering costs (including legal expenses incident thereto) and all other expenses incurred in the operation of the Fund, if any, including the ordinary and necessary expenses directly related to its investment activities, including brokerage commissions, exchange fees, interest and commitment fees on loans and debit balances, all administration fees and all legal and auditing fees, including any legal and auditing fees that relate to extraordinary circumstances, such as tax examinations or litigation involving the Fund.  As noted above, the Fund invests its assets through a "master-feeder" fund structure in the Master Fund.  Each investment vehicle, including the Fund, that invests in the Master Fund will indirectly bear the administrative and other expenses of the Master Fund pro rata based upon its interest in the Master Fund.  It is anticipated that virtually all expenses will be incurred at the Master Fund level and therefore that expenses incurred directly by the Fund will be relatively small.  If expenses are incurred by the Fund requiring payment by the Fund, the Fund may make a

17

withdrawal of a portion of its interest in the Master Fund (within the limitation imposed by the Master Fund) in order to pay those expenses.

**Management Fee.** The Investment Manager will receive a quarterly fixed fee equal to one half of one percent (0.50%) of the Net Asset Value (as defined) of the Fund as of the last day of each calendar quarter (equivalent to 2% per annum) The Management Fee will be paid to the Investment Manager within three business days after the close of each calendar quarter. In the discretion of the Investment Manager, certain shareholders may be assessed a Management Fee in a different amount.

**Performance Fee.** The Investment Manager will receive contingent fees, for each calendar year or otherwise determined upon the redemption of any Common Stock, with respect to such redeemed Common Stock, respectively, (each a "Performance Period") of the Fund (the "Performance Fee"), in an amount equal to 20% of the increase of the Fund's per Share Net Asset Value, if any, after adjustment for additional contributions and/or redemptions. The Investment Manager may elect to defer all or part of Performance Fee amount for two years, 10 years, or any period in between. If the Investment Manager elects to defer all or part of its Performance Fee, that deferred amount is treated as if it were invested in newly issued common stock of the Fund as of the last day of the Performance Period. The deferred amount then rises and falls with the value of the Fund's Shares.

If the Fund incurs a net loss during the Performance Period, the Investment Manager will not receive any Performance Fees unless and until the amount of such net loss applicable to each and every Share of the Fund's stock which experienced such net loss (and which remains outstanding at the time the subsequent profit occurs) has been recouped in full.

As noted above, the Fund invests all of its assets through a "master-feeder" fund structure in the Master Fund, a Cayman Islands limited partnership. The Limited Partnership Agreement of the Master Fund provides that the General Partner shall be paid a fixed fee for each quarter in an amount equal to 0.5% of the net assets of the Master Fund before any Incentive Fee allocation and an incentive allocation equal to 20% of the net profits of each limited partner in the Master Fund. However, to the extent the Fixed Fees or Incentive Fees are paid by the Master Fund, such Fixed Fee and Incentive Fee amounts will not be charged at the Investor Fund level.

The Management Agreement recognizes that the Investment Manager has investments of its own and is acting as investment manager for others. The Management Agreement further recognizes that the Investment Manager may become associated with other investment entities and engage in investment management for others. The Investment Manager or its affiliates are not limited or restricted from engaging in or devoting time and attention to the management of any other business, whether of a similar or dissimilar nature, or to render services of any kind to any other corporation, firm, individual or association. As a result, the Investment Manager and its affiliates and other clients may hold substantial positions in securities that are owned by the Fund. If the Investment Manager and its affiliates and other clients hold a substantial position in an issuer, liquidity and concentration considerations may limit the ability of the Investment Manager to add to the position on behalf of the Fund or other clients or to readily dispose of the position. The Investment Manager may on occasion give advice or take action with respect to those accounts that differs from the advice given with respect to the Fund. See discussion above under "Conflicts of Interest."

## DIVIDEND POLICY

The declaration of dividends on the Shares will be in the discretion of the Board of Directors, and dividends may be declared only out of retained earnings. The Fund does not presently intend to pay dividends on its Shares.

## TAXATION

THE FOLLOWING IS A SUMMARY OF CERTAIN U.S. AND B.V.I. TAX CONSIDERATIONS AFFECTING THE FUND AND ITS SHAREHOLDERS. WHILE THE FOLLOWING SUMMARY IS BELIEVED TO BE ACCURATE AS OF THE DATE HEREOF, A SHAREHOLDER'S OWN CIRCUMSTANCES MAY RENDER THE FOLLOWING SUMMARY INACCURATE OR INCOMPLETE. THUS, THE FOLLOWING SUMMARY SHOULD NOT BE CONSTRUED AS BINDING OR AUTHORITATIVE ADVICE TO ANY ACTUAL OR PROSPECTIVE SHAREHOLDER. ANY ACTUAL OR PROSPECTIVE SHAREHOLDER IS URGED TO CONSULT HIS OR HER OWN TAX ADVISOR REGARDING THE TAX CONSIDERATIONS RELEVANT TO AN INVESTMENT IN THE FUND.

### United States Federal Income Taxation of the Fund.

1. Neither the Master Fund nor the Fund will be subject to any income, withholding or capital gains taxes in the Cayman Islands or the British Virgin Islands.

2. Under present law, the Fund will not be subject to any United States federal income tax on its capital gains whether from sources within or without the United States to the extent that such gains are not derived from securities classified as United States real property interests within the meaning of Section 897 of the Internal Revenue Code of 1986, as amended (the "Code"). In this connection, the Fund does not presently intend to acquire any securities which would be classified as United States real property interests.

3. The only United States income taxes which will be payable by the Fund on its income from dividends and interest is the 30% withholding tax applicable to dividends and certain interest income considered to be from sources within the United States. Certain debt obligations which may be acquired by the Fund will not be subject to the 30% withholding tax. The Fund generally intends to invest its cash reserves in short-term debt obligations the interest on which is not subject to 30% withholding.

4. Shareholders who are not residents of the British Virgin Islands will not be subject to any income, withholding or capital gains taxes in the British Virgin Islands with respect to the shares of the Fund owned by them and dividends received on such shares, nor will they be subject to any estate or inheritance taxes in the British Virgin Islands.

5. Shareholders who are not residents of the Cayman Islands will not be subject to any income, withholding or capital gains taxes in the Cayman Islands with respect to the shares of the Fund owned by them and dividends received on such shares, nor will they be subject to any estate or inheritance taxes in the Cayman Islands.

6. Shareholders that are neither citizens nor residents of the United States and are not engaged in a trade or business in the United States will not be subject to any United States federal income, withholding, capital gains, estate or inheritance taxes with respect to shares of the Common Stock owned by them and dividends received on such shares.

**U.S. Shareholders.** As noted above, shares in the Fund may be sold to a limited number of U.S. investors who are pension and profit sharing trusts or other organizations which are generally exempt under U.S. federal income tax laws ("U.S. tax-exempt entities"). The U.S. tax-exempt entities in the Fund may not exceed 100 in number. Because the Fund is a "passive foreign investment company" ("PFIC") as defined in Section 1297 of the U.S. Internal Revenue Code of 1986, as amended, (the "Code"), any U.S. tax-exempt entities will be subject to certain filing requirements in the United States. A U.S. tax-exempt entity which does not borrow money or otherwise use leverage in acquiring Shares in the Fund should not be subject to U.S. federal income tax under the PFIC provisions of the Code on any dividends from the Fund or on any sale or redemption of its Shares in the Fund.

While the Fund may purchase securities on margin, borrow money and otherwise use leverage in connection with its investments, under present U.S. tax law that leverage should not be attributed to U.S. tax-exempt entities who are shareholders in the Fund. Thus, assuming that a U.S. tax-exempt entity does not borrow money or otherwise use leverage in acquiring Shares in the Fund, any dividends from the Fund or gain on the sale or redemption of shares in the Fund should not constitute "unrelated debt-financed income" as defined in Section 514 of the Code, or "unrelated business taxable income" as defined in Section 512 of the Code, to such U.S. tax-exempt entity.

However, under certain proposed U.S. tax legislation, a portion of the dividends received by a U.S. tax-exempt entity, as well as a portion of any gain derived by such an entity from a sale or redemption of Shares, would be treated as "unrelated debt-financed income" if that entity were to hold 10 percent or more of the outstanding shares of the Fund (directly or by attribution from related parties). It cannot be predicted whether this proposed legislation will become law and, if so, what form the law would ultimately take.

The Fund will monitor its shareholders in an attempt to ensure that the Fund is not more than 50% owned by such U.S. tax-exempt entities, so that the Fund will not be a "controlled foreign corporation" as defined in Section 957 of the Code.

**ERISA Matters.**  The Fund will not accept any contributions from shareholders that are pension plans or similar pension or retirement trusts (all such entities being herein called "Retirement Trusts") if, after such contribution, the Shares in the Fund held by such Retirement Trusts would represent 25% or more of the total outstanding shares in the Fund.  If the shares held by such Retirement Trusts were to exceed this 25% limit, then the Fund's assets would be considered "plan assets" under the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), which could result in adverse consequences to the Investment Manager and the fiduciaries of the Retirement Trusts.

* * * * *

THE FOREGOING TAX SUMMARY DOES NOT ADDRESS TAX CONSIDERATIONS WHICH MAY BE APPLICABLE TO CERTAIN SHAREHOLDERS UNDER THE LAWS OF JURISDICTIONS OTHER THAN THE UNITED STATES OR THE BRITISH VIRGIN ISLANDS. ACCORDINGLY, ALL PERSONS INTERESTED IN PURCHASING THE SHARES SHOULD INFORM THEMSELVES AS TO ANY INCOME OR OTHER TAX CONSEQUENCES PARTICULAR TO THEIR CIRCUMSTANCES ARISING IN THE JURISDICTION IN WHICH THEY ARE RESIDENT OR DOMICILED FOR TAX PURPOSES IN CONNECTION WITH THE ACQUISITION, HOLDING OR DISPOSITION OF THE SHARES.

## MISCELLANEOUS

**Reports to Shareholders.**  The fiscal year for the Fund will be the calendar year.  The Administrator will furnish each Shareholder an annual report, including audited financial statements, within 120 days following the close of each fiscal year.  Quarterly investment reports will also be sent after the close of each interim quarterly period.

**Accountants and Auditors.**  Auditors of the Fund's annual financial statements will be selected annually by the Fund's Board of Directors.  The Fund's initial 12/31/02 auditors will be PricewaterhouseCoopers.

# APPENDIX A

## SUBSCRIPTION DOCUMENTS

## SUBSCRIPTION AGREEMENT AND STANDING PROXY

To:    Epsilon Global Active Value Fund II Ltd.
       c/o UBS Fund Services (Cayman) Ltd.
       UBS House
       227 Elgin Avenue
       P.O. Box 852GT
       Grand Cayman, Cayman Islands
       Fax: 1-345-914-4060

Please fill in the following information:

Amount of Subscription in U.S. Dollars: $ *10,000,000.—*

I/We hereby apply to subscribe to purchase as many shares in Epsilon Global Active Value Fund II Ltd. (the "Fund") as may be purchased with above amount upon the terms of the Confidential Offering Memorandum of the Fund, as it may be amended, which I/we have received and read. I/We acknowledge that I am/we are able to afford a shareholding in a venture having the risks and objectives of the Fund.

I/We declare the following: (1) the Shares hereby subscribed for are not being (i) acquired directly or indirectly by, and (ii) will not be transferred directly or indirectly to, (A) any individual who is a citizen, national or resident of the United States of America, (B) a corporation, partnership, association, joint-stock company, trust, fund, or any organized group of persons whether incorporated or not, created, organized or existing in, or organized and existing under the laws of the United States of America or any state, territory or possession thereof, or any other trust or estate, other than an estate or trust the income of which from sources outside of the United States of America is not includible in gross income for purposes of computing United States income tax payable by it, (C) any other trust in which one or more of the persons specified in clause (A) and (B) above have a cumulative direct or indirect beneficial interest in excess of 50 percent of the value of the trust, (D) any other non-corporate entity in which one or more of the persons specified in clause (A) or (B) above, directly or indirectly, have more than a 50 percent beneficial interest, (E) any other corporation in which one or more of the persons specified in clause (A) or (B) above, directly or indirectly, own stock possessing more than 50 percent of the total combined voting power of all classes of stock entitled to vote, or more than 50 percent of the total value of shares of all classes of stock, and (F) any other corporation, partnership, association, joint-stock company, trust, fund, organized group or persons whether incorporated or not with respect to which one or more of the persons specified in clauses (A) or (B) above have the power to exercise a controlling influence over the management or policies, unless such power is solely the result of an official position with such company ("U.S. Person"); (2) no offer to purchase such shares was made to me/us while I was/we were in the United States; (3) I/We did not agree to purchase such Shares while in the United States; and (4) I/We will not attempt by any means, to offer, originate or execute an agreement to sell such Shares while in the United States.

If the subscriber is a bank or broker-dealer, the subscriber hereby represents and warrants, when it is acquiring Shares on behalf of clients for investment purposes, that such clients are not U.S. Persons, that it will notify the Fund if it shall come to its knowledge that any such client is or has become a U.S. Person, that it will not at any time knowingly transfer or deliver the Shares or any part thereof or interest therein to a U.S. Person, and that it will not make any transfer thereof in the United States of America, its territories or possessions.

I/We declare that in subscribing for Shares in the Fund, I/each of us am/is a Professional Investor within the meaning of the Mutual Funds Act 1996, as amended in that:

[check one or both]

✓      My/our ordinary business involves, whether for my/our own account or the account(s) of (an)other(s), the acquisition or disposal of property of the same kind as the property, or a substantial part of the property which is (or will be) owned by the Company, as detailed in the Confidential Offering Memorandum of the Company.

_____    My/our net worth (in the case of a natural person, whether individually or jointly with my spouse) exceeds US$1,000,000 or its equivalent in any other lawfully recognized currency and I/we consent to be treated as a Professional Investor for the purpose of an investment in the Company.

Shares will be held in book entry form for the subscriber, following acceptance, by the Administrator, UBS (Cayman Islands) Limited.

If requested, Share Certificates may be issued in the name of a nominee. If this facility is required, please fill in name of nominee:

_____

The Subscriber hereby designates and appoints UBS Fund Services (Cayman) Ltd., through its authorized officers and directors, with full power of subscription, as its true and lawful Proxy and Attorney-in-Fact for the purpose of voting the shares herein subscribed for as said Proxy may determine on any and all matters which may arise at any annual or special meeting of shareholders and upon which such shares could be voted by shareholders present in person at such meeting. This Proxy may be revoked by the owner of record of the shares hereby subscribed for, either personally or by presentation of a subsequently executed proxy at any annual meeting or special meeting of shareholders, or by written notice to UBS Fund Services (Cayman) Ltd., P.O. Box 852, George Town, Grand Cayman, Cayman Islands.

Signature Page for Subscription by an ENTITY

SHARES TO BE REGISTERED AS FOLLOWS:

ENTITY OWNERSHIP - Check form of organization:

☐ CORPORATION -     Please include certified resolutions (or similar documents) authorizing signature.

☐ PARTNERSHIP -     Please include a copy of the partnership agreement (or similar document) authorizing signature.

☑ TRUST -     Please include a copy of the trust agreement. *Government Pension Plan (Municipal Corporation)*

☐ BANK or BROKER-DEALER - See Page A-2

(Please print all information exactly as you wish it to appear on the Company's records.)

*Seattle City Employees' Retirement System*
(Name of Subscriber)

*801 Third Avenue, Suite 300*     *206-615-1424*
(Address)                                  (Telephone - Days)

*USA*     *206-954-5753 (cell)*
(Country of Formation)                    (Telephone - Evenings)

       The undersigned trustee, partner or officer warrants that he has full power and authority from all beneficiaries or partners or from the board of directors of the entity named below to sign this Share Application Form on behalf of the entity and that a purchase of Shares in Epsilon Global Active Value Fund II Ltd. is not prohibited by the governing documents of the entity.

Dated: *12/18/03*          Signatures of Entity Subscriber(s)
                                 (Please print name below each signature):

                                 *Seattle City Employees' Retirement System*
                                 (Name of Entity)

                                 By: _____
                                 (Trustee, partner or authorized corporate officer)

                                 *Mel Robertson, Asst. Executive Director*
                                 (Name and Title)

                                 By: _____
                                 (Trustee, partner or authorized corporate officer)

                                 _____
                                 (Name and Title)

**SUBSCRIPTION INFORMATION**

SHARE REGISTRATION INFORMATION

MAILING (POST) INFORMATION (if other than address of registration)

Seattle City Employees Retirement System
Name

801 Third Avenue, Suite 300
Address

Seattle, WA, USA   98104
Country of Residence

206-615-1424
Telephone

206-954-5753 (cell)
Telephone (Evenings)

206-386-1506
Fax

REMITTING BANK

BANK FOR TRANSFERS in case of redemptions (if other than Name & Address of Remitting Bank):

Wells Fargo
Name

Address

Seattle WA USA   98104
Country of Residence

206-684-5214 (Marilyn Mirazo)
(Seattle City Treasury)
Telephone

Telephone (Evenings)

Fax

A-6

# EPSILON GLOBAL ACTIVE VALUE FUND II LTD.
## SUBSCRIPTION AGREEMENT AND STANDING PROXY

### Instructions

A.   All Subscribers.  Complete page A-2 by filling in the amount of the subscription; page A-3 by indicating whether the Shares are to be issued in book entry form or issued in the name of a nominee; and page A-6 by completing the necessary subscription information.

B.   Subscriptions by Individuals.  If a subscription is by an individual (including more than one), the "Signature Page for Subscription by an Individual" (page A-4) must be completed.

C.  Subscriptions by Entities.  If a subscription is by an entity (trust, partnership, corporation, bank or broker-dealer), the "Signature Page for Subscription by an Entity" (page A-5) must be completed.

D.  Items to be delivered by All Subscribers.

    (i)    Completed and signed Share Application Form and corresponding signature page (pages A-2, A-3, A-4 or A-5, and A-6).

    (ii)    U.S. dollar denominated funds in the amount of the full purchase price for Shares.  Wire transfer funds for the full amount of the subscription to the Company's subscription account at:

| | |
|---|---|
| To: | UBS AG, Stamford Branch |
| ABA Fedwire: | 0260-0799-3 |
| SWIFT: | UBSWUS33XXX |
| For account of: | UBS Fund Services (Cayman) Ltd. |
| Account#: | 101-WA-359025-000 |
| For further credit to: | Epsilon Global Active Value Fund II Ltd. |
| Account#: | 72162 |

    (iii)    Subscription documents should be delivered or mailed to Epsilon Global Active Value Fund II Ltd., c/o UBS Fund Services (Cayman) Ltd., UBS House, 227 Elgin Avenue, P.O. Box 852GT, Grand Cayman, Cayman Islands

A-1

Signature Page for Subscription by an INDIVIDUAL

SHARES TO BE REGISTERED AS FOLLOWS:

(Check One)

☐    INDIVIDUAL SUBSCRIBER        ☐    CO-SUBSCRIBERS
                                          (Both signatures required below)

(Please print all information exactly as you wish it to appear on the Company's records.)

_____
(Name of Subscriber)

_____        _____
(Address)                                    (Telephone - Days)

_____        _____
(Country of Residence)                       (Telephone - Evenings)

_____
(Name of Co-Subscriber)

_____        _____
(Address)                                    (Telephone - Days)

_____        _____
(Country of Residence)                       (Telephone - Evenings)

Dated: _____        Signatures of Individual Subscriber(s)
                                      (Please print name below each signature):

                              _____

                              _____

                              _____

                              _____

A-4

## EPSILON GLOBAL ACTIVE VALUE FUND II LTD.
## SUBSCRIPTION AGREEMENT AND STANDING PROXY

### Instructions

A. All Subscribers. Complete page A-2 by filling in the amount of the subscription; page A-3 by indicating whether the Shares are to be issued in book entry form or issued in the name of a nominee; and page A-6 by completing the necessary subscription information.

B. Subscriptions by Individuals. If a subscription is by an individual (including more than one), the "Signature Page for Subscription by an Individual" (page A-4) must be completed.

C. Subscriptions by Entities. If a subscription is by an entity (trust, partnership, corporation, bank or broker-dealer), the "Signature Page for Subscription by an Entity" (page A-5) must be completed.

D. Items to be delivered by All Subscribers.

    (i)    Completed and signed Share Application Form and corresponding signature page (pages A-2, A-3, A-4 or A-5, and A-6).

    (ii)    U.S. dollar denominated funds in the amount of the full purchase price for Shares. Wire transfer funds for the full amount of the subscription to the Company's subscription account at:

| | |
|---|---|
| To: | UBS AG, Stamford Branch |
| ABA Fedwire: | 0260-0799-3 |
| SWIFT: | UBSWUS33XXX |
| For account of: | UBS Fund Services (Cayman) Ltd. |
| Account#: | 101-WA-359025-000 |
| For further credit to: | Epsilon Global Active Value Fund II Ltd. |
| Account#: | 72162 |

    (iii)    Subscription documents should be delivered or mailed to Epsilon Global Active Value Fund II Ltd., c/o UBS Fund Services (Cayman) Ltd., UBS House, 227 Elgin Avenue, P.O. Box 852GT, Grand Cayman, Cayman Islands

A-1

# EXHIBIT B

SUBSCRIPTION AGREEMENT AND STANDING PROXY

To:     Epsilon Global Active Value Fund II Ltd.
        c/o UBS Fund Services (Cayman) Ltd.
        UBS House
        227 Elgin Avenue
        P.O. Box 852GT
        Grand Cayman, Cayman Islands
        Fax: 1-345-914-4060

        Please fill in the following information:

        Amount of Subscription in U.S. Dollars: $ *10,000,000.—*

        I/We hereby apply to subscribe to purchase as many shares in Epsilon Global Active Value Fund II Ltd. (the "Fund") as may be purchased with above amount upon the terms of the Confidential Offering Memorandum of the Fund, as it may be amended, which I/we have received and read.  I/We acknowledge that I am/we are able to afford a shareholding in a venture having the risks and objectives of the Fund.

        I/We declare the following:  (1) the Shares hereby subscribed for are not being (i) acquired directly or indirectly by, and (ii) will not be transferred directly or indirectly to, (A) any individual who is a citizen, national or resident of the United States of America, (B) a corporation, partnership, association, joint-stock company, trust, fund, or any organized group of persons whether incorporated or not, created, organized or existing in, or organized and existing under the laws of the United States of America or any state, territory or possession thereof, or any other trust or estate, other than an estate or trust the income of which from sources outside of the United States of America is not includible in gross income for purposes of computing United States income tax payable by it, (C) any other trust in which one or more of the persons specified in clause (A) and (B) above have a cumulative direct or indirect beneficial interest in excess of 50 percent of the value of the trust, (D) any other non-corporate entity in which one or more of the persons specified in clause (A) or (B) above, directly or indirectly, have more than a 50 percent beneficial interest, (E) any other corporation in which one or more of the persons specified in clause (A) or (B) above, directly or indirectly, own stock possessing more than 50 percent of the total combined voting power of all classes of stock entitled to vote, or more than 50 percent of the total value of shares of all classes of stock, and (F) any other corporation, partnership, association, joint-stock company, trust, fund, organized group or persons whether incorporated or not with respect to which one or more of the persons specified in clauses (A) or (B) above have the power to exercise a controlling influence over the management or policies, unless such power is solely the result of an official position with such company ("U.S. Person"); (2) no offer to purchase such shares was made to me/us while I was/we were in the United States; (3) I/We did not agree to purchase such Shares while in the United States; and (4) I/We will not attempt by any means, to offer, originate or execute an agreement to sell such Shares while in the United States.

A-2

If the subscriber is a bank or broker-dealer, the subscriber hereby represents and warrants, when it is acquiring Shares on behalf of clients for investment purposes, that such clients are not U.S. Persons, that it will notify the Fund if it shall come to its knowledge that any such client is or has become a U.S. Person, that it will not at any time knowingly transfer or deliver the Shares or any part thereof or interest therein to a U.S. Person, and that it will not make any transfer thereof in the United States of America, its territories or possessions.

I/We declare that in subscribing for Shares in the Fund, I/each of us am/is a Professional Investor within the meaning of the Mutual Funds Act 1996, as amended in that:

[check one or both]

✓      My/our ordinary business involves, whether for my/our own account or the account(s) of (an)other(s), the acquisition or disposal of property of the same kind as the property, or a substantial part of the property which is (or will be) owned by the Company, as detailed in the Confidential Offering Memorandum of the Company.

_____      My/our net worth (in the case of a natural person, whether individually or jointly with my spouse) exceeds US$1,000,000 or its equivalent in any other lawfully recognized currency and I/we consent to be treated as a Professional Investor for the purpose of an investment in the Company.

Shares will be held in book entry form for the subscriber, following acceptance, by the Administrator, UBS (Cayman Islands) Limited.

If requested, Share Certificates may be issued in the name of a nominee. If this facility is required, please fill in name of nominee:

_____

The Subscriber hereby designates and appoints UBS Fund Services (Cayman) Ltd., through its authorized officers and directors, with full power of subscription, as its true and lawful Proxy and Attorney-in-Fact for the purpose of voting the shares herein subscribed for as said Proxy may determine on any and all matters which may arise at any annual or special meeting of shareholders and upon which such shares could be voted by shareholders present in person at such meeting. This Proxy may be revoked by the owner of record of the shares hereby subscribed for, either personally or by presentation of a subsequently executed proxy at any annual meeting or special meeting of shareholders, or by written notice to UBS Fund Services (Cayman) Ltd., P.O. Box 852, George Town, Grand Cayman, Cayman Islands.

Signature Page for Subscription by an INDIVIDUAL

SHARES TO BE REGISTERED AS FOLLOWS:

(Check One)

☐    INDIVIDUAL SUBSCRIBER        ☐    CO-SUBSCRIBERS
                                          (Both signatures required below)

(Please print all information exactly as you wish it to appear on the Company's records.)

_____
(Name of Subscriber)

_____                    _____
(Address)                                               (Telephone - Days)

_____                    _____
(Country of Residence)                                  (Telephone - Evenings)

_____
(Name of Co-Subscriber)

_____                    _____
(Address)                                               (Telephone - Days)

_____                    _____
(Country of Residence)                                  (Telephone - Evenings)

Dated: _____          Signatures of Individual Subscriber(s)
                                    (Please print name below each signature):

                                    _____

                                    _____

                                    _____

                                    _____

A-4

Signature Page for Subscription by an ENTITY

SHARES TO BE REGISTERED AS FOLLOWS:

ENTITY OWNERSHIP - Check form of organization:

☐  CORPORATION -        Please include certified resolutions (or similar documents) authorizing signature.

☐  PARTNERSHIP -        Please include a copy of the partnership agreement (or similar document) authorizing signature.

☑  TRUST -              Please include a copy of the trust agreement. *Government Pension Plan (Municipal Corporation)*

☐  BANK or BROKER-DEALER - See Page A-2

(Please print all information exactly as you wish it to appear on the Company's records.)

*Seattle City Employees' Retirement System*
(Name of Subscriber)

*801 Third Avenue, Suite 300*          *206-615-1424*
(Address)                              (Telephone - Days)

*USA*                                  *206-954-5753 (cell)*
(Country of Formation)                 (Telephone - Evenings)

The undersigned trustee, partner or officer warrants that he has full power and authority from all beneficiaries or partners or from the board of directors of the entity named below to sign this Share Application Form on behalf of the entity and that a purchase of Shares in Epsilon Global Active Value Fund II Ltd. is not prohibited by the governing documents of the entity.

Dated: *12|18|03*

Signatures of Entity Subscriber(s)
(Please print name below each signature):

*Seattle City Employees' Retirement System*
(Name of Entity)

By: _____
(Trustee, partner or authorized corporate officer)

*Mel Robertson, Asst. Executive Director*
(Name and Title)

By: _____
(Trustee, partner or authorized corporate officer)

_____
(Name and Title)

A-5

SUBSCRIPTION INFORMATION

SHARE REGISTRATION INFORMATION

MAILING (POST) INFORMATION (if other than
address of registration)

Seattle City Employees Retirement System
Name

801 Third Avenue, Suite 300
Address

Seattle, WA, USA    98104
Country of Residence

206-615-1424
Telephone

206-954-5753 (cell)
Telephone (Evenings)

206- 386-1506
Fax

REMITTING BANK

BANK FOR TRANSFERS in case of redemptions (if
other than Name & Address of Remitting Bank):

Wells Fargo
Name

Address

Seattle WA USA   98104
Country of Residence

206-684-5214 (Marilyn Miento)
                (Seattle City Treasury)
Telephone

Telephone (Evenings)

Fax

A-6

**EPSILON GLOBAL ACTIVE VALUE FUND II LTD.**
**SUBSCRIPTION AGREEMENT AND STANDING PROXY**

### Instructions

A.   All Subscribers.   Complete page A-2 by filling in the amount of the subscription; page A-3 by indicating whether the Shares are to be issued in book entry form or issued in the name of a nominee; and page A-6 by completing the necessary subscription information.

B.   Subscriptions by Individuals.   If a subscription is by an individual (including more than one), the "Signature Page for Subscription by an Individual" (page A-4) must be completed.

C.   Subscriptions by Entities.   If a subscription is by an entity (trust, partnership, corporation, bank or broker-dealer), the "Signature Page for Subscription by an Entity" (page A-5) must be completed.

D.   Items to be delivered by All Subscribers.

   (i)   Completed and signed Share Application Form and corresponding signature page (pages A-2, A-3, A-4 or A-5, and A-6).

   (ii)   U.S. dollar denominated funds in the amount of the full purchase price for Shares.   Wire transfer funds for the full amount of the subscription to the Company's subscription account at:

   | | |
   |---|---|
   | To: | UBS AG, Stamford Branch |
   | ABA Fedwire: | 0260-0799-3 |
   | SWIFT: | UBSWUS33XXX |
   | For account of: | UBS Fund Services (Cayman) Ltd. |
   | Account#: | 101-WA-359025-000 |
   | For further credit to: | Epsilon Global Active Value Fund II Ltd. |
   | Account#: | 72162 |

   (iii)   Subscription documents should be delivered or mailed to Epsilon Global Active Value Fund II Ltd., c/o UBS Fund Services (Cayman) Ltd., UBS House, 227 Elgin Avenue, P.O. Box 852GT, Grand Cayman, Cayman Islands

A-1

## SUBSCRIPTION AGREEMENT AND STANDING PROXY

To:     Epsilon Global Active Value Fund II Ltd.
c/o UBS Fund Services (Cayman) Ltd.
UBS House
227 Elgin Avenue
P.O. Box 852GT
Grand Cayman, Cayman Islands
Fax: 1-345-914-4060

Please fill in the following information:

Amount of Subscription in U.S. Dollars: $ *10,000,000* ——

I/We hereby apply to subscribe to purchase as many shares in Epsilon Global Active Value Fund II Ltd. (the "Fund") as may be purchased with above amount upon the terms of the Confidential Offering Memorandum of the Fund, as it may be amended, which I/we have received and read. I/We acknowledge that I am/we are able to afford a shareholding in a venture having the risks and objectives of the Fund.

I/We declare the following: (1) the Shares hereby subscribed for are not being (i) acquired directly or indirectly by, and (ii) will not be transferred directly or indirectly to, (A) any individual who is a citizen, national or resident of the United States of America, (B) a corporation, partnership, association, joint-stock company, trust, fund, or any organized group of persons whether incorporated or not, created, organized or existing in, or organized and existing under the laws of the United States of America or any state, territory or possession thereof, or any other trust or estate, other than an estate or trust the income of which from sources outside of the United States of America is not includible in gross income for purposes of computing United States income tax payable by it, (C) any other trust in which one or more of the persons specified in clause (A) and (B) above have a cumulative direct or indirect beneficial interest in excess of 50 percent of the value of the trust, (D) any other non-corporate entity in which one or more of the persons specified in clause (A) or (B) above, directly or indirectly, have more than a 50 percent beneficial interest, (E) any other corporation in which one or more of the persons specified in clause (A) or (B) above, directly or indirectly, own stock possessing more than 50 percent of the total combined voting power of all classes of stock entitled to vote, or more than 50 percent of the total value of shares of all classes of stock, and (F) any other corporation, partnership, association, joint-stock company, trust, fund, organized group or persons whether incorporated or not with respect to which one or more of the persons specified in clauses (A) or (B) above have the power to exercise a controlling influence over the management or policies, unless such power is solely the result of an official position with such company ("U.S. Person"); (2) no offer to purchase such shares was made to me/us while I was/we were in the United States; (3) I/We did not agree to purchase such Shares while in the United States; (4) I/We will not attempt by any means, to offer, originate or execute an agreement to sell such Shares while in the United States; and (5) I/We agree that I/We will not, directly or indirectly, participate (defined below) in any business or enterprise with any past, present or future employee of the Fund, its general partner or its affiliates in any geographical area in which the Fund now conducts business, presently intends to conduct business, or has conducted business. The term "participate" includes any direct or indirect interest in any enterprise, whether as an investor, officer, director, employee, partner, sole proprietor, agent, representative, independent contractor, consultant, franchiser, franchisee, creditor, owner or otherwise; provided that the term "participate" shall not include ownership of less than two percent of the stock of a publicly-held corporation whose stock is traded on a national securities exchange or in the over-the-counter market. Investor agrees that this covenant is reasonable with respect to its duration, geographical area and scope. I/We also agree that I/We shall not (i) induce or attempt to induce or solicit any past, present or future employee of the Fund, its general partner of its affiliates to participate in any business with Investor or its affiliates or in any way interfere with the relationship between the Fund and any of its employees; or (ii) induce or attempt to induce any investor or other business relation of the Fund to cease doing business with the Fund or in any way interfere with the relationship between the Fund and any customer, investor or business relation. I/We agree and understand that the Fund would suffer irreparable harm from a breach by me/us of any of the covenants or

A-2

agreements contained herein, and that money damages would not be wholly adequate to remedy such breach. In the event of a breach (or an alleged or threatened breach) by me/us of any of the provisions of this Agreement, the Fund or its successors or assigns may, in addition to all other rights and remedies in law or in equity existing in their favor, redeem the investment made by me/us, and apply to any court of competent jurisdiction for injunctive or other relief in order to enforce or prevent any violations of the provisions hereof, without the posting of any bond or any other security. I/We agree that these provisions are reasonable.

If the subscriber is a bank or broker-dealer, the subscriber hereby represents and warrants, when it is acquiring Shares on behalf of clients for investment purposes, that such clients are not U.S. Persons, that it will notify the Fund if it shall come to its knowledge that any such client is or has become a U.S. Person, that it will not at any time knowingly transfer or deliver the Shares or any part thereof or interest therein to a U.S. Person, and that it will not make any transfer thereof in the United States of America, its territories or possessions.

I/We declare that in subscribing for Shares in the Fund, I/each of us am/is a Professional Investor within the meaning of the Mutual Funds Act 1996, as amended in that:

[check one or both]

_✓_      My/our ordinary business involves, whether for my/our own account or the account(s) of (an)other(s), the acquisition or disposal of property of the same kind as the property, or a substantial part of the property which is (or will be) owned by the Company, as detailed in the Confidential Offering Memorandum of the Company.

_____      My/our net worth (in the case of a natural person, whether individually or jointly with my spouse) exceeds US$1,000,000 or its equivalent in any other lawfully recognized currency and I/we consent to be treated as a Professional Investor for the purpose of an investment in the Company.

Shares will be held in book entry form for the subscriber, following acceptance, by the Administrator, UBS Fund Services (Cayman) Limited.

If requested, Share Certificates may be issued in the name of a nominee. If this facility is required, please fill in name of nominee:

_____

The Subscriber hereby designates and appoints UBS Fund Services (Cayman) Ltd., through its authorized officers and directors, with full power of subscription, as its true and lawful Proxy and Attorney-in-Fact for the purpose of voting the shares herein subscribed for as said Proxy may determine on any and all matters which may arise at any annual or special meeting of shareholders and upon which such shares could be voted by shareholders present in person at such meeting. This Proxy may be revoked by the owner of record of the shares hereby subscribed for, either personally or by presentation of a subsequently executed proxy at any annual meeting or special meeting of shareholders, or by written notice to UBS Fund Services (Cayman) Ltd., UBS House, 227 Elgin Avenue, P.O. Box 852, George Town, Grand Cayman, Cayman Islands.

A-3

Signature Page for Subscription by an ENTITY

SHARES TO BE REGISTERED AS FOLLOWS:

ENTITY OWNERSHIP - Check form of organization:

☐  CORPORATION -          Please include certified resolutions (or similar documents) authorizing signature.

☐  PARTNERSHIP -          Please include a copy of the partnership agreement (or similar document) authorizing signature.

☑  TRUST -                Please include a copy of the trust agreement *Government Pension Plan (Municipal Corporation)*

☐  BANK or BROKER-DEALER - See Page A-2

(Please print all information exactly as you wish it to appear on the Company's records.)

*Seattle City Employees' Retirement System*          *mel.robertson@seattle.gov*
(Name of Subscriber)                                  (E-Mail Address)

*801 Third Ave, Suite 300 Seattle WA 98104*          *206-615-1424*
(Address)                                             (Telephone - Days)          (Facsimile)

*USA*                                                 *206-954-5753 (cell)*
(Country of Formation)                                (Telephone - Evenings)

The undersigned trustee, partner or officer warrants that he has full power and authority from all beneficiaries or partners or from the board of directors of the entity named below to sign this Share Application Form on behalf of the entity and that a purchase of Shares in Epsilon Global Active Value Fund II Ltd. is not prohibited by the governing documents of the entity.

Dated: *12/10/09*

Signatures of Entity Subscriber(s)
(Please print name below each signature):

*Seattle City Employees' Retirement System*
(Name of Entity)

By: _____
(Trustee, partner or authorized corporate officer)

*Mel Robertson, Asst. Executive Director*
(Name and Title)

By: _____
(Trustee, partner or authorized corporate officer)

_____
(Name and Title)

A-5

**SUBSCRIPTION INFORMATION**

**SHARE REGISTRATION INFORMATION**

**MAILING (POST) INFORMATION** (if other than address of registration)

Seattle City Employees' Retirement System
Name

801 Third Ave. Suite 300
Address

Seattle, WA 98104 · USA
Country of Residence

206-615-1424
Telephone

206-954-5753 (cell)
Telephone (Evenings)

206-386-1506
Fax

**REMITTING BANK**

**BANK FOR TRANSFERS** in case of redemptions (if other than Name & Address of Remitting Bank):

Wells Fargo
Name

Address

Seattle WA USA 98104
Country of Residence

206-684-5214    Marilyn Minato
Telephone              Seattle City Treasury

Telephone (Evenings)

Fax

A-6

# Epsilon References

## Epsilon Investor References:

Mr. James Manley
President
Atlantic-Pacific Capital, Inc.
411 West Putnam Avenue, Suite 340
Greenwich, CT 06830, USA
(203) 862-9182

Mr. Kevin Hite
UBS Financial Services Inc.
1285 Avenue Of Americas
New York, NY 10019,USA
(212) 713-8854

Mr. Vicente Zaragoza
The Pentium Fund
3857 Birch Street, Suite 213
Newport Beach, CA 92660, USA
(714) 751-1624

## Professional References:

Mr. Gordon McDonnell
Executive Vice President
Jefferies & Company
11100 Santa Monica Blvd., 11th Floor
Los Angeles, CA 90025, USA
(310) 914-1155

Mr. Bruce Tolbert
Prudential Securities Inc.
880 Munson, Suite H
P.O. Box 1286
Traverse City, MI 49686, USA
(231) 929-4700

Mr. Jim Glanzer
BNP Paribas
787 Seventh Avenue
New York, NY 10019, USA
(212) 841-2623

Εpsilon Investment Management

Grand rue 3, CH-1820
Montreux, Switzerland
Tel: +41-21-966-7900
Fax: +41-21-962-8801

February 4, 2010

Memorandum to
Epsilon Global Active Value Fund Ltd., Epsilon Global Active Value Fund II Ltd.,
Epsilon Structured Strategies Fund Ltd., Westford Special Situations Fund Ltd.,
and Westford Special Situations Fund II Ltd.

| Epsilon & Westford Versus Selected Indices | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2009 | | | | Last | Correlation | | | |
| | 2nd Quarter | 3rd Quarter | 4th Quarter | YTD | 24 months | EGAVF | EGAVF II | ESSF | WSSF |
| Epsilon Global Active Value Fund Ltd * | 1.23% | (0.41)% | 1.67% | 1.77% | 6.78% | | | | |
| Epsilon Global Active Value Fund II Ltd * | 2.05% | 0.08% | 2.18% | 3.55% | 10.04% | | | | |
| Epsilon Structured Strategies Fund Ltd* | (1.12)% | (1.59)% | (2.67)% | (7.21)% | 26.50% | | | | |
| Westford Special Situations Fund Ltd * | 2.19% | 0.50% | 2.04% | 5.26% | 12.72% | | | | |
| Westford Special Situations Fund II Ltd ** | | 1.03% | 0.59% | 1.63% | 1.63% | | | | |
| S&P 500 Index | 15.91% | 15.59% | 6.04% | 26.47% | (20.31)% | 0.03 | (0.11) | (0.06) | (0.06) |
| MSCI Global EAFE Index | 16.92% | 14.82% | 3.33% | 24.72% | (25.51)% | (0.04) | (0.14) | (0.06) | (0.06) |
| CSFB Investable Hedge Fund Index | 3.85% | 4.60% | 8.29% | 18.62% | (14.06)% | 0.14 | 0.07 | (0.04) | 0.13 |
| Merrill Lynch Investment Grade Bond Index | 8.61% | 7.04% | 1.33% | 18.27% | 10.76% | (0.06) | (0.01) | (0.03) | 0.06 |

\* Returns are net of fees.
\*\* Fund was launched on July 1, 2009. YTD figures are inception to date. Correlation data is not relevant due to limited history.

We set forth above our quarterly performance summary for the second, third and fourth quarters. As our results reflect, during 2009, as throughout the history of our Funds, we have made no attempt to capture short-term market rallies, but instead have focused consistently, with the success that our longer term results reflect, on providing attractive risk-adjusted returns with no correlation to the broader markets.

Particularly because we believe markets globally appear poised at the edge at what may, at least in retrospect, be regarded as an historically significant inflection point, we would be remiss if we did not afford our investors the opportunity to evaluate our profound skepticism regarding the sustainability of current market valuation levels.

Following the burst of the technology bubble in 2000, the S&P reached its bottom nearly three years later, in March 2003. From the daily low close in March of 2003, it took no fewer than 793 days for the index to rally 60%. By way of comparison, from the daily low close in March of 2009 (the generally accepted "bottom" of this bear market), the S&P has rallied 60% in less than one-fourth that time, thus recording one of history's most rapid market rallies. A great many market observers have pointed to the bear market rally of 1929-30 as an instructive contrast, and have contended that since the current rally has persisted for more than six months without nosing over, we are in a new bull market. To us, however, the more compelling historical analogy is the behavior of the Nikkei following the burst of the Japanese asset bubble in 1989. In a manner anticipating the current extraordinary central bank and government interventions, no one has built more bridges or paved more riverbeds than the Liberal Democratic Party of Japan. Whether or not as a result, since 1990 the Nikkei has managed no fewer than four 50%+ rallies and six 20%+ rallies. Yet the Nikkei is down over 74% from 1990 through 2009. These are the grim hallmarks of deflationary credit collapse.

# EXHIBIT C

The US consumer continues to deleverage at a pace unseen since the Great Depression. During 2009, total consumer credit shrank 3.7% during the year and 3.95% from its peak, and has contracted in 11 of the past 12 months. During the third quarter, weekly hours worked in the US fell to an all-time low of 33 hours. The unemployment rate is 10%, less than 1% below the postwar high seen in 1982. For 23 consecutive months, the longest stretch in data going back to 1929, US non-farm payrolls have contracted. Never before have we experienced a 60% rally in risk assets while also losing 2.7 million jobs. The rally in investment grade credit has been remarkable. For prime borrowers, spread levels have now returned to levels unseen since the Federal Reserve arranged the shotgun marriage between JP Morgan and Bear Stearns—although for other borrowers the credit markets remain highly dislocated and volatile. Since that time, the US has lost 6.1 million jobs. Markets are pricing in GDP growth of 4-5%, but when 70% of the world's largest economy is the consumer, and said consumer has seen his working hours shrink to the lowest level in history, and his credit contract at a record pace to a level that has now reached 4%, we believe the only rational conclusion is intense skepticism that current equity and credit market valuations are sustainable for any length of time.

We are also writing to apprise you of important decisions that we are taking regarding the Epsilon and Westford Funds. In part, these decisions are motivated by our concern, as discussed above, regarding the persistence and possible intensification of credit market dislocation and volatility. As discussed below, certain other developments also have contributed to these decisions. All of these decisions have been reached after painstaking consideration on our part and, in the case of the offshore Funds, each such Fund's Board of Directors. All of these decisions reflect our (and the Boards') dedication to the best interests of the Funds and their investors, and our (and their) conviction that these decisions will best serve those interests.

First, effective as of the date of this letter, all of the Epsilon and Westford Funds are being closed to new subscriptions. Second, effective as of the date of this letter, we are temporarily suspending the redemption of shares or limited partnership interests, as the case may be, in three of our Funds: Epsilon Global Active Value Fund (LP & Ltd.) ("Epsilon I"); Epsilon Global Active Value Fund II (LP & Ltd.) ("Epsilon II"); and Westford Special Situations Fund (LP & Ltd.) ("Westford I"). We take this second step with great reluctance, for the reasons discussed below.

For Westford I in particular, the decision to suspend redemptions stems largely from the ongoing lack of sufficient liquidity in both the credit markets and the Westford I portfolio, and what we see as the diminishing prospect that credit market liquidity will recover meaningfully in the near future, as we had previously anticipated. During 2005-07, prior to the market crash, as equity-oriented investment strategies performed well, Westford I endured substantial redemptions, which the Fund was able to meet in full through disposition of portfolio securities. Beginning in late 2007, as credit market liquidity sharply diminished and then, in 2008, virtually collapsed, Westford I was no longer able to meet redemptions in full. Redemptions fell off sharply in early 2008 and have remained light, and during 2008-09 WSSF has made five *pro rata* partial payments of redemption proceeds to redeemed investors.

Currently, the four largest positions in Westford I are direct lending positions representing approximately 63% of Westford I's portfolio assets. These positions consist of fully secured credit extensions to certain distressed issuers, in furtherance of a distressed lending/loan-to-own strategy along the longer investment horizon characteristic of this strategy. The Manager is a very experienced and skilled practitioner of this strategy, and we believe that all of these investments offer the prospect of highly attractive investment returns. We are pursuing definite "harvesting" strategies for all of these investments, and we are highly confident that, given the time and opportunity to bring these strategies to fruition, as we are in the best position to do, we

will both secure for the Westford Funds the attractive returns that we have anticipated from these investments and, of course, complete payment of the remaining unpaid Westford I redemption proceeds.

Another factor influencing our decision to suspend redemptions in the three Funds named above is that we have not yet received final audited financial statements for the Epsilon and Westford Funds for their fiscal years ended December 31, 2008, from PricewaterhouseCoopers Accountants N.V. ("PwC"), the Funds' independent accountants since 1998. Until December of 2009, we had expected the audited statements to be released before the end of 2009. However, we have been advised by PwC that the release of the audited statements has been delayed because of contacts to PwC from the Staff of the U.S. Securities and Exchange Commission (the "SEC") in connection with a private and confidential order of investigation relating to Westford, which was delivered to us by the Staff in May of 2009. We understand that the investigation has come to focus largely on matters relating to the valuation of the direct loan investments in the Westford portfolio discussed above. These are fully collateralized loans that, in accordance with industry and accounting convention, are valued simply at face value plus accrued interest. From the beginning of the 2008 audits, we and PwC have gone to unusual lengths, including independent audits and valuations of several of these investments by leading independent accountants and valuation experts, all for the purpose of determining beyond reasonable doubt whether each of these investments was unimpaired and thus correctly valued. We are therefore confident that our positions in this regard will be sustained. To date, the SEC has not advised us of any conclusions from its investigation, nor have we been charged with any wrongdoing. We believe we have at all times conducted ourselves appropriately. We have been cooperating fully with the Staff in this investigation.

During the next few days, we shall be reaching out to each of you individually to discuss these matters with you. We very much appreciate the trust and confidence you have placed in us, and very much hope that you will remain steadfast in these challenging times.


Sincerely,


Steve G. Stevanovich

**Carter, Cecelia**

| | |
|---|---|
| From: | Carter, Cecelia |
| Sent: | Friday, February 12, 2010 3:22 PM |
| To: | 'Karen Tomblin'; 'George Rudman' |
| Cc: | Wells, Teresa; Seu, Carlton |
| Subject: | Seattle CERS / Epsilon Conference Call 02.12.2010 |

George & Karen;

I want to thank you both, and your compliance officer – Ed Bergman, Esq. again for taking time to speak with the representatives of Seattle City Employees' Retirement System (SCERS) this morning – myself, Teresa Wells, and Carlton Seu, Esq. Both Ms. Wells, Mr. Seu and myself found the dialogue to be most informative and very productive. The conversations helped further our understanding of the position the Epsilon Global Value Fund II (the "Fund") is in.

We look forward to receiving a formal statement from the Fund of SCERS's December 31, 2009 holdings as a percentage of the entire Fund.

We further understand the current gating of redemption request is a business decision and not a mandatory, statutory, or contractual requirement. That said; I would like to reiterate on behalf of the Seattle City Employees' Retirement System our Notice for full redemption of our share of the Fund's assets as outlined in the two subscription documents executed on SCERS's behalf – Notice, which was made to the Fund January 28, 2010. We await your re-evaluation of the Fund's position with regards to this request. Alternatively, we ask for the Fund to consider redeeming 85% of the SCERS's position within the subscription documents timeline and hold back 15% pending completion of the Fund's 2008 audit, or other event driven circumstance providing a full release of held back monies. We await your evaluation of this request as well. We would greatly appreciate feedback from you regarding these request by close of business Tuesday, February 23, 2010.

In the meantime; we certainly look forward to your update communications regarding this Fund as things unfold; the more communication – the better.

Best Regards,

- *Cecelia*

Cecelia M. Carter
Executive Director
Seattle City Employees' Retirement System
720 Third Avenue, Suite 1000
Seattle, WA 98104
Office Telephone: 206.386.1292
City Mobile Number: 206.255.4117
Office Fax: 206.386.1506

NOTICE: This communication may contain privileged or other confidential communications. If you have received this message in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

Tracking:                                                    1

**EXHIBIT D**



# Investor Statement

Cecelia Carter
Seattle City Employees Retirement System
720 Third Avenue
Suite 1000
Seattle WA 98104
UNITED STATES

**Email:** cecelia.carter@seattle.gov

**Investor Id:** 001063
**Investor Name:** SEATTLE CITY EMPLOYEES RETIREMENT SYSTEM

| Class Description | | | | Currency |
|---|---|---|---|---|
| Epsilon Global Active Value Fund II Ltd USD Class | | | | USD |

| Account Summary | | Units | Valuation | Market Value |
|---|---|---|---|---|
| Opening Position: | 01/12/2009 | 142,674.58 | 174.12 | 24,842,497.87 |
| Additions in the period: | | 0.00 | | 0.00 |
| Subtractions in the period: | | 0.00 | | 0.00 |
| Closing Position: | 31/12/2009 | 142,674.58 | 174.22 | 24,856,765.33 |
| Market Value Variation: | | | | 14,267.46 |
| Valuation % Change: | | | | 0.0574% |

Should you have any questions please feel free to contact David Barry at dbarry@equinoxeals.com or David McCormack at dmccormack@equinoxeals.com.

EQUINOXE

EXHIBIT E

**From:** Carter, Cecelia
**Sent:** Monday, March 08, 2010 3:19 PM
**To:** 'Karen Tomblin'; 'George Rudman'
**Cc:** Wells, Teresa; Seu, Carlton
**Subject:** SCERS - Epsilon Global Active Value Fund II
**Importance:** High

Dear George and Karen,

We haven't heard back from you with respect to the February 12, 2010 email from me regarding our alternative redemption request of 85%. Please let us know by the end of this week whether Epsilon will agree to the alternative redemption request.

Further, I must insist and therefore request that you provide us with additional information regarding SCERS's position in the Epsilon Global Active Value Fund II Ltd. In Mr. Stevanovich's February 4, 2010 memorandum/correspondence, the justifications provided for gating redemptions are all related to issues with the Westford funds, not Epsilon Global Active Funds. Specifically, the two reasons set forth by Mr. Stevanovich for gating were: (1) lack of liquidity in Westford; and (2) PwC's failure to provide audited financial statements because of an ongoing investigation by the SEC into Westford. From our perspective neither of these reasons justify: (a) the withholding of audited financial statements for Epsilon Global Active Value Fund II Ltd or associated financial records if the audited financial statements for Epsilon are not complete; and (b) refusing to redeem SCERS's shares in Epsilon Global Active Value Fund II Ltd.

As a result, I would like to meet with you at our offices on Monday, March 15, 2010 at 9 a.m or 10am. At this meeting, please be prepared to provide SCERS with: (1) the 2008 audited financial statement if it exist; (2) all underlying documents provided to PwC for the purposes of preparing the 2008 audited financial statement; and (3) an accounting of SCERS's December 31, 2009 holdings as a percentage of the entire Epsilon Global Active Fund II Ltd (as requested in our February 12, 2010 email). Please confirm directly back with me your meeting with us on March 15th and the time more convenient for your travels.

As you know we are a public pension plan; and thus we appreciate your assistance and understanding of the necessity for transparency in all SCERS investments.

I look forward to hearing from you soon.

Best Regards,
- *Cecelia*

Cecelia M. Carter
Executive Director
Seattle City Employees' Retirement System
720 Third Avenue, Suite 1000
Seattle, WA 98104
Office Telephone: 206.386.1292
City Mobile Number: 206.255.4117

3/14/2010

Office Fax: 206.386.1506

NOTICE: This communication may contain privileged or other confidential communications. If you have received this message in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

EXHIBIT F

Epsilon Global Active Value Fund II Ltd.

Road Town, Tortola

British Virgin Islands

Directors' report and financial statements

for the year ended December 31, 2007

EXHIBIT G

# Contents

**Directors and general information**                                                     **2**
Directors and general information                                                          3

**Directors' report**                                                                     **4**
Directors' report                                                                    ⋅ 5

**Financial statements**                                                                  **6**
Balance sheet as at December 31, 2007                                                      7
Income statement for the year ended December 31, 2007                                      8
Statement of changes in net assets attributable to holders of redeemable
participating shares for the year ended December 31, 2007                                  9
Cash flow statement for the year ended December 31, 2007                                   10
Notes to the financial statements                                                         11
Auditor's report                                                                          22

*Epsilon Global Active Value Fund II Ltd.,*
*Road Town, Tortola, British Virgin Islands*

Directors and general information

## Directors and general information

**Board of directors**
Steve G. Stevanovich
Alberto C. d'Abreu de Paulo

**Registered office**
Epsilon Global Active Value Fund II Ltd.
Craigmuir Chambers
P.O. Box 71
Road Town, Tortola
British Virgin Islands

**Registrar and transfer agent**
**(up to November 30, 2006)**
UBS Fund Services (Cayman) Ltd.
UBS House
227 Elgin Avenue
P.O. Box 852
George Town, Grand Cayman
Cayman Islands

**Custodian and prime broker**
Goldman Sachs & Co
One New York Plaza
New York, NY 10004
United States of America

**Investment manager**
Epsilon Global Asset Management Ltd.
P.O. Box 309
George Town, Grand Cayman
Cayman Islands

**Auditors**
PricewaterhouseCoopers Accountants N.V.
P.O. Box 8800
3009 AV Rotterdam
The Netherlands

**Legal counsel**
Monahan & Biagi, P.L.L.C.
701 Fifth Avenue, Suite 2800
Seattle, Washington 98104
United States of America

**Administrator, registrar and transfer agent**
**(as of December 1, 2006)**
JPMorgan Hedge Fund Services (Ireland) Limited
Newenham House
Northern Cross
Malahide Road
Co. Dublin
Ireland

**Directors' report**

## Directors' report

Results for the year ended December 31, 2007 were satisfactory. The Fund had total investment income of USD 2,908,452 and net income of USD 2,575,547. Total investment income included interest income of USD 100,171 and net gains on financial assets and liabilities at fair value through profit or loss of USD 2,808,281. Expenses totaled USD 332,905 for the year. The largest expense was attributed to the management fee of USD 308,928.

Epsilon Global Active Value Fund II Ltd. and its sister fund, Epsilon Global Active Value Fund II-B L.P. are organised into a master/feeder structure with their Master Fund, Epsilon Global Master Fund II L.P. (the 'Master Fund').

The Master Fund employs a global opportunistic and event driven investment strategy, investing in a variety of securities. These include but are not limited to, equities, bonds, bank debts, trade claims, options, swaps, futures, Credit Default Swaps (CDSs), Collateralised Debt Obligations (CDOs), Collateralised Loan Obligations (CLOs), direct lending and structured products. In conjunction with this strategy, the Master Fund seeks to minimise risk, opportunistically employing hedging strategies for specific investments. As a result of the global opportunistic and event driven investment strategy, the Master Fund's results frequently do not correlate significantly with global stock and bond indices. The Master Fund requires securities markets to operate with adequate liquidity in order to meet its investment objectives.

The Fund began trading in December 2001 and its assets have grown from that date to USD 29.2 million by December 31, 2007. Due to the nature of the Fund's investments and its global perspective, the directors believe that the Fund has significant capacity for growth. This capacity is further enhanced by the capabilities and depth of the Fund's management team. The investment manager currently employs twenty investment professionals with considerable investment and trading experience.

The Master Fund has thus far employed borrowed funds in the form of margin to establish short positions in both stocks and bonds. For the most part these short positions are used to hedge specific related long positions, although there are instances where the Master Fund may sell short a security it views to be overvalued.

Steve G. Stevanovich

Alberto C. d'Abreu de Paulo

July 15, 2008

*Epsilon Global Active Value Fund II Ltd.,*
*Road Town, Tortola, British Virgin Islands*

5

Financial statements

## Balance sheet as at December 31, 2007

| | Notes | 2007 | 2006 |
|---|---|---|---|
| | | USD | USD |
| **Assets** | | | |
| Financial assets at fair value through profit or loss | 3 | 24,139,222 | 59,398,416 |
| Other receivables | | 4,168 | - |
| Distributions receivable | | 3,826,033 | 3,920,069 |
| Other amount receivable from related entity | | 68,281 | |
| Other amounts receivable from the Master Fund | | 96,510 | |
| Cash due from banks | | 1,219,918 | 249 |
| **Total assets** | | 29,354,132 | 63,318,734 |
| | | | |
| **Liabilities** | | | |
| Equalisation shares | | 7 | 284 |
| Deferred distributions | | 3,826,034 | 3,920,069 |
| Other amounts payable to related entity | | 1,287,602 | - |
| Fees payable and accrued expenses | 6 | 18,083 | 225,798 |
| Liabilities (excluding net assets attributable to holders of redeemable participating shares) | | 5,131,726 | 4,146,151 |
| Net assets attributable to holders of redeemable participating shares | 7 | 24,222,406 | 59,172,583 |
| **Total liabilities** | | 29,354,132 | 63,318,734 |
| | | | |
| Net asset value per share (in USD) | | 158.77 | 149.95 |

The accompanying notes are an integral part of these financial statements.

## Income statement for the year ended December 31, 2007

| | Notes | 2007 | 2006 |
|---|---|---|---|
| | | USD | USD |
| **Revenue** | | | |
| Interest income | | 100,171 | 40,826 |
| Other income | | - | 3,750 |
| Depreciation deposit earned | | - | 22,797 |
| Net gains on financial assets and liabilities at fair value through profit or loss | | 2,808,281 | 5,906,810 |
| **Total investment income** | | 2,908,452 | 5,974,183 |
| | | | |
| **Expenses** | | | |
| Management fees | 8 | 308,928 | 1,011,950 |
| Administration fees | 8 | 15,890 | - |
| Legal and professional fees | | - | 85,642 |
| Other expenses | | 8,087 | 10,758 |
| **Total expenses** | | 332,905 | 1,108,350 |
| | | | |
| **Increase in net assets attributable to holders of redeemable participating shares from operations** | | 2,575,547 | 4,865,833 |

The accompanying notes are an integral part of these financial statements.

**Statement of changes in net assets attributable to holders of redeemable participating shares for the year ended December 31, 2007**

| | Number of shares | USD |
|---|---|---|
| **Net assets attributable to holders of redeemable participating shares at January 1, 2006** | 1,548,705 | 217,221,325 |
| Subscriptions of redeemable participating shares | 11,349 | 1,600,000 |
| Redemptions of redeemable participating shares | (1,165,429) | (164,514,575) |
| Increase in net assets attributable to holders of redeemable participating shares from operations | | 4,865,833 |
| **Net assets attributable to holders of redeemable participating shares at December 31, 2006** | 394,625 | 59,172,583 |
| Subscriptions of redeemable participating shares | 2 | 1,765 |
| Redemptions of redeemable participating shares | (242,065) | (37,527,489) |
| Increase in net assets attributable to holders of redeemable participating shares from operations | | 2,575,547 |
| **Net assets attributable to holders of redeemable participating shares at December 31, 2007** | 152,562 | 24,222,406 |

The accompanying notes are an integral part of these financial statements.

*Epsilon Global Active Value Fund II Ltd.,*
*Road Town, Tortola, British Virgin Islands*

9

## Cash flow statement for the year ended December 31, 2007

|  | 2007 | 2006 |
|---|---:|---:|
|  | USD | USD |
| **Cash flow from operating activities** |  |  |
| Increase in net assets attributable to holders of redeemable participating shares from operations | 2,575,547 | 4,865,833 |
| *Adjustments for:* |  |  |
| Interest income | (100,171) | (40,826) |
| **Operating profit before working capital changes** | 2,475,376 | 4,825,007 |
| Net decrease in financial assets at fair value through profit or loss | 35,259,194 | 158,837,852 |
| Net decrease in other receivables | - | 56,957 |
| Net increase in other amounts receivable from the Master Fund | (96,510) | - |
| Net increase in other receivables from and payables to related entities | 1,219,321 | - |
| Net decrease in fees payable and accrued expenses | (207,715) | (804,017) |
|  | 38,649,666 | 162,915,799 |
| Interest received | 96,003 | 40,826 |
| **Net cash from operating activities** | 38,745,669 | 162,956,625 |
| **Cash flows from financing activities** |  |  |
| Proceeds from subscriptions of redeemable participating shares | 1,488 | - |
| Distributions paid | (37,527,488) | (164,588,330) |
| **Net cash used in financing activities** | (37,622,510) | (164,588,330) |
| **Net increase/(decrease) in cash and cash equivalents** | 1,219,669 | (1,631,705) |
| Cash and cash equivalents at beginning of the year | 249 | 1,631,954 |
| **Cash and cash equivalents at end of the year** | 1,219,918 | 249 |

The accompanying notes are an integral part of these financial statements.

## Notes to the financial statements

### 1    General

Epsilon Global Active Value Fund II Ltd. ('the Fund') was incorporated in the British Virgin Islands under the International Business Companies Act (Cap. 291) on October 30, 2001 and commenced operations on December 1, 2001.

All assets of the Fund are, and the proceeds from the sale of additional ordinary shares in the Fund will be, invested through a master/feeder fund structure in Epsilon Global Master Fund II L.P. ('the Master Fund'), a limited partnership formed under the laws of the Cayman Islands. In addition to the Fund, the other Limited Partner in the Master Fund, Epsilon Global Active Value Fund II-B L.P., a Delaware limited partnership, also invests in the Master Fund and other vehicles may be formed in the future to invest in the Master Fund as a Limited Partner. Each such investment vehicle will invest in the Master Fund on substantially the same terms and conditions as the Fund and therefore will generally be allocated a proportionate share of the Master Fund's gains, losses and expenses based on their interest in the Master Fund, adjusted for any differences in fees.

Shares of the common stock of the Fund are offered only to investors who are neither citizens nor residents of the United States of America (natural persons) and to a limited number of United States investors consisting primarily of tax-exempt entities.

The declaration of dividends on the shares will be in the discretion of the board of directors, and dividends may be declared only out of retained earnings. The Fund does not presently intend to pay dividend on its shares.

The Fund has no employees.

The Fund's financial statements were authorised for issue on July 15, 2008, and signed on its behalf by the board of directors.

Mr Steve G. Stevanovich                                        Mr Alberto C. d'Abreu de Paulo

### 2    Accounting policies

The principal accounting policies adopted in the preparation of these financial statements are set out below. These policies have been consistently applied to all years presented, unless otherwise stated in the following text.

*Basis of preparation*
The financial statements are prepared in accordance with International Financial Reporting Standards (IFRS). The financial statements are prepared under the historical cost convention as modified by the revaluation of financial assets and financial liabilities held at fair value through profit or loss.

The preparation of financial statements in conformity with IFRS requires the use of accounting estimates. It also requires management to exercise its judgment in the process of applying the Fund's accounting policies. The areas involving a higher degree of judgment or complexity, or areas where assumptions and estimates are significant to the financial statements are disclosed in note 4.

These financial statements are the non-consolidated financial statements of the Fund. Separate financial statements have been prepared for the Master Fund and may be obtained from the investment manager of the Fund.

*New standards and amendments to published standards effective in 2007*

The following standards and amendments are applicable to the Fund's operations and mandatory for the Fund's accounting period beginning on January 1, 2007 and have been adopted on January 1, 2007:

–   IFRS 7, Financial Instruments: Disclosures, and the complementary Amendment to IAS 1, Presentation of Financial Statements: Capital Disclosures, effective January 1, 2007 and

–   The Amendment to IAS 1, Presentation of Financial Statements: Capital Disclosures, effective January 1, 2007.

The Fund has also applied this new standard and amendment to 2006.

IFRS 7 introduced new disclosures relating to financial instruments. This standard does not have any impact on the classification and valuation of the Fund's financial instruments. In accordance with the requirements of the Amendment to IAS 1, additional disclosures have been provided on the Fund's objectives and policies for its capital, which is represented by the net assets attributable to the holders of redeemable participating shares.

*Amendments not yet effective and which have not been early adopted by the Fund*

The following amendments to existing standards applicable to the Fund have been published that are mandatory for the accounting periods beginning on or after January 1, 2008 but that the Fund has not early adopted:

–   Amendments to IAS 32 Financial Instruments: Presentation, effective January 1, 2009 and Amendments to IAS 1 Presentation of financial statements revision, effective January 1, 2009.

Amendments to IAS 32 may affect the classification of the redeemable participating shares issued by the Fund in the balance sheet of the Fund. The Fund issues redeemable participating shares, which are redeemable at the holder's option. Redeemable participating shares can be put back to the Fund at any time for cash equal to a proportionate share of the Fund's net asset value. The redeemable participating share is carried at the redemption amount that is payable at the balance sheet date if the holder exercises the right to put the share back to the Fund. At December 31, 2007, redeemable participating shares are classified as liabilities in terms of IAS 32 before this amendment. It is expected that the amendment to this standard may result in the classification of redeemable participating shares as equity in the balance sheet of the Fund.

IAS 1 affects the presentation of owner changes in equity and of comprehensive income. It does not change the recognition, measurement or disclosure of specific transactions and other events required by other IFRS standards.

*Standards and Interpretations to existing standards that are not yet effective and not relevant for the Fund's operations*

The following standards and interpretations to existing standards have been published that are mandatory for the Fund's accounting periods beginning on or after 1 January 2008 or later periods but are not relevant for the Fund's operations:

–   IFRIC 12, Service Concession Agreements (effective from January 1, 2008);

–   IFRIC 13, Customer Loyalty Programmes (effective from July 1, 2008);

–    IFRIC 14, IAS 19 - The Limit on a Defined Benefit Asset, Minimum Funding Requirements and their Interaction (effective from January 1, 2008) and

–    IFRS 8, Operating segments (effective January 1, 2009).

All references to net assets throughout this document refer to net assets attributable to holders of redeemable participating shares unless otherwise stated.

The balance sheet presents assets and liabilities in increasing order of liquidity and does not distinguish between current and non-current items. All the Fund's assets and liabilities are held for the purpose of being traded or are expected to be realised within one year, with the exception of redeemable participating shares.

### Foreign currency translation

(a) Functional and presentation currency
The financial statements are prepared in United States dollar (USD), this being the Fund's functional currency. Management determined USD as the functional and presentation currency for the Fund to reflect the fact that the issued ordinary shares of the Fund are denominated in USD and most of the Fund's investments are denominated in USD.

(b) Transactions and balances
Foreign currency transactions are translated into the functional currency using the exchange rates prevailing at the dates of the transactions. Foreign exchange gains and losses resulting from the settlement of such transactions and from the translation at year-end exchange rates of monetary assets and liabilities denominated in foreign currencies are recognised in the income statement.

When a gain or loss on a non-monetary item is recognised in profit or loss, any exchange component of that gain or loss shall be recognised in profit or loss.

Translation differences on non-monetary items such as financial assets held at fair value through profit or loss are reported as part of the fair value gain or loss.

### Financial assets and liabilities at fair value through profit or loss

–    Classification:
All financial assets and liabilities categorised as financial assets and liabilities at fair value through profit or loss are held for trading. Financial assets or liabilities held for trading are acquired or incurred principally for the purpose of selling or repurchasing in the short term.

–    Recognition/derecognition:
Regular-way purchases and sales of investments are recognised on trade date - the date on which the Fund commits to purchase or sell the asset. Investments are initially recognised at fair value. Investments are derecognised when the rights to receive cash flows from the investments have expired or the Fund has transferred substantially all risks and rewards of ownership.

–    Measurement:
Investments are initially recognised at fair value. Transaction costs for all financial assets and financial liabilities carried at fair value through profit or loss are expensed in the income statement as part of net gains/losses on financial assets and liabilities at fair value through profit or loss as incurred.

–    Fair value estimation:
The Fund follows the following measurement hierarchy when determining the fair value of financial assets and liabilities at fair value through profit or loss:

    a.   For instruments traded in active markets, quoted prices are used;

    b.   For instruments for which there is not an active market, recent market transactions are used and

    c.   For instruments for which there is neither an active market nor a recent market transaction, valuation techniques are used.

Unlisted securities are valued at their fair values as determined by management in consultation with the investment manager in accordance with recognised accounting and financial principles. In this respect, investments in other investment companies are valued at fair value which is the net asset value per share on the day of valuation as calculated by the related administrators, unless the directors are aware of good reasons why such valuation would not be the most appropriate indicator of fair value.

The fair value of investments is based on available information and does not necessarily reflect the amounts which might ultimately be realised. Such realisation depends upon future events and circumstances. Due to the inherent uncertainty of valuations, these estimated values may differ materially from the values that would have been used had a ready market for the investments existed.

*Determination of gains or losses on financial assets and liabilities at fair value through profit or loss*
Both realised and unrealised gains and losses on financial assets and liabilities at fair value through profit or loss are taken as income and expenses as incurred. Realised gains and losses on sales of financial assets and liabilities at fair value through profit or loss are calculated on a first in first out basis.

*Other fair values*
For all other categories than financial assets and liabilities at fair value through profit or loss, at December 31, 2007 and December 31, 2006, the carrying amount of all financial assets and liabilities approximates their fair values.

*Offsetting financial instruments*
Financial assets and liabilities are offset and the net amount is reported in the balance sheet when there is a legally enforceable right to set off the recognised amounts and there is an intention to settle on a net basis, or realise the asset and settle the liability simultaneously.

*Other receivables*
Receivables are non-derivative financial assets with fixed or determinable payments that are not quoted in an active market. Receivables are recognised initially at fair value plus transaction costs that are directly attributable to their acquisition or origination. They are subsequently measured at amortised cost using the effective interest method, less provision for impairment.

*Distributions receivable*
Distributions receivable represent a receivable from the Master Fund for accepted redemptions made in the Master Fund during the year, not yet received at year-end.

*Other amounts receivable from related entity*
Other amounts receivable from related entity represent amounts receivable from Epsilon Global Master Fund I L.P.

*Epsilon Global Active Value Fund II Ltd.,*                                                                14
*Road Town, Tortola, British Virgin Islands*

*Other amounts receivable from the Master Fund*

Other amounts receivable from the Master Fund represent amounts receivable from Epsilon Global Master Fund II L.P., the Master Fund of the Fund.

*Cash and cash equivalents*

For the purpose of the cash flow statement, cash and cash equivalents include cash in hand, deposits held at call with banks, other short-term highly liquid investments with original maturities of three months or less, and bank overdrafts.

*Equalisation shares*

Equalisation shares represent the amount issuable in redeemable participating shares to investors to equalise timing differences between individual investors with respect to the accrual of performance fees.

*Deferred distributions*

Deferred distributions represent amounts payable to shareholders for:

(a) 90% of the redemption requests received and accepted by the Fund in the last 30 days before the financial year-end and

(b) a retained portion of 10% of the value of redemptions received and accepted during the year, both of which are payable to the redeeming shareholders within 15 days of the date of distribution of these audited financial statements to the Fund.

(c) Interest on deferred distributions which is charged at the month-end interest overdraft rate as used by the Fund's main broker, Goldman Sachs & Co. The interest is accrued monthly and paid when the applicable deferred distribution is paid to the shareholder.

*Other amounts payable to related entity*

Other amounts payable to related entity represent amounts payable to Epsilon Global Active Value Fund II L.P., the other feeder fund of the Master Fund of the Fund.

*Fees payable and accrued expenses*

Fees payable and accrued expenses are recognised initially at fair value and subsequently stated at amortised cost. The difference between the proceeds and the amount payable is recognised over the period of the payable using the effective interest method.

The effective interest method is a method of calculating the amortised cost of a financial asset or financial liability and of allocating the interest income or interest expense over the relevant period. The effective interest rate is the rate that exactly discounts estimated future cash payments or receipts throughout the expected life of the financial instrument, or a shorter period where appropriate, to the net carrying amount of the financial asset or financial liability. When calculating the effective interest rate, the Fund estimates cash flows considering all contractual terms of the financial instrument (for example, prepayment options) but does not consider future credit losses. The calculation includes all fees and points paid or received between parties to the contract that are an integral part of the effective interest rate, transaction costs and all over premiums or discounts.

*Redeemable participating shares*

The redeemable participating shares of the Fund are redeemable at the holder's option and are classified as financial liabilities.

Each ordinary redeemable participating share carries one vote. They are entitled to participate ratably, on a share for share basis, with all outstanding shares, in the earnings and assets of the Fund.

The Fund offers its shares on a continuous basis at a price per share equal to the Net Asset Value (the 'NAV') per share as of date of issuance, plus any applicable subscription charges. A deposit to an Incentive Fee Reserve may be required in certain circumstances, and further adjustments to the number of shares may be required in accordance with an equalisation credit. Subscriptions received during any monthly period will ordinarily be accepted as of the first day of the following monthly period, i.e., subscriptions received between March 1 and March 31 will be accepted as of April 1. The Fund may, in its discretion, accept subscriptions on a day other than the first day of a month. The Fund will issue number of shares by dividing subscription amount by per share price rounded to 2 decimal places. Subscriptions received during any monthly period will ordinarily be accepted as of the first day of the following monthly period. The Fund may, in its discretion, accept subscriptions on a day other than the first day of a month. The minimum subscription for shares is USD 2,000,000, subject to the Fund's discretion to accept lesser amounts.

Upon 45 days' prior written notice to the Fund, each shareholder may request that the Fund redeems all or part of such shareholder's shares as of the close of business on the last day of the calendar quarter.

With respect to any partial redemption, a shareholder may not make a partial redemption of less than USD 100,000 and may not reduce such shareholder's unredeemed shares to an amount less than the minimum investment then required of new shareholders. Also, in order to be considered a partial redemption, the redemption cannot exceed 90% of a shareholder's total capital account. In any case, the redemption price shall be the net asset value of the redeemed shares, as calculated at the end of the applicable measurement period.

The investment manager also has the right to force the complete redemption of any shareholder at any time at the investment manager's sole discretion.

The net asset value of the shares is calculated by dividing the value of the assets, less the liabilities and appropriate reserves, by the total number of shares outstanding on the valuation date.

### Interest income and expense
Interest income is recognised on an accruals basis for those securities for which collection is probable. Recognition on an accruals basis approximates the effective interest rate method for the type of debt instruments held by the Fund. Once a financial asset or a group of similar financial assets has been written down as a result of an impairment loss, interest income is recognised using the rate of interest used to discount the future cash flows for the purpose of measuring the impairment loss.

### Expenses
Expenses are accounted for on an accrual basis and are charged to the income statement.

### Taxation
Under current laws of the British Virgin Islands, there are no income, estate, transfer, sales or other British Virgin Island taxes payable by the Fund. Generally, the Fund intends to conduct its affairs so as not to be liable to taxation in any other jurisdiction; however, the Fund may invest in securities whose income is subject to non-refundable foreign withholding taxes.

*Epsilon Global Active Value Fund II Ltd.,*
*Road Town, Tortola, British Virgin Islands*

**3    Financial assets at fair value through profit or loss**

At December 31, 2007, the portfolio of financial assets at fair value through profit or loss comprised long positions in Epsilon Global Master Fund II L.P. for a total market value of USD 24,139,222 (2006: USD 59,398,416).

The Fund has not sold or re-pledged any collateral during the year.

|  | Dec 31, 2007 | Dec 31, 2006 |
|---|---|---|
|  | USD | USD |
| Partnership interest - held for trading | 24,139,222 | 59,398,416 |
| Total financial assets at fair value through profit or loss | 24,139,222 | 59,398,416 |

**4    Accounting estimates and judgments in applying accounting policies**

The Fund makes estimates and assumptions that affect the reported amounts of its unlisted investment in the Master Fund within the next financial year. Estimates are continually evaluated and based on historical experience and other factors, including expectations of future events that are believed to be reasonable under the circumstances. The estimates and assumptions that have a significant risk of causing a material adjustment to the carrying amounts of its investment in the Master Fund, within the next financial year, are disclosed in the financial statements of the Master Fund, which are available on request from the investment manager of the Fund.

**5    Financial risk management**

The Fund's investment activities expose it to the various types of risks taken by the Fund and the money managers of the underlying funds, which are associated with the financial instruments and markets in which they invest. The following summary is not intended to be comprehensive of all risks and investors should refer to the Confidential Offering Memorandum for a more detailed discussion of the risks inherent to investing in the Fund.

The investment objective of the Feeder Fund is to invest in the Master Fund.

The investment objective is capital appreciation with risk control. The Master Fund employs a global opportunistic and event driven investment strategy, investing in a variety of securities. These include but are not limited to, equities, bonds, bank debts, trade claims, options, swaps, futures, Credit Default Swaps (CDSs), Collateralised Debt Obligations (CDOs), Collateralised Loan Obligations (CLOs), direct lending and structured products. In conjunction with this strategy, the Master Fund seeks to minimise risk, opportunistically employing hedging strategies for specific investments. As a result of the global opportunistic and event driven investment strategy, the Master Fund's results frequently do not correlate significantly with global stock and bond indices. The Master Fund requires securities markets to operate with adequate liquidity. In order to meet its investment objectives.

Based on the Fund's activities, it may be exposed to a variety of financial risks which include market risk, credit risk and liquidity risk.

The disclosures below are in respect of the Fund only and are not done on a look-through basis to the level of the Master Fund. Disclosure on financial risk management employed by the Master Fund is disclosed in the financial statements of the Master Fund which are available on request from the investment manager of the Fund.

*Market risk*

(a)  Other price risk
Other price risk is the risk that the fair value or future cash flows of a financial instrument will fluctuate because of changes in market prices (other than those arising from interest rate risk, currency risk, market credit risk or correlation risk), whether those changes are caused by factors specific to the individual financial instrument or its issuer, or factors affecting all similar financial instruments traded in the market.

The Fund's investments and financial instruments are susceptible to other price risk arising from uncertainties about future prices of the instruments. The Fund's overall market positions are monitored on a daily basis by the Fund's manager. Changes in market prices can occur extremely sudden due to numerous factors and may have an adverse impact on the results of the Fund. The maximum other price risk resulting from financial instruments is determined by the fair value of the financial instruments. As at December 31, 2007 and December 31, 2006, the Fund only invested in the Master Fund. At 31 December 2007, should equity prices of the Master Fund on average have increased or decreased by 1%, with all other variables remaining constant, the increase or decrease in net assets attributable to holders of redeemable participating shares for the year would amount to approximately USD 241,392 (2006: USD 593,984). Refer to the financial statemenst of the Master Fund for specific risk factors affecting the equity prices of the Master Fund.

(b)  Interest rate risk
All of the Fund's financial assets and liabilities, with the exception of cash and cash equivalents, are non-interest bearing; as a result, the Fund is not subject to significant amounts of risk due to fluctuations in the prevailing levels of market interest rates. Any excess cash and cash equivalents are invested at short-term market interest rates.

(c)  Credit risk
Credit risk is the risk that an issuer or counterparty will be unable or unwilling to meet a commitment that it has entered into with the Fund. Financial assets, which potentially expose the Fund to credit risk, consist principally of investments made in the Master Fund, deferred distributions receivable from the Master Fund and cash due from banks. The Fund's cash balances are primarily with high credit quality, well established financial institutions. The extent of the Fund's exposure to credit risk in respect of these financial assets approximates their carrying value as recorded in the Fund's balance sheet.

*Liquidity risk*
Liquidity risk is defined as the risk that the Fund may not be able to meet its obligations on time or must secure them at excessive cost.

The Fund is exposed to quarterly cash redemptions of redeemable participating shares. A lack of liquidity may also result from limited trading opportunities of the Master Fund. To manage this risk, the Fund invests in the Master Fund from which the Fund may redeem on an annual basis after a notice of 60 days.

*Epsilon Global Active Value Fund II Ltd.,*
*Road Town, Tortola, British Virgin Islands*

*Currency risk*

The Fund may invest in assets denominated in currencies other than its reporting currency, the USD. Consequently, the Fund is exposed to risks that the exchange rate of the USD relative to other currencies may change in a manner, which has an adverse effect on the reported value of that portion of the Fund's assets, which are denominated in currencies other than the USD.

As at December 31, 2007 and December 31, 2006, all assets and liabilities of the Fund were denominated in USD.

*Capital risk management*

The capital of the Fund is represented by the net assets attributable to the holders of redeemable participating shares. The Fund does not have any external requirements in respect of capital risk management and therefore does not perform any such activities.

### 6    Fees payable and accrued expenses

|  | Dec 31, 2007 | Dec 31, 2006 |
|---|---|---|
|  | USD | USD |
| Management fees | 12,958 | 192,231 |
| Legal and professional fees | - | 33,567 |
| Administration fees | 5,125 | - |
|  | 18,083 | 225,798 |

### 7    Redeemable participating shares

The authorised share capital of Epsilon Global Active Value Fund II Ltd. amounts to USD 100,000, divided into 10,000,000 ordinary shares of USD 0.01 each. As at December 31, 2007, 152,562 (2006: 394,625) of the ordinary shares were issued and fully paid.

### 8    Fees

*Management fees*

Under the terms of the management agreement, the investment manager receives an annual fee of 2% of the gross asset value of the Fund as of the last day of each quarter, adjusted for subscriptions and redemptions occurring within the quarter and computed without regard to the incentive fee.

To the extent that the management fee is paid by Epsilon Global Master Fund II L.P. (Master Fund) for investments made into the Master Fund by the Fund, such management fee amounts will not be charged to investors at the Fund level.

It is decided by the board of directors of the Fund and the General Partner of the Master Fund that the management fee of the two feeder funds, for the years ended December 31, 2007 and

*Epsilon Global Active Value Fund II Ltd.,*
*Road Town, Tortola, British Virgin Islands*

December 31, 2006, will be charged at the feeder level, therefore, the fees stated in these financial statements relate to the Fund only.

### Incentive fees

The General Partner receives an incentive fee for each fiscal year or otherwise determined upon the redemption of any ordinary shares, with respect to such redeemed ordinary shares respectively, (each a 'Performance Period') equal to 20% of the amount, if any, of the net appreciation of the Fund's net assets during that Performance Period.

To the extent that the incentive fee is paid by Epsilon Global Master Fund II L.P. (Master Fund), with regard to investments made into the Master Fund by the Fund, such incentive fee amounts will not be charged to investors at the Fund level.

If the Fund incurs a net loss during a fiscal year, the General Partner may not receive any incentive fees from the Fund in a subsequent fiscal year unless and until the amount of such net loss applicable to each and every share which experienced such net loss (and which remains outstanding at the time the subsequent profit occurs) has been recouped in full.

It is decided by the board of directors of the Fund and the General Partner of the Master Fund that the incentive fee of both feeder funds, for the years ended December 31, 2007 and December 31, 2006, will be charged at the Master Fund level, therefore, no such fees are stated in these financial statements.

### Directors' fees

The listing of the members of the board of directors is shown on page 3. In 2007 an amount of USD 6,230 (2006: USD 6,395) was paid to Alberto C. d'Abreu de Paulo as remuneration and no fees were paid to Steve G. Stevanovich.

### Administration fees

The administrator of the Fund is JPMorgan Hedge Fund Services (Ireland) Limited. The Fund pays a monthly fee to the administrator based on the average of the trading net asset value of the Fund, calculated monthly and payable monthly in arrears. The fee is subject to an annual minimum fee. Additionally, fees are charged for feeder servicing and corporate secretarial services.

The administrator is also the Fund's transfer agent for which fees are paid included in fees mentioned above.

### Audit expenses

Professional and other expenses in the income statement for the year ended December 31, 2006 is an amount of USD 21,537 for audit fees. It was decided by the board of directors of the Fund and the General Partner of the Master Fund that audit fees of both feeder funds, for the year ended December 31, 2007 will be charged at the Master Fund level; therefore, no audit fees are included in the incomes tatement of these financial statements for the year ended December 31, 2007.

### 9.    Related parties

Parties are considered to be related if one party has the ability to control the other party or exercise significant influence over the other party in making financial or operational decisions.

The Fund is managed by Epsilon Global Asset Management Ltd., an investment management company incorporated in the Cayman Islands. Epsilon Global Asset Management Ltd. receives

*Epsilon Global Active Value Fund II Ltd.,*
*Road Town, Tortola, British Virgin Islands*                                                20

from the Fund a fee based on the gross asset value of each class of fund payable quarterly using the annual rate of 2%.

Total management fees for the year, including the outstanding accrued fees due to Epsilon Global Asset Management Ltd. at the end of the year, are detailed below.

|  | Dec 31, 2007 | Dec 31, 2006 |
|---|---|---|
|  | USD | USD |
| Management fees for the year | 308,928 | 1,011,950 |
| Accrued at the end of the year | 12,958 | 192,231 |

As at December 31, 2007 and December 31, 2006, Steve G. Stevanovich had direct interests in the Fund through shares held in the Fund.

The directors are entitled to be reimbursed for all expenses incurred by them in attending and returning from meetings of the directors or any other meetings in connection with the business of the Fund. Refer to note 8 for more information in respect of directors' fees paid during the year.

As at December 31, 2007 and December 31, 2006, the Fund had amounts receivable from and payable to parties related to the investment manager as disclosed on the face of the balance sheet.

10    Subsequent events

There were no post-balance-sheet events.

*Epsilon Global Active Value Fund II Ltd.,*
*Road Town, Tortola, British Virgin Islands*

# PRICEWATERHOUSE(COOPERS 🅑

---

To the Board of Directors of
Epsilon Global Active Value Fund II Ltd.

PricewaterhouseCoopers
Accountants N.V.
Fascinatio Boulevard 350
3065 WB Rotterdam
P.O. Box 8800
3009 AV Rotterdam
The Netherlands
Telephone +31 (10) 407 55 00
Facsimile +31 (10) 456 43 33
www.pwc.com/nl

## Auditor's report

We have audited the accompanying financial statements of Epsilon Global Active Value
Fund II Ltd. ('the Fund') as set out on pages 7 to 21 which comprise the balance sheet as
at December 31, 2007 and the income statement, statement of changes in net assets
attributable to holders of redeemable participating shares and the cash flow statement for
the year then ended and a summary of significant accounting policies and other
explanatory notes.

### *The directors' responsibility for the financial statements*
The directors are responsible for the preparation and fair presentation of the financial
statements in accordance with International Financial Reporting Standards. This
responsibility includes designing, implementing and maintaining internal control relevant to
the preparation and fair presentation of the financial statements that are free from material
misstatement, whether due to fraud or error, selecting and applying appropriate
accounting policies and making accounting estimates that are reasonable in the
circumstances.

### *Auditor's responsibility*
Our responsibility is to express an opinion on the financial statements based on our audit.
We conducted our audit in accordance with International Standards on Auditing. Those
standards require that we plan and perform the audit to obtain reasonable assurance
about whether the financial statements are free of material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and
disclosures in the financial statements. The procedures selected depend on the auditor's
judgment, including the assessment of the risks of material misstatement of the financial
statements, whether due to fraud or error. In making those risk assessments, the auditor
considers internal control relevant to the Fund's preparation and fair presentation of the
financial statements in order to design audit procedures that are appropriate in the
circumstances, but not for the purpose of expressing an opinion on the effectiveness of
the Fund's internal control. An audit also includes evaluating the appropriateness of
accounting policies used and the reasonableness of accounting estimates made by the
directors, as well as evaluating the overall presentation of the financial statements.

We believe that our audit provides a reasonable basis for our audit opinion.

---

FG-e0064337u-av-00526466001

PricewaterhouseCoopers is the trade name of among others the following companies: PricewaterhouseCoopers Accountants N.V. (Chamber
of Commerce 34180285), PricewaterhouseCoopers Belastingadviseurs N.V. (Chamber of Commerce 34180284), PricewaterhouseCoopers
Advisory N.V. (Chamber of Commerce 34180287) and PricewaterhouseCoopers B.V. (Chamber of Commerce 34180289). The services
rendered by these companies are governed by General Terms & Conditions, which include provisions regarding our liability. These General
Terms & Conditions are filed with the Amsterdam Chamber of Commerce and can also be viewed at www.pwc.com/nl.

# PRICEWATERHOUSECOOPERS 🏢

### Audit opinion

In our opinion, the accompanying financial statements present fairly, in all material respects, the financial position of Epsilon Global Active Value Fund II Ltd. as at December 31, 2007 and its financial performance and its cash flows for the year then ended in accordance with International Financial Reporting Standards.

### Emphasis of matter

The Fund is the feeder fund of Epsilon Global Master Fund II L.P. ('the Master Fund') and invests only in the Master Fund. The financial statements of the Master Fund are available on request from the investment manager of the Partnership. We draw attention to the emphasis of matter included in the Auditor's report relating to the financial statements for the year ended December 31, 2007 of the Master Fund. Our opinion is not qualified in respect of this matter.

Rotterdam, July 15, 2008

PricewaterhouseCoopers Accountants N.V.

H.F.M. Gertsen RA