UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| SEATTLE CITY EMPLOYEES'<br>RETIREMENT SYSTEM, an agency<br>of the City of Seattle,<br><br>          Plaintiff,<br><br>v.<br><br>EPSILON GLOBAL ACTIVE VALUE<br>FUND II, LTD., a British<br>Virgin Islands corporation,<br>et al.<br><br>          Defendants. | ) <br>) <br>) <br>) CASE NO. C10-555 RAJ<br>) <br>) SEATTLE, WASHINGTON<br>) April 2, 2010<br>) <br>) MOTION FOR TRO/<br>) PRELIMINARY INJUNCTION<br>) <br>) <br>) <br>) <br>) |

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE RICHARD A. JONES
UNITED STATES DISTRICT JUDGE

APPEARANCES:

    For the Plaintiff:      BRADLEY THORESON, SAMUEL BULL,
                            RAFAEL STONE, CARLTON SEU


    For the Defendant:      HARRY SCHNEIDER, JR.
                            JEFFREY HANSON


    Reported by:            NANCY L. BAUER, CCR, RPR
                            Federal Court Reporter
                            700 Stewart Street, Suite 17205
                            Seattle, WA 98101
                            (206) 370-8506
                            nancy_bauer@wawd.uscourts.gov

# EXHIBIT A

| | |
|---|---|
| 1 | April 2, 2010 |
| | PROCEEDINGS |

April 2, 2010                                    1:30 p.m.
                        PROCEEDINGS
_____

THE CLERK:  We're here in the matter of the Seattle
City Employees' Retirement System v. Epsilon Global Active
Value Fund, et al., Cause No. C10-555, assigned to this
court.  Counsel, please rise and make your appearances.

MR. THORESON:  Good afternoon, Your Honor.  Brad
Thoreson from Foster Pepper for plaintiff.  I have with me
Sam Bull from Foster Pepper; Rafael Stone, one of my partners
at Foster Pepper; and Cecelia Carter, the executive director
for the plaintiff; and Carlton Seu, who is with the City of
Seattle Attorney's Office.

THE COURT:  Good afternoon, all of you.

MR. SCHNEIDER:  Good afternoon, Your Honor.  Harry
Schneider on behalf of defendants.  With me is my colleague,
Jeff Hanson.

THE COURT:  Good afternoon to both of you as well.

From the defendant's perspective, who will be arguing on
behalf of the defendant?  Yourself, Mr. Schneider?

MR. SCHNEIDER:  If the court will please, yes.

THE COURT:  All right.  Thank you for attending this
afternoon.  The court scheduled this without a lot of notice.
The court didn't receive much notice in terms of the request
of the parties.

I'd like to begin with counsel for the plaintiff.  If you

1    would step to the lectern, I have several questions I'd like

2    to ask of you before you begin your formal presentation to

3    the court.

4        I'd like to begin, first of all, by asking you, what's the

5    status on service?  I think there's only two entities that

6    have been served so far.  What's the update?

7            MR. THORESON:  To the best of my knowledge, Your

8    Honor, the only entity that has not been served is Mr. and

9    Mrs. Stevanovich, who, per declarations filed, have

10   apparently been avoiding service.

11       We have served the BVI corporations in the British Virgin

12   Islands, we served the investment management company in

13   Delaware, and then there's a Cayman Island entity as well

14   that's been served in the Caymans, I believe.  So we've

15   effectuated the service process of the -- all the applicable

16   pleadings, with the exception probably of some of the more

17   recent filings.  But at least a summons, compliant, and the

18   TRO-associated declarations, and those pleadings should be in

19   the court file and should be part of the -- what was filed as

20   part of the removal, because I know that we filed the

21   affidavits of service with the King County Superior Court.

22           THE COURT:  Before we go any further, Counsel, the

23   court set this for today with the understanding that the

24   parties will be prepared to go forward on the TRO and/or the

25   injunction.  Is that part your understanding as well?

1    MR. SCHNEIDER:  That is our understanding of what you

2    indicated, yes.

3    THE COURT:  Is there any reason why we should delay

4    these proceedings regarding the issuance of injunction or the

5    denial?

6    MR. THORESON:  Not from our perspective, Your Honor.

7    I believe the authority is that --

8    THE COURT:  That's as far as you have to go, Counsel.

9    Counsel for the defendant's perspective?

10    MR. SCHNEIDER:  Yes.

11    THE COURT:  You are of the understanding as well that

12    we're proceeding today on the injunctive relief as well?

13    MR. SCHNEIDER:  That is my understanding.  In answer

14    to your other question, we believe there are reasons to not

15    proceed today with issuing any injunction.

16    THE COURT:  Okay.  I'm not asking about the

17    substantive basis; I'm saying in terms of your being ready to

18    argue on the motion today.  That's what I'm getting to.

19    MR. SCHNEIDER:  This won't take long.

20    THE COURT:  Okay.

21    MR. SCHNEIDER:  If the court wants to hear argument,

22    we are prepared to present argument.

23    THE COURT:  Okay.

24    MR. SCHNEIDER:  But we believe that a more -- not to

25    suggest that this is not an orderly proceeding.  We think a

1  more thorough area with witnesses would make sense, and I'm

2  prepared to address that in oral argument.  But I'm not

3  suggesting that I'm unable to present argument today.  We

4  understand we're here to do just that.

5       THE COURT:  Okay.  If you'd step back to the lectern,

6  Mr. Thoreson.

7       Now, with that out of the way, Counsel, I'd like to go

8  through some of the areas of relief, and then I'll give you a

9  chance to make a formal presentation to the court.

10      If relief is to be tied to your original claim, breach of

11  contract, under what authority or basis can the court order

12  nonpayment of the management fee?

13      MR. THORESON:  We believe, Your Honor, under the --

14  and I -- it's -- Ms. Carter's supplemental declaration

15  includes a -- what we believe to be the operative

16  confidential offering memoranda.  I'm just going to grab it

17  real quick and step away.

18      Ms. Carter filed a declaration in support of the motion on

19  March 31, 2010, Cecelia Carter, and the Exhibit B to that,

20  Your Honor, the confidential offering memoranda, and the page

21  4 of the redemption procedure specifically indicates, "With

22  respect to assets representing any part of the redemption

23  price not paid within 30 days of the redemption date, the

24  fund will not charge management fees and will pay interest at

25  a rate paid by the fund's prime broker on the fund's cash

1   balances."

2       We understand there were prior confidential operating

3   memoranda.  This was provided to our client, we believe it's

4   the operative document, and we believe that when the

5   redemption request was made in January and when it was

6   denied, the fund was gated at the 30 days passed, that at

7   that point the fund was not allowed per the operative

8   covenant to take any management fees.

9           THE COURT:  Well, let me ask you, from a practical

10  standpoint, Counsel, if the court were to grant a request

11  that said stop payment of all management fees, it's

12  essentially funds not managed by any entity, what's supposed

13  to happen under the circumstances?

14          MR. THORESON:  That's a great question.  I think when

15  we get into oral argument, you'll see that there are no

16  assets within this fund at this point per the Bergan

17  declaration that was supplied to the court by Perkins Coie on

18  Tuesday, that they've actually been placed in a different

19  fund, and they have then gone from that fund to a different

20  fund.  But I don't believe anything is happening at the fund

21  level at this point that would justify the payment of a

22  management fee.

23          THE COURT:  Counsel, if the funds, according to your

24  theory, are now with a different entity, under what authority

25  would the court have interest and control over this other

1   entity?

2        MR. THORESON:  I don't think you do, Your Honor.  I

3   think all you have is jurisdiction and control over Fund II,

4   which is the fund whom we believe is not entitled to recover

5   any management fee at this point.

6        THE COURT:  So are you withdrawing your request for

7   termination of the management fee payment?

8        MR. THORESON:  Well, I believe what we did, Your

9   Honor, is we requested a termination or a cessation of the

10  fund we have a contractual relationship with.  I don't -- and

11  it may be unclear in the order, but I -- our request would be

12  that Epsilon II -- Epsilon Global Active Fund II be the party

13  that is disallowed from taking a management fee at this point

14  or anyone acting on their behalf.

15       THE COURT:  Another question:  Recognizing the

16  specificity requirements for either the TRO or a preliminary

17  injunction, you asked the court to order the defendants to

18  take no action that could be deemed harmful.  Now, the

19  concern I have is, I'm not quite certain what that means or

20  how far the court is supposed to go in that regard, because

21  that would, in theory, put the court in a position of having

22  to second guess every single determination that could be made

23  by the managing entity.

24       MR. THORESON:  I agree, but I also think that given

25  the situation, which we believe is not overstated when you're

1   dealing with Madoff or Enron -- I mean, just complete hide

2   the ball, refuse to give any information, that having the

3   entity against whom the injunctive relief is ordered be

4   worried about every decision they make, I -- I mean,

5   particularly given what we know, I think that is fair and

6   equitable in this situation.

7       And I think when we get into argument -- I know the

8   court's reviewed the pleadings -- but when we get into

9   describe what's happened and what we've determined in the

10  couple of day has happened, enjoining the managing partner

11  from engaging in any activity that could conceivably be

12  harmful to the pensioners from the City of Seattle is fair

13  relief, it's equitable relief.

14      Maybe when they produce records and they tell us what's

15  going on so we can assess our position as a shareholder,

16  whether we're the last man standing, where all our money is,

17  how it's been invested, why we weren't given disclosures that

18  we believe we're entitled to receive, why they're not giving

19  us information, why the SEC is investigating the entity that

20  they decided to put our money into that's disallowed by, we

21  believe, the investment guidelines contrary to them, when

22  they've answered those questions, maybe we'll be able to sit

23  here and go, oh, here's some things they should be able to

24  do, here's some things it shouldn't.  But what we have is

25  complete disregard, complete lack of information, and we

1    think based on that situation, Your Honor, something broader

2    as opposed to narrower is appropriate.

3         And if they believe -- if we believe they've violated it,

4    then that we might be in front of you at some point arguing

5    it harmful, and they can argue it wasn't.  But at least

6    they're the ones that are placed in the riskiest position,

7    meaning do something that is perceived to be bad, and if it

8    ends up being bad, you're going to be held accountable by the

9    court.

10         THE COURT:  Well, Counsel, I assume you'll be giving

11   the court a little bit more help in the context of defining

12   what harmful means, because at this point in time it's rather

13   nebulous for the court to be able to make that assessment.

14         MR. THORESON:  I will try.

15         THE COURT:  Next question, Counsel:  You seek relief

16   in your TRO -- I'm assuming for injunctive purposes as

17   well -- of the auditing of the financial statements from

18   2009.  That isn't due until May of 2010.  Now, Counsel, isn't

19   that premature for the court to make determinations before

20   it's even ripe for the court's decision?

21         MR. THORESON:  Yes.  We will throw out that.

22         THE COURT:  And, Counsel, not that it's supercritical

23   to the court's determination on your motion, but you've

24   tossed in your theory the alter ego issue regarding

25   Stevanovich.  Is that determination necessarily critical for

1    the issuance of an injunctive TRO?

2         MR. THORESON:  Let me spend 30 seconds just to give

3    the court our thought, and then I'm going to say unlikely

4    necessary, but I'm just going to give you why we've asserted

5    the alter ego claim.

6         We really need the information.  We're not asking for any

7    conclusions as to liability in this case.  We just need to

8    know what's going on.  And we were a little bit, given what's

9    happened, concerned that Epsilon II may appear and say, oh,

10   but we don't have the documents, they're in the custody of

11   our investment manager, or, oh, they're in the possession of

12   Mr. Stevanovich, or, oh, they're in the possession of our

13   broker-dealer and therefore we can't comply with the order.

14        So the idea was, because it appears that all of these are

15   Stevanovich-controlled entities, we've argued the altered ego

16   claim in the event that on the motion for sanctions for

17   failure to comply, assuming the court were to order some

18   production here and assuming, perhaps, Epsilon II says, we

19   don't have the documents, that perhaps we have a cause of

20   action that would allow the court to order a party with whom

21   we don't have direct contractual privity the ability to

22   require that party to produce the records that Epsilon II

23   claims it doesn't have.

24        THE COURT:  Well, Counsel, you really seek

25   information; is that the bottom line?

**13**

1        MR. THORESON:  That is absolutely correct, Your

2  Honor.

3        THE COURT:  And counsel for the defense has proposed

4  an alternative to injunctive relief, and that alternative is

5  expedited discovery and an early trial date, and they've

6  listed several witnesses that they believe having their

7  depositions taken would give you the necessary information

8  you desire.  Do you think that that's a viable option or

9  alternative?

10       MR. THORESON:  I think we're entitled to the

11  information.  If what they're saying is they're refusing to

12  honor the obligation to give us the source documents or audit

13  financial records, which I'll chat about a little bit in a

14  minute, yeah, I guess if we could do it Monday or Tuesday and

15  that's as soon as they can get us the documents, and we can

16  get the information, that would probably be acceptable.

17      But, you know, it's a little bit we're faced with the

18  hangover from Bear Stearns and Lehman and these other folks.

19  It's terrifying when you're sitting in the pensioners'

20  position.  They've got $20 million invested and they can't

21  get any meaningful information.

22      And then the stuff that we found out recently is even more

23  troubling; that we've been invested in a fund that's

24  insolvent.  We just spoke with the liquidator yesterday who

25  told us they don't have any money there, they've invested it

12

1    in another fund.  And the person who's responsible for all

2    this, Mr. Stevanovich, is avoiding service.

3          THE COURT:  Okay.  The last question I have before

4    you proceed with your argument to the court:  In looking at

5    the actual confidential offering memorandum, as I note from

6    that document, Counsel, it appears that what you agreed to

7    was to get the audited report, but you're asking the court

8    now to provide you with underlying data.  Wouldn't that

9    exceed the boundaries of which you agreed to initially?

10         MR. THORESON:  I think that it is less than what we

11   agreed to initially, but I think it is a suitable alternative

12   in the event that 10 months or 12 months after the report is

13   due, the documents are not produced.

14      Again, all we're seeking, Your Honor, is information that

15   tells us if we are the last man standing in the fund, meaning

16   whether it's $20- or $25 million, whether we're the only

17   shareholders.  We're seeking information about where -- why

18   the $20- or $25 million, which we know was is in our fund, is

19   not there anymore.  We're looking at the rights, vis-à-vis

20   our fund, Epsilon II, or our monies were invested as to the

21   Westford fund that's in insolvency were apparently invested

22   in.  And we're -- we're -- I mean, we're entitled to

23   understand our situation, our predicament, and I don't think

24   that Epsilon II can say -- and I'll get into it in more

25   detail.

1    But, you know, the auditor hasn't given audited financial

2    statements.  I mean, in the real world, the reason that

3    doesn't happen is because the party who has instructed the

4    auditor to proceed with the audit hasn't accepted the audit.

5    But it's in their control.  They haven't put anything in the

6    record that suggests they've gone to another auditing firm to

7    try to get this done, completed by somebody else.

8    They've stated -- and I think this is very problematic --

9    that it looks like an SEC investigation happened late last

10    year in the Westford, which was a fund we never knew we were

11    invested in, it doesn't have anything to do with Epsilon II,

12    but we now understand why they can't honor our redemption

13    request is because they took our money and put it into

14    another fund that was disallowed, and that fund is

15    delinquent, that fund is insolvent, and that fund has

16    apparently transferred its -- all of its invested $180

17    million into another fund.

18    But we -- what's really troubling here, you're asking

19    about the source information that -- that every year until

20    2009, within 120 days we got the information.  In 2009 -- or

21    2008, we didn't get the information, and apparently whatever

22    this SEC investigation happening, it didn't happen until well

23    after we've been provided, typically, the information.  And

24    it just -- you know, it's one of those ones that it just

25    doesn't look right, it doesn't smell right.  It's the fact

1    that three weeks ago or four weeks ago, we invited these guys

2    to come out and tell us what the situation was, and they

3    wrote us an email declining, just saying, no, we're not going

4    to come.

5        We're entitled to information, and I believe what we're

6    asking, Your Honor, is less -- we can't get the audited

7    statements because apparently they're not done.  But we're

8    taking their representation -- we don't have anything before

9    the court, by the way, from PricewaterhouseCoopers saying

10   that they're not done or why they're not done.  We just have,

11   again, their representations.

12       But we believe that the source documents are inclusive,

13   that they're what PwC is relying on to create the audited

14   financial statements and annual report.  And, yes, it's

15   lesser, but at least it gives us the information that we need

16   to decide how to go forward.  We don't even know that right

17   now.

18           THE COURT:  Let me ask you this, Counsel:  The court,

19   understanding the original claim is breach of contract --

20           MR. THORESON:  Right.

21           THE COURT:  -- and assuming the original claim of

22   breach of contract, the court has to look at the actual

23   contract in making its determination of its assessment of the

24   likelihood of success in this case of an actual breach.

25       Now, using that as a base, if the initial agreement

1    provides for an annual report, but doesn't reference

2    underlying documentation and data, doesn't that go more

3    towards the issue of discovery as opposed to immediate

4    relief, and wouldn't the remedy that you're calling for

5    require the court to engage in reformation of the contract or

6    restructure of the contract that didn't originally exist?

7            MR. THORESON:  I don't -- I don't think it does,

8    because I think the court, in the injunctive proceeding, the

9    nature, can fashion whatever remedy it believes is equitable,

10   given the situation.

11        In this situation, Your Honor, what the fund is saying is

12   we don't have these because we've got an SEC investigation.

13   That's apparently what they're saying, although now

14   Mr. Bergan is saying, "but we think we'll have them in a

15   month."

16        I hope the court noticed that in the email we got from the

17   representative of the fund back in October, they said they

18   were going to give them to us then, too, and we still don't

19   have them.

20        But I think the court can fashion whatever remedy it deems

21   is equitable.  I believe that that is a -- the source

22   documents are a subset of what they actually have to give us,

23   which is an audited, you know, financial statement and annual

24   report from their auditors, which it's troubling they can't

25   get it.  But I believe the court can order that remedy as a

1  remedy that is encompassed by the breach of contract.

2    You can't perform what the contract obligation requires

3  you to perform and give us the alternative, and the best

4  alternative performance are the source documents, which would

5  give us at least the understanding of what our status is

6  within this fund, how our $20 million was transferred to

7  another fund that wasn't supposed to get our funds, and the

8  other relevant information relative to the operation of the

9  fund, the subscription agreement between our fund and

10  Westford so that we can evaluate our situation.  That's all

11  we're trying to do.

12    THE COURT:  All right, Counsel.  It's this court's

13  standard practice -- I think you've been before me in this

14  court and the other court -- is to make sure that I get all

15  the questions that I have answered before you begin your

16  presentation, but I think you can get an idea what the

17  primary concerns that this court has in response to the

18  relief that you're requesting.  You may proceed, Counsel.

19    MR. THORESON:  Thank you, Your Honor.  I appreciate

20  the court's questions, and I will try not to go over the

21  areas that have already been covered by your questions.

22    THE COURT:  That's appreciated.

23    MR. THORESON:  Again, may it please the court, Brad

24  Thoreson for the plaintiffs, Seattle City Employees'

25  Retirement System.  I'm going to refer it to probably, Your

1    Honor, today as either the pension fund or SCERS, an acronym,

2    S-C-E-R-S.

3        SCERS is a public pension fund, Your Honor, that's funded

4    by current and retired employees of the City of Seattle.

5    It's an agency of the City of Seattle, and it currently has

6    over 15,000 pensioners who are beneficiaries of the fund, and

7    they are, again, current and former employees.

8        We mentioned it in our pleadings, Your Honor, and I think

9    it's important to note that as a pension fund, we also have

10   certain reporting obligations under the pension fund rules

11   for reporting the fair market value of certain investments.

12   I think something the court should just understand as it's

13   proceeding is that it's very difficult for us to do this at

14   this time given the questions that have arisen out of this

15   asset, this investment, and it's very important that we

16   sooner than later really get to the bottom of this and find

17   out what is going on relative with investment, because we

18   really don't know.

19       As I said before, who I have with me is Cecelia Carter,

20   who administered the fund.  She is the executive director.

21   Mr. Seu is with the City of Seattle.  Mr. Stone is head of

22   our investment management group, the firm that represents

23   many public pension funds across the country, and Mr. Bull.

24       We're seeking the enforcement of the TRO.  As the court

25   knows, the TRO was issued two and a half weeks ago, and today

1    there's been no compliance, although there's been service.

2        I know that the court asked earlier opposing counsel

3    about, you know, whether we needed a continuance or not.  I

4    just would hope the court take record in the files, and there

5    are extensive pleadings, that, you know, the day that we went

6    down and took the TRO, it's kind of ironic, the confidential

7    subscription agreement identifies local attorneys as the

8    fund's lawyers.

9        We sent the information to them.  They had an opportunity

10   to appear.  When I got back to my office and called the

11   attorney who had called me, he said, "Well, did you get the

12   order?"  And I said, yeah.  He said, "Can you send me a

13   copy?"  I did.  We then were told, "I don't have authority to

14   accept service for anyone."

15       The next day, Mr. Bergan and I and Mr. Bull engaged in

16   some exchanges about service and telling them who their

17   lawyers were and who they represented, and Mr. Bergan said he

18   would immediately be hiring lawyers.

19       And I think it's unfortunate, and certainly it's not

20   Mr. Schneider or Mr. Perkins, you know, probably, fault, but

21   literally two days before the preliminary injunction hearing

22   was scheduled, I got a call while I was in -- back east,

23   saying, and, "Oh, we've been hired."  So they had a while to

24   digest this, but they didn't hire local counsel for some

25   time.

1    Well, what we -- the only reason I say that is because

2  this TRO has been in place for two and a half weeks, and we

3  haven't got a single document.  The most constructive thing

4  we got is Mr. Bergan's sworn declaration where he says some

5  additional facts that are very troubling.

6    You know, what we are seeking for purposes of the TRO,

7  Your Honor, is provision of the documents required by the

8  confidential offering memorandum.  I don't think there's any

9  dispute what they owe us, and I don't believe that the case

10 they cited, the impossibility case, has suggest- -- and we

11 have some supplemental briefs we can hand to the court, if

12 you'd like -- suggests that they can hide behind that and

13 say, "We did what we needed to do, and therefore we don't

14 have to do anything.  We haven't breached.  They've been in

15 breach for eleven months.  They haven't offered any real good

16 reason for why they haven't given us the audit statements.

17 They haven't put before the court any factual testimony

18 suggesting they tried to find another auditor, and put before

19 the court anything from PricewaterhouseCoopers saying, "We're

20 the ones holding it up."  What, in all likelihood, as we said

21 before, Your Honor, the facts probably are that

22 PricewaterhouseCoopers is done with its audit and has

23 presented the findings to Epsilon and Epsilon said, no, we

24 can't do it.

25    Because we're pretty confident that, as with Westford,

1    they're not really concerned.  They don't have any assets,

2    they don't have the ability to honor any redemption requests,

3    and they don't want everybody knowing that, as with Westford,

4    that Epsilon II is insolvent.  But they do believe they have

5    control.  We don't believe they have met any kind of burden

6    showing possibility.

7        We believe we're entitled to documents showing whether

8    we're the last standing shareholder in Epsilon II or whether

9    there is others.  From some financial records we got in '06,

10   Your Honor, almost four years ago, the total value of the

11   fund had gone, over the prior two years, $200 million to $30

12   million.  As the court will note, we are stated to have $25

13   million invested.  We don't know of any new investors.  It

14   could very well be we're the last shareholder, and if we are,

15   then we're entitled to take over the fund and start to try to

16   figure out what our remedies are as it relates to what

17   happened to the investments.

18       You know, in the alternative, and I said this before,

19   we're entitled to the source documents so that they can't

20   hide behind this idea that, well, we don't have audited

21   financial statements so we don't have to give you anything,

22   which is what we've basically been told.  We don't believe

23   that's a reasonable reading of the agreement, we don't

24   believe that's a fair interpretation, and if that were the

25   case, then they could basically, for the next five or ten

1    years, instruct their auditors not to issue a final report

2    and we could not get anything.  I don't think that that's

3    what that provision was intended to do.

4        We believe we're also entitled -- and we've modified the

5    amendment somewhat, Your Honor -- to documents related to

6    what we now know as of three days ago the probably 2008

7    investment of all of our money into the insolvent entity,

8    Westford.  It's obviously a very troubling development, the

9    fact that, you know, there were -- they were supposed to -- I

10   know this is complicated.  If I may take a couple of minutes

11   and try to explain the fund structure here, Your Honor?

12        THE COURT:  You may, Counsel.  I've read your

13   pleadings, Counsel, to the extent that you've identified at

14   least the broad categories, so if it's something beyond what

15   you've already provided.

16        MR. THORESON:  All I'm going to do -- I'm just going

17   to hold this up, if I can?

18        THE COURT:  Certainly.

19        MR. SCHNEIDER:  Permission to move?

20        THE COURT:  Get as close as you want, Counsel.

21        MR. THORESON:  Thank you, Your Honor.

22      So the City of Seattle invested $20 million in '03 and '04

23   into Epsilon II, and there's the direct investment.  And the

24   red is basically because Stevanovich is involved in all of

25   these entities.

1     But what this provides for in the guidelines is that it

2  was then going to be invested in a master fund with certain

3  objectives, which was called Epsilon Global Master Fund II.

4     What we found out on Tuesday happened, and I believe this

5  is in Mr. Bergan's declaration, was that instead of this

6  happened, or this may have happened at some point, but what's

7  ended up happening is a new arrow has happened, and they've

8  done a direct investment into Westford, and they did this in

9  '08, we believe, but that's what Mr. Bergan's declaration

10  says.

11     We didn't know about that until three days ago.  And then

12  talking to the liquidator yesterday, who had been appointed,

13  the entity has been deemed to be insolvent.  A liquidator

14  from Grant Thornton that's been appointed to take control of

15  this Westford special active fund said there's no assets in

16  this.  All of it had been invested in another fund controlled

17  by Mr. Stevanovich.

18     So it's not gone like this, and that's what we believe.

19  We were offered, initially, and it's in the documents, the

20  opportunity to invest in Westford.  We declined.  As Ms.

21  Carter's declaration, filed the other day, Your Honor,

22  indicates, they knew that because they came out in October of

23  last year and again asked us to consider an investment in

24  Westford, which we think is dubious, at best, because

25  obviously at that point Westford is illiquid and being

1   investigated by the SEC.  We declined.  But I think it's

2   evidence showing that the investment in Westford should never

3   have happened.

4       I raise that, Your Honor, because I think we're also

5   entitled, therefore, to see the documents between Epsilon and

6   Westford wherein all of our money was invested in Westford.

7   First off, it's disallowed, but second, to just find out what

8   the rights are between Epsilon II and Westford, who, again,

9   we learned about three days ago relative to that investment.

10  We just don't know.  We never heard about it.

11          THE COURT:  Okay.  I'm still trying to keep this

12  connected, Counsel, to the original contract and the

13  authority that this court would have to grant your request

14  for information about an entity that wasn't directly

15  connected to the original agreement or contract.

16          MR. THORESON:  I believe, Your Honor, if you look at

17  the -- I mean, I agree that this is going -- if you read the

18  four corners of that provision, I mean, I'm trying to adopt

19  kind of a more material and fair kind of order on some of

20  these things, because I'm not anticipating -- they've --

21  they've -- they've gone outside of what the contract allows.

22      But if you look at it, Your Honor, there's three things

23  that this provision read as narrowly as possible provides

24  for; one is within 120 days, an audited financial statement;

25  two, within 120 days of the last day of the year, an annual

24

1  report; and three -- and I understand this is discretionary,

2  but I think the court acting as a court of equity can review

3  this, and given this situation, order the relief it deems

4  appropriate, just and equitable.  You know, "Describing the

5  fund's activities in such detail as the fund in its sole

6  discretion shall determine."  Well, the fund, at least per

7  Mr. Bergan's declaration, decided to invest our money in '08

8  into a fund that's insolvent.  We should be able to, maybe

9  through discovery, but I would say for an order from this

10  court, if they clearly have information, tell us the terms

11  and conditions on which that investment was made so we can

12  again evaluate our position.

13      We talked about the two other activities, Your Honor, so

14  I'm not going to get into -- I guess you asked me what I

15  thought "harmful" meant.  And -- and -- and in my estimation,

16  Your Honor, it would be to maintain the status quo, not allow

17  them to do any activities that may further damage or dilute

18  the $20 million investment by SCERS.  I know that that is not

19  probably as crystal clear as the court would like.  I'm happy

20  to talk about language at a later point.  But in my world,

21  and I think, you know, Mr. Stone does this on the transaction

22  basis, would be handcuffing the general partner so they can't

23  do anything that materially affects us in a bad financial

24  way, more than we've already been harmed.  Clearly the harm

25  is there, but what the harm is, we don't know until we get

1    the records.

2        And, lastly, we believe that the '09 agreement that's

3    attached to Ms. Carter's declaration, when the 30-day period

4    ran, the redemption we made in January was not honored, that

5    the right to take management fees at the Epsilon Global

6    Active Fund II level Cs, they're not allowed to do it, and we

7    believe that the order should issue confirming that they're

8    not allowed to do so.

9        I said earlier that, you know, I hate to use -- it's sad

10   when you're in front of a court using Madoff as an example,

11   but I think the court has to look at the conduct of the fund.

12   So far there's no transparency, there's no provision of

13   records, there's no denial that we haven't got it.  They're

14   just trying to blame a third party, who apparently is not

15   giving them, if you even accept their arguments, information

16   about us because they invested our money in a fund that they

17   shouldn't have invested it in the first place, and that fund

18   is being investigated by the SEC.  That's troubling.

19       The conduct of Mr. Stevanovich, a fund manager who's a

20   trustee at the University of Chicago, who has a mathematics

21   building named after him, and who, you know, is director or

22   owner directly or indirectly of all of these entities that I

23   showed you up on the chart, shows up on the request of the

24   executive director of a large public pension fund and answers

25   questions.  All Mr. Stevanovich has done is evade service.

1    And if you look at the service, it's really bothersome.

2    Sending the housekeeper saying that Mrs. Stevanovich is in

3    the shower, at the gate at their nice house in Florida,

4    telling the processor to come back 20 minutes later,

5    unwilling to open the door 20 minutes later, and then

6    basically dodging service effectively.

7        We have the SEC investigation of Westford, the fund that

8    we, again, learned just three days ago that our funds were

9    invested in.  The gating of the redemption request.  We want

10   our money back; you can't have it.  It wasn't based on the

11   fact that anything was wrong, by the way, in Epsilon II, but

12   based on the fact that the money was invested in the

13   disallowed fund, Westford, who, in turn, apparently is

14   insolvent -- I mean, not apparently.  In the BVI, a

15   liquidator has been appointed in an insolvency proceeding.

16       And I -- you know, I was -- and this is absolutely the

17   case.  I was watching CNBC last night, and they had a deal on

18   Enron, and there were two things I thought was real

19   interesting, and that, again, I think is why we need

20   injunctive relief to speed the process so we can at least

21   figure out what's going on.  And that -- it was *The Smartest*

22   *Guys in the Room*.  This show was about Enron and Skilling and

23   Lay.  And the first was Barbara Boxer, the congresswoman,

24   drilling Skilling, "Mr. Skilling, why was it you were selling

25   all your stock while you were telling all your employees to

1   buy and everything was fine?" You know, and Skilling, before

2   he got sentenced to 25 years, didn't respond.

3       The second part -- and really -- I -- I hope the court

4   understands this. This is not their money. This is the

5   15,000 pensioners' money. But they were talking to a guy

6   from PGE down in Portland, was a longtime Enron employee, and

7   he goes, you know, it's terrible. He goes, "I've invested

8   every month my hard-earned money into my retirement. Those

9   guys got tens of millions, and I have nothing." That -- it

10  really is a fair anecdote for what we have going on here.

11      And, you know, whether or not they're liable, I can't sit

12  here before the court and tell you that we're going to get a

13  judgment against Mr. Stevanovich for the fund for $20 million

14  or $30 million, but I can tell you there's no transparency,

15  there's no attempt to provide the requested information. And

16  when you take that and couple that with all the bad stuff

17  we've learned, we're entitled to get the information to see

18  what the status is.

19      Here are the undisputed facts: In 2002, their client came

20  to Seattle and asked the fund to invest in Epsilon II. They

21  also presented Westford and some others. In 2003, the

22  pensioners invested $10 million into this fund. That was

23  supposed to then go into the master fund for investing with

24  specific objectives. We don't have any evidence to suggest

25  that didn't happen initially.

1    In 2004, they invested another $10 million.  And then we

2  found out three days ago that in 2008, in a fund that is now

3  insolvent, instead of going into the master fund and being

4  invested, they invested in the very entity we declined to be

5  invested in, which is Westford, but problematic.

6    We know that the 2008 audited financial statement was due

7  11 months ago, and we know that every year before that, it

8  had been provided on time.  We -- it does not appear that the

9  SEC commenced any formal investigation until the later part

10  of 2009 into Westford, so we don't understand why -- how you

11  can make this connection with PricewaterhouseCoopers in terms

12  of an investigation, and not giving a report six or seven

13  months prior just doesn't make sense.

14    And, in fact, they're kind of falling on their own sword

15  if they come in and say, well, we knew about it well before,

16  because how could they then explain why they were out

17  pitching the Westford funds in October of 2009?  If they knew

18  there was an SEC investigation, they knew it was insolvent.

19  The two cannot exist in the same universe.

20    So given the concerns that we have just based on the lack

21  of information in 2010, January of this year, Your Honor, we

22  requested redemption, and six days later, Mr. Stevanovich

23  responded and refused the redemption request, not based on

24  anything bad within Epsilon II, but based on -- and we didn't

25  understand this until we got Mr. Bergan's declaration -- but

1    based upon the liquidity of Westford and the SEC

2    investigation into Westford.  It all makes sense now, because

3    contrary to what they were supposed to do, they took their

4    money and invested it into Westford, who we still don't

5    believe was an improper basis to deny the redemption request

6    because they should have our money and they should be able to

7    pay it back.

8        I think the court should pay particular attention to the

9    declaration of Ms. Carter that's filed with our moving

10   papers, where we invited Mr. Stevanovich and his folks to

11   Seattle before any -- we don't want to be here.  This is a

12   last resort.  But when somebody is unwilling to communicate

13   with you, you don't have any other choices.  We asked them to

14   come to Seattle and explain to us the situation.  They wrote

15   back and refused.  We filed the lawsuit.

16       So we believe, you know, that both legally -- and I'm

17   going to say this because this is a public pension -- I mean,

18   morally, we're entitled to this documentation.  We're not

19   asking for a liability determination against these claims.

20   We're just asking for the documents so we can see where we

21   are.

22       And, again, like I said, we spoke to the -- we were

23   thinking we'd go down and intervene in the insolvency

24   proceeding and see if -- in the BVI, the British Virgin

25   Islands, and see if we can get our money back.  So it was

1  troubling when we talked to the liquidator this morning and

2  he told us we had no money because it's all been invested,

3  all $180 million had been invested in a master fund that

4  we're not even aware of called Westford Master Fund.  So

5  we're not quite sure what we're going to do there, but it's

6  another troubling rainbow.

7      So what we want, Your Honor, is we want the documents.  We

8  want to find out if we're the last investor standing in Fund

9  II.  We want to figure out how it was they invested our funds

10  in Westford.  We want to see the documents evidencing the

11  investment.  We want to see what our rights are.  We'd love

12  to see the audited financial statements and annual report,

13  but if they don't have them, give us the -- what we know you

14  have, which are the source documents so that we can figure

15  out what the situation is.

16      And I know what Epsilon has argued in terms of trade

17  secret and proprietary.  I'm happy to talk about that.  But I

18  think we all agree that the fewer shareholders in Epsilon II,

19  the less there can be any concern.  And if we're the last one

20  standing, we know what we're entitled to under the Articles

21  of Association and the subscription agreement to take the

22  full fund and can do whatever we want with all this

23  proprietary information.

24      Let's talk for a minute, and I want to focus for a second

25  on the audit, Your Honor, because I think it's a red herring.

1    I -- I believe that the -- generally, the client controls the

2    audit process.  And we also believe -- and I'll be very

3    interested to hear what opposing counsel says, because

4    Mr. Bergan kind of dances around this, and we certainly don't

5    want to say anything dishonest to a federal judge -- but we

6    believe it's absolutely probable that the only reason the

7    audit hasn't been issued is because it's being stopped by the

8    fund.

9        They've -- given what we know, this is not a growing

10    concern.  The auditors would say that the fund is not letting

11    the report issue, and they're using that as a basis for not

12    giving us the information, which would give us the rights

13    that we're trying to assert -- we will assert, which is to

14    take control of the fund and figure out how to get back maybe

15    some of the pensioners' money.

16        There hasn't been a fact alleged that they tried to go to

17    someone other than PwC and get an audit, again, because we

18    believe they're stopping it from being completed.  We haven't

19    got a single fact suggesting that the SEC investigation,

20    which, again, we believe occurred late last year, why that

21    would have delayed the audited financial statements that were

22    supposed to be given in 120 days if the SEC investigation

23    hadn't even started.  It doesn't make sense.

24        Every prior year we got it out.  Now we don't have it.

25    And, again, where there's smoke, there's fire.  I think it's

1  pretty easy to conclude where this whole thing is going, and

2  it doesn't look like it's very good.  But we need to get our

3  account -- our hands on the horns of the bull and try to

4  figure out if we have -- if there is anything left.  We just

5  need to figure that out.

6      I think the court should pay particular attention to the

7  fact they haven't produced anything.  We get a quarterly or

8  monthly report that says that we have -- our $20 million

9  investment is worth $25 million.  There's nothing else except

10  for the letter we got gated.

11      If everything is okay, why aren't they giving us the

12  information?  Why wouldn't they give us the source documents?

13  Doesn't make any sense.

14      So in conclusion, Your Honor, and I'm happy to answer any

15  questions the court might have.

16      I'm not going to get into the injunction standards,

17  because I think the court knows what they are:  Fair and

18  equitable right, you know, likelihood of success on the

19  merits, invasion, damage, status quo, sliding scale.  Counsel

20  pointed out in the brief -- I mean, we were -- sorry -- in an

21  earlier injunction this year, and I know what the standards

22  are, or late last year, I guess.

23      But I think what the court needs to understand is that we

24  clearly have met our burden as it relates to a right to this

25  information.  I don't believe that their one cite where they

1    say impossibility gives them an excuse.  And I particularly

2    believe that when you look at the gaps in the Bergan

3    declaration, which is the only -- other than the Alarm

4    Treatises of the two lawyers that practice in New York and in

5    the BVI who have -- you know, until I see that they have a

6    textbook, mean nothing to me.  But we have a contractual

7    right.  They haven't explained why they haven't honored that

8    right, other than to blame PwC.  There's not a single piece

9    of evidence from PwC saying we've declined to do it because

10   we were doing this and we've been delayed.  What you have is

11   their assertion that they have.  We believe that any

12   reasonable person is going to conclude they're just holding

13   up the PwC audit from being issued because they have this

14   huge problem.

15       And let's face it.  They just had a liquidator appointed

16   over the fund that we're invested in all of our money, and

17   Bergan says that.  He doesn't say that anywhere in his

18   pleadings, but we know that.  It's a matter of fact.  We've

19   got the documents showing a liquidator was appointed.  It was

20   opposed.  The person who supplied the declaration for them

21   from the BVI was the lawyer sitting there arguing against it,

22   and they lost.

23       So where our money, at least, was supposed to -- it wasn't

24   supposed to go, but apparently went per the Bergan

25   declaration, that's an insolvency.  That's an, essentially,

1    the words we use here, that's a bankruptcy proceeding.

2        So, you know, we've met our burden.  We're entitled to

3    the -- I would say the best thing would be the audited

4    financial statements and the audit report, but I could say

5    within that category are the source documents that would be

6    used to compile that.

7        We're entitled to the information related to where we are,

8    vis-à-vis other investors within the fund.  If we are the

9    last man standing, the right thing to do would be to tell us

10   that, not to play hide the ball.

11       We should know why they invested in Westford and what the

12   agreements are between the parties relative to that

13   investment.  I mean, again, this isn't rocket science, this

14   is common sense.  And I do get the impression that this is

15   just a big, unfortunate, but it's a kind of game for the

16   fund.  They're using every kind of legal maneuver to try to

17   avoid giving us the information that we're entitled to that

18   would allow us, at least, to figure out what's going on.

19       THE COURT:  Counsel, you're asking for something a

20   little bit different now.  Previously you asked for the

21   source documents or the underlying documents to support the

22   issuance of the audited financial information or report, and

23   now you're asking for the reasons why certain determinations

24   were being made.  Wouldn't that transcend the extent of what

25   you were originally requesting?

1    MR. THORESON:  If I said that, I misstated, Your

2  Honor.  Thank you for correcting me.

3    What I really meant was what we didn't anticipate was this

4  investment in Westford, and we need to know what our rights

5  are vis-à-vis Westford, and we just don't know.  It's not an

6  allotted investment.  But hopefully -- Mr. Stevanovich

7  controls all these funds, but hopefully at least he said in

8  Westford, we're going to give you $25 million of our Fund II

9  money, here's the terms and conditions of that investment.

10  That's what they're supposed to do.  But we just don't know.

11  We don't have those documents.

12    And, I mean, obviously our rights are kind of dependent on

13  what fund to do relative to the investment in Westford, but

14  we don't have that.  Again, this -- it's more this case in

15  the nature of fact-finding, because Mr. Stevanovich and his

16  group wouldn't show up and give us the information, he

17  wouldn't show up and talk to us about what's happened, and

18  instead he's kind of -- unfortunately, he's not -- he's

19  evading service and he's hiding behind kind of the legal, I

20  mean, lawyers in the case.

21    THE COURT:  All right.

22    MR. THORESON:  So we've got request before Your

23  Honor.  I'm happy to answer any questions you might have.  I

24  really appreciate the court's time, and I know there's a lot

25  of information, so getting us in here quickly, it is

1    important to our client.

2         THE COURT:  I appreciate the information, Counsel.  I

3    have no additional questions at this point in time.  Thank

4    you.

5         Counsel, if you'll step to the lectern.  Good afternoon

6    again, Counsel.

7         MR. SCHNEIDER:  Good afternoon.

8         THE COURT:  Let's begin, Counsel.  I have several

9    questions, using the same format.  One of the things that

10   courts always find difficult is when another court has at

11   least exercised its discretion in issuing an order and

12   there's been noncompliance with the order.  And in this case,

13   there doesn't appear to be any effort towards compliance.

14        So if the defendants or some defendants were served about

15   two and a half weeks ago, according to counsel's

16   representations to this court, why shouldn't this court

17   entertain right now an issue of sanctions for contempt of an

18   order of the court previously issued in King County Superior

19   Court?

20        MR. SCHNEIDER:  Two reasons:  One reason is that we

21   believe that the TRO was improperly granted.  It was not

22   opposed.  It was a procedure that you are familiar with in

23   the superior court when the commissioner issued the order.

24        That's not a reason not to comply, but there has been an

25   effort to try to produce some financial information, I'm

1  prepared to tell you that today, and prepared to tell you

2  that it preceded the setting of this hearing.  It even

3  preceded the removal of the case.  I'm happy to address it

4  right now.  I was going to do it later, but let me just get

5  right to that.

6        THE COURT:  Okay.

7        MR. SCHNEIDER:  The contract into which the parties

8  entered is specific as to what is obligated and what is

9  entitled in the way of information.  It is not complete

10 transparency.  It is not everything that's in the TRO.

11 That's true.  It is an audited financial statement and annual

12 report.

13    As the court is aware, the audited financial statement is

14 the independent auditors applying or producing an opinion on

15 the company's financial statements.  For reasons I can

16 discuss at length, Pricewaterhouse won't issue the audited

17 yet -- won't issue the audited opinion.  My suggestion is --

18 and I've made it before today to people I represent --

19 produce the financial statement.

20    If Pricewaterhouse has not issued its audited opinion on

21 it, it's your financial statement, give them the 2009

22 financial statement.  Give them the 2008 financial statement.

23 We can't require Pricewaterhouse to say, "We've audited and

24 the audit is clean," but produce it.

25    My understanding -- and I spoke to Mr. Bergan within the

1    last two hours.  I said, "I'm going into court, and I'm going

2    to be asked that question.  How soon can you get that in the

3    hands of plaintiff?"  And the answer is, "By the end of next

4    week."  And I do not take lightly the responsibility that a

5    company has in making that representation to the court.  That

6    is what I am told.  I believe that it is something on which

7    we can rely on.

8              THE COURT:  Now, Counsel, I want to make sure I have

9    crystal clear understanding of what your client has

10   represented to you to represent to this court.

11       Now, when you say "by the end of next week," what

12   specifically are you representing to the court that he will

13   have and what will it look like by the end of next week?

14             MR. SCHNEIDER:  Number one, the 2008 financial

15   statement, which, by the terms of the contract, an audited

16   version of which was due May 1, 2009.  Okay.  Can't produce

17   the audit, but it's the company's financial statement, the

18   statement of financial condition.  And I would have to look

19   at what Pricewaterhouse has issued as an audited financial

20   statement in the past, but it would be the financial

21   statement not accompanied with the independent auditor's

22   opinion.  Okay?  That's item one.

23       Item two, the same financial statement unaccompanied by

24   the independent auditor's, Pricewaterhouse's, opinion on the

25   2009 financial statement, which will be due May 1, as you

1  previously indicated.

2     Item number three -- which I haven't addressed yet, but

3  I'm happy to keep going -- the most recent month-end

4  financial statement, again, internal to the company, not

5  audited by the independent auditors.  I am told that the one

6  that is most current is not February 2010 but it's January

7  2010.  Fairly recent.  I'm told that it is finished and it

8  can be produced to the plaintiff by the end of next week.

9  Again, it would not be accompanied by the audit, but it would

10 be the financial information.

11    And, again, I don't -- again, this is not information that

12 is required by the contract, but I believe it to be

13 appropriate, given the circumstances in which we find

14 ourselves.

15    Number four, item number four, again, this is nothing

16 that's required by the contract.  It is our client's position

17 that it's not required, they're not obligated, but I'm

18 prepared to tell you, with the client's understanding,

19 they'll produce by the end of next week item number four,

20 certain portfolio information regarding the actual

21 investments which have been made with the money that was

22 invested by the plaintiffs.

23    Let me be very clear, let me try to be very careful.  This

24 would not be a disclosure of each and every, for instance,

25 corporation in which an investment has been made or a lending

1    arrangement that has been made, but it would be identified by

2    amount, status, value, and sector.  And I think Mr. Stone,

3    who is certainly an expert in this field, would understand

4    that to mean is it in the energy sector, is it in retail, is

5    it in some other, you know, industry sector?  It would be

6    information which would be of interest to the plaintiff, I

7    believe.  It goes beyond what the contract requires.  As I

8    stand before you today, I'd say I think it's appropriate that

9    it be produced, even though it's not required by the

10   contracts.

11        As far as the other information, I think you have examples

12   in front of you in Exhibits 5 and 6 to the Bergan

13   declaration, these are the monthly statements from the

14   administrator, Equinox, which it is my understanding those

15   come out monthly and are received by the plaintiff in the

16   ordinary course.  That's why I'm told.

17        Item -- Exhibit 6 to the Bergan declaration is more of a

18   return statistic, statistics on returns, which I don't think

19   the plaintiff gets in the ordinary course, but it was

20   provided in the Bergan declaration as an example of the type

21   of information that can be provided.

22        The last thing I'll say on this subject -- and I apologize

23   if I've gone on longer than you intended -- we believe that

24   it would be appropriate to have a form of protective order

25   entered in order to exchange that information.  We have

1  prepared one.  We actually prepared one yesterday in

2  anticipation of making this information available, and you

3  can quote me, regardless of what the court's ruling is today,

4  I'm prepared to tell you, even if you don't order this

5  information produced, it is the client's understanding that

6  the client is producing it next week with or without an order

7  from the court requiring them to do so.

8      That is a long explanation of the fact that steps have

9  been taken.  I don't want to mislead you.  I don't believe

10  that there's been a lot of energy expended over the two weeks

11  or the three weeks that the TRO issued.  I don't think that

12  there has been literal -- there hasn't been literal

13  compliance with the TRO, that is true.  Are these efforts

14  that could have been undertaken earlier than they have been?

15  I think it's fair to say yes, and I think I should tell you

16  that.  But I don't think that it should mitigate the merit of

17  the clients doing it now and deciding to do it now before we

18  ever understood we'd be here for this hearing today.

19          THE COURT:  Let me stop you there, Counsel.

20      Oftentimes, Counsel, it is the court's option of

21  recognizing where the parties are prior to the court making a

22  formal determination is to step back and give the parties the

23  opportunity to confer to see if what's on the table is a

24  sufficient proposed remedy, that it's adequate under the

25  circumstances.  And I'm certainly not terminating my

1   examination of counsel, but I don't know if it's necessarily

2   a wise course of action to stop right now and take a recess

3   to give counsel for the plaintiffs and counsel for the

4   defense a chance to confer regarding the proposal made by

5   counsel.

6       One other question before I ask you to do that, Counsel.

7   Counsel for the defense, you've indicated in many of your

8   representations point by point that the items were finished,

9   but it was a question of production not until the end of next

10   week.

11       So if the items are finished and if urgency is the primary

12   concern and the reason for the TRO being filed in the first

13   place, we're already two and a half weeks past the initial

14   filing, what would prevent an immediate production, meaning

15   as soon as Monday, for that material to be provided to the

16   plaintiffs?

17       MR. SCHNEIDER:  Again, I want to be careful, and I

18   think you can appreciate exactly why I want to be careful.  I

19   think I used the word "finished" with respect to the

20   month-end January of 2010 internal financial statement.

21       THE COURT:  You're correct, Counsel.

22       MR. SCHNEIDER:  I hope I didn't use it with respect

23   to the other items I mentioned, because I don't know that

24   those are absolutely finished and able to be produced right

25   away.

1    THE COURT:  Okay.

2    MR. SCHNEIDER:  But they might be, and I'll find out.

3    THE COURT:  Okay.  Now let me come back to counsel --

4    MR. SCHNEIDER:  Lastly, I think I need to say this in

5    response to your question:

6    The portfolio sector information, that is going to require

7    some redacting, some presentation.  I know that to be

8    unfinished.  I believe it is being done as we speak, but I'm

9    not positive about that.  That is not a finished product, nor

10   could it be.

11   THE COURT:  Counsel for the plaintiffs?

12   MR. THORESON:  There's really only one other area I

13   think needs to be vetted, Your Honor, before we talk, because

14   it's important to us, and that's, we need to, and we're

15   amenable to a protective order on this point and topic, but

16   we need to know if there are any other investors.  We need to

17   know percentages and we need to know investors, because it's

18   very important.  And if they are going to be attentive in a

19   belated way -- and I appreciate Mr. Schneider has probably

20   pushed this process forward where it wasn't being pushed

21   before -- it's a very important piece of information that my

22   clients need now.  We can maybe get it through expedited

23   discovery, but that -- that would -- I think if they can

24   produce that as well, that we'd have something to talk about.

25   MR. SCHNEIDER:  I can tell you what I know, and that

1   is, I hate to sound like Donald Rumsfeld, believe me, but I

2   can tell you what I know is that I don't know the answer to

3   that.  What is in the Bergan declaration sheds some light on

4   it.  It's not enough, in my opinion, and I say that

5   willingly.  Even though the contracts don't require it, BVI

6   doesn't require it, I believe it would be appropriate to

7   provide that information, if the court so orders it.  I

8   believe it will be forthcoming, but as I stand here today, I

9   can't tell you that I have authorization to say, yes, that

10  will be produced without a court order.  Does that make

11  sense, Your Honor?

12          THE COURT:  That makes sense.  All right.  Counsel?

13          MR. THORESON:  Your Honor, I think we'd be happy to

14  chat with Mr. Schneider for a minute and see if we can come

15  to some resolution.  I think you're looking at something

16  that's more of an agreed-to order the parties will present

17  this afternoon?

18          THE COURT:  What I want, Counsel, is I want to have

19  an oral agreement between the parties, even if it's not in a

20  written fashion right now.  My preference is to have it

21  ultimately reduced to writing before the end of today so that

22  counsel can fax something back to his client or transmit

23  something back to his client so they're operating under court

24  order.  But I want to make sure that as you walk out the

25  door, you and your clients have a full understanding of

1  exactly what the agreement is, and it's merely a question of

2  reducing it to writing.

3          MR. SCHNEIDER:  We are on the record, I take it?

4          THE COURT:  Absolutely, Counsel.  When you walk in

5  that door, you're on the record.

6          MR. SCHNEIDER:  Okay.  I've been under that

7  impression, and I just want to be sure.  In fact, we have a

8  record of what I've said so far, and I think it's entirely

9  appropriate to proceed exactly as you've indicated.

10         MR. THORESON:  The one thing I would suggest, Your

11  Honor, if your client is available, would be that we try to

12  work something out and hopefully get your client -- and if --

13  if -- to agree, at least confer with his client that he'll

14  agree, or in the alternative, that we reconvene, we get

15  something on the record, but he gets the agreement this

16  weekend so we're back in front of you first thing next week.

17         THE COURT:  Counsel, be back before this court at

18  9:00 a.m. on Monday, if you're ready to go.  We'll take a

19  break now, but I want affirmations from the parties as to

20  exactly what you agree to.  I won't set a time limit on the

21  break right now so that you can confer and make telephone

22  calls, if necessary and appropriate, and then let the

23  in-court deputy know the appropriate time for the court to

24  come back out.

25         MR. SCHNEIDER:  Very well.  We expect to be able to

1    reach Mr. Bergan before 2:45, but not for an hour or two

2    after, so I'd like to make that call.

3              THE COURT:  Okay.  We'll be in recess.

4                        (A RECESS WAS TAKEN.)

5              THE COURT:  Counsel, I see more smiles on people's

6    faces now than there were when I walked out before the break.

7    I assume you've had some progress in your discussions.

8    Counsel for the plaintiff or for the defense?

9              MR. THORESON:  I think I'll let Mr. Schneider hang

10   himself for his client, based on getting on the record.

11        I think we've got an agreement, Your Honor, and I'll let

12   Mr. Schneider give it a try, and I will add stuff at the end.

13             MR. SCHNEIDER:  The commitments I represented to the

14   court are unchanged.

15             THE COURT:  Okay.

16             MR. SCHNEIDER:  So we have affirmation, as I

17   suspected we would, of everything I've told you as to what

18   would be produced.

19        I have a couple of answers to questions you asked, Your

20   Honor, if you would like to hear them.

21             THE COURT:  Please, I would.

22             MR. SCHNEIDER:  The January 2010, the monthly, the

23   last month-end financial statement, I'm told yes, it is

24   finished.  It's in Montrose, Switzerland.  Mr. Bergan will

25   know Monday morning if he can get it to us Monday morning.

1  If he can, it will be early in the morning, and I'll get it

2  to counsel for the plaintiff early in the morning.  So that's

3  not meant to be wavering, it's meant to be accurate.  I think

4  we can do it.  I can't commit to you that it will happen,

5  because he has to have that conversation with people in

6  Europe on Monday morning.

7      With respect to the participants in the fund and their

8  identities and positions, we believe that information can be

9  provided and will be provided.  It's not something that will

10  be Monday, but there's no -- there's no reservation on that

11  commitment as well.

12      I'm looking at my notes, if there are any other questions

13  you had about what I said.  I don't see any others.

14          THE COURT:  Okay.  If you're committing to the same

15  representations you made, Counsel, I won't make you restate

16  them.  They're all a matter of record right now.  What I

17  would like, though, you made the statement "by the end of

18  next week."  I always like to know what someone's end of week

19  is, just in case somebody is on a four-day workweek.  What

20  does end of the week mean, Counsel?

21          MR. SCHNEIDER:  It means a week from today, probably

22  4:30 p.m. Pacific time on the 9th.  Let me say this:  If the

23  information is available before then, we will not wait until

24  Friday, much less 4:30.

25          THE COURT:  All right.  That's the court's

1  expectation, Counsel.  Does that complete your

2  representations of your understanding before I go to the

3  plaintiff?

4       MR. SCHNEIDER:  Yes.  I think one thing that is

5  unstated that I'll tell you, is that this arrangement is not

6  meant to postpone or defer or compromise or affect any rights

7  that the plaintiff later seeks to have this court entertain.

8  This is going to happen.

9       THE COURT:  Well, what I'd do, Counsel, just to give

10  you a heads-up, assuming we do have an agreement, is that

11  correct, counsel for the plaintiffs?

12       MR. THORESON:  There's a couple of things I'm going

13  to raise, but I believe we have an agreement, Your Honor.

14       THE COURT:  Okay.  It's the court's intention,

15  assuming you have an agreement, is to continue the injunction

16  hearing so that the court maintains jurisdiction over that

17  particular issue.  The only question is in terms of

18  preserving status quo, so I'd like you to address that, but

19  I'll give counsel for the plaintiff an opportunity to

20  interpose his additional comments and see where we are from

21  there.

22       MR. SCHNEIDER:  Can I be heard first?

23       THE COURT:  Yes.

24       MR. THORESON:  Um, this Mr. Stone, who I think

25  appreciates being called an expert, I think he is, but it's

1  always nice to be called that by opposing counsel, he's

2  leaving for London next Friday, so to the extent possible,

3  if -- I know they're going to get it to us earlier, but I --

4  we really could use it because he needs to look at this on

5  Thursday.  I don't know if an extra day really matters that

6  much, but that's just a request coming from -- from

7  Mr. Stone.

8          THE COURT:  Any objection to modifying the order,

9  Counsel, to be due at 4:30 on Thursday?

10         MR. SCHNEIDER:  Again, I just need to be careful.

11 That's not something I sought in the phone call I made, and

12 so I don't have that commitment.  I can tell you that if it's

13 available, we'll get it to him Tuesday, not Friday.  But I

14 don't have -- I did not ask the client in the phone call,

15 "Can we commit to something before the end of next week?"

16         THE COURT:  I'll set it for next Friday, 4:30 Pacific

17 Standard Time, and if it presents any problem as we're

18 approaching Friday, or, actually, Thursday, before Mr. Stone

19 leaves, if you'd alert the court, you can contact the court's

20 in-court deputy or the court's law clerk, and if we need to

21 have some type of a hearing on the telephone to address any

22 minor concerns, we can do it that way.

23         MR. SCHNEIDER:  I would envision giving a status

24 report midweek, if you wish.  I don't mean to take your time,

25 but we'll communicate with the designee, and the two can get

1    on the phone and say here's where we are.  If something comes

2    up, we'll report it.

3            THE COURT:  All right.  That sounds perfectly fine.

4    Counsel?

5            MR. THORESON:  I just want to -- I know the record is

6    what the record is, but I -- I just want to kind of recite so

7    that Mr. Schneider can jump on me, if he needs to, kind of

8    what I understand is going to be provided.  And then I'm

9    going -- we've made a couple of requests that Mr. Schneider

10   has agreed to ask about, and I want the court to be aware of

11   those because there's some stuff we asked as it relates to

12   injunctive relief, he's not sure, and we may have to be back

13   here anyways on those issues, if we can't reach an agreement,

14   so I'm going to raise a couple of them.

15        So that I understand, we're going to be getting unaudited

16   financial statements --

17           MR. SCHNEIDER:  2008.

18           MR. THORESON:  -- for 2008, and am I right, 2009?

19           MR. SCHNEIDER:  (Nods.)

20           MR. THORESON:  And a month-end that's unaudited for

21   the last month; is that fair?

22           MR. SCHNEIDER:  January of 2010.

23           MR. THORESON:  January of 2010.  And these are not

24   the same as the one-line documents that we see in Exhibit 5

25   or the -- some of the return documents that are Exhibit 6 to

1    Mr. Bergan's declaration, but they, in fact, are the fund

2    performance documents for Fund II?

3          MR. SCHNEIDER:  That's my understanding, yes.

4          MR. THORESON:  The second thing that we're going to

5    get is going to be a list of the other investors in Fund II,

6    and, I mean, I know that you said you're going to talk to

7    your client, and the percentage interest of the folks within

8    Fund II; is that right?  I'm sorry.  I'm not trying to -- I

9    understood you said that.  I just want to make sure that

10   we're right.

11         MR. SCHNEIDER:  To be clear, what I said was I have

12   no problem requesting that.  I personally think it would be

13   appropriate.  I don't know of a reason why the client would

14   say no to that, but I do not have authority this afternoon to

15   say that the client has committed to do that or has agreed to

16   do that, but it is correct that I have agreed to inquire and

17   promote the idea.

18         MR. THORESON:  Okay.  Well, that's -- that's why I'm

19   saying this right now so the record is clear.  And we would

20   also ask -- and we'd ask that Mr. Schneider talk to his

21   client about it -- for those folks to the extent you can get

22   the client to produce it, the contact information.

23         THE COURT:  The contact information for?

24         MR. THORESON:  For each other investor.

25         THE COURT:  Okay.

1         MR. THORESON:  We did ask -- and I believe, again,

2   and I will say on the record that I think that Mr. Schneider

3   is being very fair in this proceeding.  For -- he talked

4   about the type of investment that was made.  I believe he

5   talked about it by, you know, market sector, it might be

6   retail, it might be something else, but we talked to him also

7   about -- because we have reporting requirements, Your Honor,

8   as a public pension fund, and we talked to him about the type

9   of sector and the investment type, and I think Mr. Schneider

10  agreed he would inquire of his client and try to get the

11  investment type, because that's something we need to report.

12        MR. SCHNEIDER:  That is true, I did agree to try to

13  get agreement on that.

14       For your information, Your Honor, when we talk about

15  investment type, subject to clarification from counsel,

16  meaning is it shares of stock, is it equity, is it debt, is

17  it a collateralized loan?  It would be a description of the

18  type of investment rather than the precise detail of the

19  investment itself.

20        THE COURT:  And also for clarification, Counsel, I

21  believe there was representation of redaction of certain

22  information.  Have we clarified what information is going to

23  be redacted, or is it going to be unredacted at this point?

24        MR. SCHNEIDER:  I expect there will be redactions,

25  which would be the very specific detailed information; for

1    example, if an investment is made in a low grade or a

2    speculative security, the actual corporation's name might be

3    redacted, but the sector in which it is operating would be

4    identified and the type of investment, whether it's equity,

5    debt, collateralized loan would be provided.  That is my

6    expectation, based on what I heard.  I've not seen what the

7    client is preparing, but I understand it is being prepared in

8    that way.

9            THE COURT:  All right.   Please continue.

10           MR. THORESON:  I think what -- what we have fought

11   about here, Your Honor, is we really can't debate the issue

12   until we see what we get.  And what we proposed to

13   Mr. Schneider, I think it's accepted, is that they'll produce

14   stuff to us in whatever redacted form they think is

15   appropriate, and if they have a problem with it, we'll get it

16   before Your Honor and ask that the unredacted documents be

17   produced to you for an in camera review and we can deal with

18   them at that point.

19       But I think right now -- hopefully, at least the way I see

20   this thing going, they're going to give us more information

21   than less.  Hopefully it's going to be the information we

22   need to understand our situation.  And if we get to a point

23   where we're finding some of the information has been overly

24   redacted or is not useful, then we'll be back in front of

25   you.

```
 1          THE COURT:  You'll have the opportunity to do so,
 2   Counsel.
 3          MR. THORESON:  A couple other things, Your Honor, is
 4   we have asked and Mr. Schneider has agreed to ask when the,
 5   in particular, when the Westford investment was made.  We
 6   kind of need to know when that was done.  And his client
 7   hasn't -- he hasn't asked him that question that he's agreed
 8   to ask, and we believe it's important information.
 9          The -- we've asked for, and Mr. Schneider, again, has
10   agreed to ask but hasn't committed to -- that his client, of
11   course, will provide it, but we're looking for the underlying
12   documents by which Epsilon II made the investment in
13   Westford, which includes subscription agreements or other
14   documents that show what Epsilon II's rights are.  These
15   would be the investment in Westford, which is the company
16   that's in liquidation proceedings to the fund.
17          And Mr. Schneider has agreed to inquire -- he does not --
18   his client -- he doesn't know what his client will respond to
19   on that issue, but it is one of the issues we talked about
20   earlier.
21          THE COURT:  Do you envision, Counsel, right now that
22   you can identify what specifics would fit under that category
23   as underlying documents so that he has some semblance or
24   context of conversation?
25          MR. THORESON:  I -- I think I've already told him.
```

1    MR. SCHNEIDER:  Subscription agreements, investment

2    agreements.  I don't know what's there, but I believe counsel

3    has accurately stated my willingness to inquire and find out,

4    and my optimism that I will be able to provide it and my

5    enthusiasm for doing so.

6    MR. THORESON:  And I think it -- it will look a lot

7    like the documents we have here, Your Honor, which are

8    confidential memorandas, subscription agreement, just the

9    documents that will be used to describe and secure that

10   investment.

11   THE COURT:  I only ask, Counsel, because I think the

12   more clarity that you have in terms of what it is you're

13   looking for will minimize the confusion in counsel's

14   communication with his client.

15   MR. THORESON:  Another area Mr. Schneider has agreed

16   to inquire but doesn't -- is not able to commit to is the

17   liquidator, Grant Thornton, has been appointed in the

18   Westford special fund matter.  When we spoke to him this

19   morning, he's been communicating with Fund II, our fund,

20   Epsilon II, but indicated he couldn't provide us the

21   information because we're just a shareholder.

22   We don't know what our status is, but we have asked

23   Mr. Schneider to ask his client whether or not they'd be --

24   they'd allow us to get the information from the liquidator

25   that has been provided to Fund II, and Mr. Schneider has

1    agreed to inquire.

2         MR. SCHNEIDER:  Correct.

3         THE COURT:  Okay.  Please continue.

4         MR. THORESON:  Mr. Schneider has also agreed to

5    approach his client and ask for permission for our client to

6    communicate directly.  I think this is kind of an expedited

7    discovery matter, so it may be a little bit outside this, but

8    I want everything on the record, to contact the auditor,

9    PricewaterhouseCoopers, and ask them directly why they're

10   not -- they have not completed the 2008 audited financial

11   statement and annual report.  So he doesn't have the

12   authority to say that the client has given that approval, but

13   he's going to seek it, as I understand it; is that right?

14        MR. SCHNEIDER:  That is correct.

15        THE COURT:  Okay.

16        MR. THORESON:  And the broker-dealer at this point is

17   a company in Ireland called Equinox.  It was Goldman Sachs,

18   and before them, I believe, JP Morgan.  They are going to

19   have some information.  We've asked Mr. Schneider also to

20   talk to his client and ask if we can talk to the

21   broker-dealer directly.  Obvious- -- that, actually, is the

22   one entity.  We did not name them as a defendant, I don't

23   believe, but we did try to get them information.  They're in

24   Ireland.  We haven't.  So we've -- we've at least asked him

25   to talk to Equinox or talk to his clients to see if we can

1  communicate directly with the broker-dealer.

2          MR. SCHNEIDER:  Correct.

3          MR. THORESON:  I'm sure I've left something out.

4          THE COURT:  How about the protective order?

5          MR. THORESON:  The protective order, we are going --

6  we haven't reviewed it, but we're going to agree with it.

7  The one thing we're going to look at modifying is a provision

8  that allows -- if any of the information is pertinent, that

9  allows us to use that information under seal saying that BVI

10 or anyplace else that we need to file an action to protect

11 our client's rights, and it sounds like we can reach

12 agreement on that.

13         MR. SCHNEIDER:  Again, that's not something that I

14 raised with the client, so I can't commit to it, but it makes

15 good sense to me that whatever the protocol is for this court

16 to have documents under seal that are protected by the

17 protective order ought to accompany any filing in any other

18 court in any other land.

19         THE COURT:  That's fine with the court.

20         MR. THORESON:  I -- I believe that's it, Your Honor.

21 I don't know that I have anything else.

22         THE COURT:  Counsel, do you have something to

23 supplement?

24         MR. SCHNEIDER:  You asked for me to respond to your

25 suggestion that the hearing on the injunction would be

1  continued, and my response is quite straightforward.  That

2  makes very good sense to me that the hearing be continued,

3  and whatever needs to be taken up at later date be taken up,

4  if anything.

5      MR. THORESON:  And that -- that is fine with us as

6  well, Your Honor.

7      THE COURT:  Is there any determination that needs to

8  be made today regarding preservation of status quo, which, I

9  think, Counsel, the main issue was getting documents, and I

10 think you specifically said that.  Continuation of the

11 injunctive hearing would give you the opportunity to come

12 back to this court.

13     MR. THORESON:  I believe, Your Honor, that it's well

14 established precedent in the Ninth Circuit that the TRO is

15 effective upon removal until it is vacated by the court.  So

16 I believe we're still operating according to the TRO, and as

17 long as they're attempting compliance, we're fine.

18     MR. SCHNEIDER:  Well, to be clear, I don't know if

19 that's correct.  I wish I did.  I know that it would have

20 expired after 14 days if we were still in state court.

21 Fourteen days have transpired.  If it is still in effect, I

22 do not want to leave here today saying that I understand it's

23 being fully complied with, because, for instance, the vague

24 and nebulousness, as the court put it, do no harm, which I

25 think it's impossible to comply with, because it doesn't set

1  forth any standards by which the party who hopes to comply

2  can engage whether he, she, or it is complying.  So my --

3         THE COURT:  Why don't we do this, Counsel:  Why don't

4  we adopt the order of what you've agreed to do and what

5  you've agreed to ask your client to do as to be the new

6  temporary restraining order that's in effect between today's

7  date and the date we continued to the preliminary injunction

8  hearing?  That way the old order expires and we have a new

9  order that will come into existence based upon what you've

10 agreed to today.

11        MR. SCHNEIDER:  My understanding is that if you

12 haven't already, you are about to order us to comply with

13 everything that we've agreed to do as represented to you.

14        THE COURT:  That's correct.

15        MR. SCHNEIDER:  I have an aversion to it being in the

16 form of a temporary restraining order.  The fact that it is

17 an order of the court is not going to make it any less

18 enforceable or compliance any less adequate, but I don't

19 think it should be in the nature of a TRO per se.

20        THE COURT:  Does the plaintiff have any objection to

21 it just being just the order of the court and eliminating the

22 categorization at this point in time?

23        MR. THORESON:  I have one grave concern, and I'll

24 just state it right now, because I trust Mr. Schneider and

25 trust Perkins Coie.  They can be fired Monday, and I've had

1   this problem before and I know he's trying to do the right

2   thing.  Our experience with these defendants has not been

3   very good so far.  So I think that there should be something

4   that has some teeth in it, and I -- again, I agree -- I -- I

5   know what Mr. Schneider is saying, and I believe --

6          THE COURT:  Counsel, even if he's fired today, the

7   order is still effective.  They can go through 15 different

8   counsel, and the order is still there.

9          MR. SCHNEIDER:  The parties are definitely ordered to

10   perform.

11          MR. THORESON:  What I'd like to do, Your Honor, is

12   maybe we can set a week from Friday -- and I believe

13   Mr. Schneider, if he's involved, will comply -- but have a

14   hearing set for noncompliance.  I know you set a 4:30.  I

15   just need some trigger.  I need something to assure that

16   these guys are still sitting there after the client has a

17   weekend to think about this and that we not getting a notice

18   of substitution, withdrawal, and I need -- I need something

19   that they're working against to know -- I know you've got an

20   order.  I don't think I have anything written today.  That's

21   just the one thing that concerns me.

22          THE COURT:  Do you have any objection, Counsel, to

23   having a date and time set for compliance?

24          MR. SCHNEIDER:  No, I don't.  I have no objection to

25   that.

1          MR. THORESON:  And that -- that -- that would be fine

2   with me.

3          THE COURT:  All right.  Let's do that, then.

4          MR. SCHNEIDER:  It is my hope the information

5   conveyed or the reports to counsel will make that

6   unnecessary, but I have no problem with it being set today.

7          THE COURT:  Okay.

8          MR. SCHNEIDER:  One question about the parties.

9   Mr. Stevanovich has not been served.  I think the order

10  should be binding on the parties who have been served.  And I

11  think that will do it, then.  I understand there may be some

12  skepticism, but I don't think it should be an order on him

13  until he is served.  I want to say --

14         THE COURT:  Until this court has jurisdiction, we

15  wouldn't have authority to do that.

16         MR. SCHNEIDER:  With your permission, may I respond?

17   There are many things about the presentation you heard

18  today to which I would respond, if the court was entertaining

19  further argument.  I don't think you are.  There are a couple

20  of things I need to tell you, despite that, if I may.

21         THE COURT:  You may.

22         MR. SCHNEIDER:  Personal service of Mr. Stevanovich,

23  it is my hope and expectation that he will execute an

24  acceptance of service as if served personally in his state of

25  residence, and that will be the end of that.  If there is a

62

1  jurisdictional challenge, it will be brought as a motion, not

2  as some effort to evade service.  That is my expectation.

3  Number two, the timing of removal might appear curious to

4  Your Honor, because it was on the verge of a hearing in

5  superior court and the TRO had been issued, and all of a

6  sudden we're up in federal court as the TRO is about to

7  expire.

8  I don't want to argue this.  I want to tell you that we

9  tried to spell out in the papers on removal why it was done

10  on the day it was done.  In essence, it was our conclusion

11  that the jurisdictional minimum of $75,000 or more was not

12  satisfied until the first date on which the management fee at

13  issue was payable.  Under the contract, the first date on

14  which that management fee could be payable was the last day

15  of the first quarter of the year, Wednesday the 31st.  That

16  is why we removed it that day and not before.

17  I didn't want the court to be under the impression that

18  the timing was governed by the hearing set in superior court

19  as opposed to that.  We spelled it out in the papers, but I

20  don't know if that would have got to your attention.  So I

21  wanted to say that.

22  THE COURT:  We did have conversations on that topic,

23  Counsel, behind closed doors.

24  MR. SCHNEIDER:  Very well.  I think that's all I wish

25  to say today, and if there's a need to address other

**65**

1  arguments that counsel made, I'll do it at that time, but not

2  today.

3          THE COURT:  Counsel, you'll have that order to the

4  court by Monday?

5          MR. SCHNEIDER:  Yes, and we've made arrangements to

6  transmit and to have what we transmit reviewed late this

7  evening New York time, so we're not going to put off till the

8  weekend trying to get something to them.

9          THE COURT:  Do we have a date certain for the

10  continuation of the injunction hearing?

11          MR. THORESON:  That's a good -- I mean, I'd -- I'd

12  like to -- I'm certainly willing to accommodate whatever

13  Mr. Schneider and his firm needs.

14      One issue we haven't addressed, and everybody is sending

15  me notes about it, so I need to raise it.  We do have a

16  dispute about whether or not -- and it was something that was

17  enjoined in the TRO, and it's what Mr. Schneider just said

18  was the basis for creating the jurisdictional requirement to

19  remove the matter.

20      We don't agree that they're allowed to make a management

21  fee, and I think they believe they are.  There's right now a

22  TRO in place that says they're not supposed to, and I don't

23  really know what we do in the interim, Your Honor -- we

24  argued it -- between now and -- you know, I guess I'd be

25  happy if they'd just said they're not going -- if they take

1    it, it is what it is.  It might be a breach of contract, in

2    our estimation.

3        But I'd like between today and between when we're back in

4    front of you on the -- on the preliminary injunction, if we

5    have to get there -- that they agree to not take a management

6    fee, because we're -- we're arguing they're not allowed to,

7    and in their response they argue they're allowed to.  I

8    understand Mr. Schneider is not going to argue this, but

9    that's -- that's the one thing that's kind of in flux, I

10    think, with this nice kind of voluntary order we entered

11    into.

12            THE COURT:  Well, I suspect that counsel is going to

13    offer to contact his client and ask if they'd be willing not

14    to take a management fee until a date the court gives the

15    parties.

16            MR. SCHNEIDER:  I do.  I will also tell you this:  I

17    don't know what's been done, if the management fees have been

18    taken.  Obviously, this case will allow the arguments about

19    whether injunctive relief is appropriate for monetary damages

20    and so forth.

21        I will tell you this:  I think it would be fair to say --

22    and you can correct me if I'm wrong -- that if the management

23    fee has not been taken, this court would be surprised and

24    concerned if it is taken in the coming days, in the next week

25    or two while this performance is being undertaken, and I

1    intend to commit.

2           THE COURT:  So you'll make the request of your

3    client?

4           MR. SCHNEIDER:  Yes.

5           THE COURT:  All right.  Let's set a date certain.

6    The 16th at 9:00.

7           MR. THORESON:  That would be fine.

8           THE COURT:  Is that acceptable to the defense?

9           MR. SCHNEIDER:  It's acceptable.  I need to tell you

10   this so you're not surprised later.

11       I will be in London that day checking on Mr. Stootman.

12   No.  Coincidently, I need to be in London, and I believe

13   Mr. McMillan, my partner who is also on the pleadings, I

14   believe will be back from his out-of-town trip, which ends

15   this weekend, and he will be here.  So I'd say yes.

16          THE COURT:  When do you come back?

17          MR. SCHNEIDER:  I leave on the 11th and I come back

18   on the 20th.  It's not just to London.  It's -- it's to the

19   East Coast and then to London.  It's two separate trips.

20          MR. THORESON:  I'm happy to put it over until he

21   returns.

22          THE COURT:  I'd prefer to have you here, Counsel,

23   because unless your co-counsel is going to go back and read

24   the transcript to know precisely what arguments have been

25   made to focus this court's attention --

1    MR. SCHNEIDER:  I'd be happy to be here.  It would be
2    very awkward for me to be here before the 20th.
3        MR. THORESON:  I'm available Friday the 23rd, Your
4    Honor.
5        THE COURT:  The 23rd at 9:00?
6        MR. SCHNEIDER:  I believe that -- I don't have my
7    calendar.  I believe that's fine.
8        THE COURT:  We'll set it to the 23rd of April at 9:00
9    a.m.
10       MR. SCHNEIDER:  Very good.
11       MR. THORESON:  Very good.
12       THE COURT:  Anything further?
13   Counsel, if you'd like, we can have a brief order issued
14   today, if it is an emergency; if not, we can wait until
15   Monday.  What is your preference?
16       MR. SCHNEIDER:  Monday is fine with me, but I
17   wouldn't have an objection if Counsel requires something
18   today.
19       MR. THORESON:  A minute order would be great, and
20   then we'll draft something more encompassing, and we'll get
21   it over to Mr. Schneider Monday morning for him to take a
22   look at, and we can vet it.
23       THE COURT:  Okay.  All right.
24   First of all, counsel, before we leave, I'd like to thank
25   all the parties for coming this afternoon, including the

1    plaintiff's respective clients, and Mr. Stone as well.  I'd

2    also like to thank the extraordinary efforts for engaging of

3    counsel for the defense.  I think oftentimes in emergency

4    circumstances as we have today, it's often more resistance

5    and more of a tug-of-war as opposed to working towards the

6    middle to try to resolve differences.  And I think counsel

7    has done a very good job of doing that.  I'm not trying to

8    praise counsel for the defense unnecessarily, but I think

9    under the circumstances, from what was represented by the

10   plaintiff, I think a lot has been accomplished this

11   afternoon.  Thank you.  We'll be in recess.


13                    (THE PROCEEDINGS CONCLUDED.)

# C E R T I F I C A T E

I, Nancy L. Bauer, CCR, RPR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.

Dated this 8th day of April 2010.

/S/  Nancy L. Bauer

Nancy L. Bauer, CCR, RPR
Official Court Reporter